**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**Nashville Division**

| | | |
|---|---|---|
| Phillip Lawson, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 3:24-cv-00538 |
| v. | ) | |
| | ) | Chief Judge William J. Campbell, Jr. |
| Tre Hargett, in his official capacity as | ) | Magistrate Judge Alistair Newbern |
| Tennessee Secretary of State, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

The State is like Lucy with the football. Desperate to avoid a ruling against an unconstitutional law, the State keeps moving the ball. First, in an earlier action, the State told Judge Richardson that Plaintiffs lacked standing to challenge the constitutionality of Tennessee Code Annotated Section 2-7-115 ("Section 115") because they had not sued the District Attorneys ("DAs") who actually prosecute under that statute. Plaintiffs then did what the State argued was required, but the State now insists that the real danger Plaintiffs face is somehow inadequate. The State fails to recognize that this case has new plaintiffs and factual allegations that further establish threats and credible fear of prosecution more than sufficient to confer standing.

A plaintiff need not be indicted to establish standing, as the State itself argued in a case decided by the Sixth Circuit just last week.[1] And once standing is established for one Plaintiff, the case can proceed for all Plaintiffs. This Court should deny the motion to dismiss.

---

[1] *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, *State of Tennessee, et al. v. U.S. Dep't of Educ., et al.*, No. 3:21-cv-0308, 2021 WL 5757129, at *12 (E.D. Tenn. 2021) ("State DOE Brief") ("a plaintiff need only show a credible threat of prosecution under the challenged law or regulation to establish that [an] enforcement action is certainly impending") (internal citation and quotation marks omitted) (Exhibit A). A court can "take judicial

# I. INTRODUCTION AND RELEVANT PLEADINGS

Some of the Plaintiffs brought a prior case that was dismissed for lack of standing. *See Ashe v. Hargett*, No. 3:23-cv-01256, 2024 WL 923771 (M.D. Tenn. Mar. 4, 2024). The State acts as if that dismissal governs, but it overlooks the important new facts pled in this case. In February, the harms to the prior subset of Plaintiffs were arguably hypothetical,[2] but now they are established facts as a result of the March 2024 primary. This case also has new Plaintiffs whose constitutional rights have been infringed by Section 115. Furthermore, another primary is pending August 1, which will cause yet further danger of prosecution or harm to constitutional rights if this Court does not grant the pending motion for a preliminary injunction.

Dismissal of the prior case was a close call. Judge Richardson noted that he was "receptive[]" to Plaintiffs' fear of future prosecution being sufficient for standing against Defendants Hargett and Goins based on their ability to refer for prosecution and specifically noted that *McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102 (6th Cir. June 20, 2023), was distinguishable. Nevertheless, he ultimately dismissed the case because the injury to Plaintiffs Ashe and Lawson was traceable to the absent DAs, and an injunction as to Hargett and Goins would not redress the problem. *Ashe*, 2024 WL 923771, at \*14. Plaintiffs in this case have cured that problem by naming the DAs as Defendants. Therefore, under the logic of Judge Richardson's prior opinion, Plaintiffs have standing.

Any doubt as to standing is further obviated by the additional facts in the new complaint addressing events since February, as to Lawson and Ambassador Ashe, and adding new Plaintiffs.

---

notice of . . . a brief submitted as part of the proceedings in a different case." *Scotty's Contracting & Stone, Inc. v. United States*, 326 F.3d 785, 789 n.1 (6th Cir. 2003)

[2] Plaintiffs disagree with the prior decision, but have not ignored it. The operative Complaint contains new parties and allegations that remedy any possible deficiencies in the prior case.

- Lawson suffered a concrete injury when he was chilled from voting in the March 2024 Knox County Republican Primary despite his intent to support a Republican candidate in both the primary and general elections. (D.E. 1 ("Compl.") ¶ 15).

- Ambassador Ashe voted in the Knox County Republican Primary in March 2024. Because he reasonably fears that those in control of today's Tennessee Republican Party—who have the power to seek an indictment against him[3]—may not consider him a bona fide member affiliated with the party and because he has publicly stated that he does not know if he is a bona fide member, Ambassador Ashe is subject to prosecution by Defendant DA Charme P. Allen. Compl. ¶ 18.

- Hart was directly and indirectly threatened multiple times by multiple Defendants. Hart voted in the 2024 Madison County Republican Primary after Defendant DA Jody Pickens confirmed for Hart that there was "heat on [Pickens] to prosecute [Hart]" based on articles Hart had written about his vote. Hart also suffered an indirect threat from Defendant Hargett, who came to Madison County shortly after Hart published an article about his voting and gave a speech about how the DA could prosecute people for cross-over voting. Hart also was indirectly threatened by a Madison County Republican Party editorial and by the Party posting a sign at the school board primary elections.[4] Compl. ¶¶ 16-17.

---

[3] This fact should be sufficient. A private party could seek an indictment in the grand jury against Ashe or any other Plaintiff, and it could cost Plaintiffs significant time and resources to fight that effort. Tenn. Code Ann. § 40-12-104.

[4] Hargett's speech and the Party's actions took place in the lead up to the legislature subsequently passing sub-section (c) requiring the sign at all polling places. Compl. ¶¶ 16-17, 71. It appears that the Madison County Republican Party's dispute with Plaintiff Hart may have been the trigger for the legislative change at issue in this case.

- Plaintiff Palmer was chilled from voting in the 2024 Roane County Republican Primary because of the risk of embarrassment of having his right to vote challenged under Section 115. He chose not to vote as a direct result of the challenged statute—a concrete example of the chilling effect of the unconstitutional statute. Compl. ¶ 19.

- As described further below, the League has articulated specific harm to both itself directly and to its members, each of which is sufficient to find standing.

All Plaintiffs have injuries traceable to one or more named Defendants that will be redressed by the declaratory relief and injunction Plaintiffs seek from this Court. These facts are more than sufficient to establish standing at the pleading stage.

The State minimizes or ignores the voter intimidation and threats detailed in the Complaint and essentially asks Plaintiffs and this Court, "Are you gonna believe what you see or what I tell you?"[5] But Plaintiffs' allegations cannot be dismissed so easily. They must be construed in the light most favorable to Plaintiffs, drawing all reasonable inferences in their favor. Plaintiffs have sufficiently pled their standing to challenge the provisions of Section 115; they have plausibly alleged its unconstitutionality; and the States' secondary arguments are without merit.

## II. STANDARD OF REVIEW

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff." *Solomon v. Solomon*, No. 3:21-cv-00498, 2022 WL 610825, at *2 (M.D. Tenn. Mar. 1, 2022). A complaint is sufficient when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[5] Fred Ebb and Bob Fosse, CHICAGO, act 1, sc. 12 (1975).

(citation omitted). "[T]he standard on a motion to dismiss is not whether Plaintiff can prove his claim, but whether he has alleged facts [] from which the court can reasonably infer the defendant is liable for the alleged conduct." *Stanton v. Joyner*, No. 3:19-cv-00270, 2021 WL 4480508, at *9 (M.D. Tenn. Sept. 30, 2021). "Thus, dismissal is appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Solomon*, 2022 WL 610825, at *2. This deferential Rule 12(b)(6) pleading standard applies to facial challenges to standing; meaning that the Plaintiffs need only plausibly allege injury, causation, and redressability. *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015).

The moving party has the burden of proving that no claim exists. *Pinnacle Bank v. Fid. & Deposit Co.*, 598 F. Supp. 3d 666, 670 (M.D. Tenn. 2022). "A motion to dismiss for failure to state a claim is disfavored, especially when one's civil rights are at stake." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012).

## III. PLAINTIFFS HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY OF SECTION 115

### A. The Individual Plaintiffs Have Standing

#### 1. *Applicable Law*

"When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 623-24 (6th Cir. 2016); *see also Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548, 555 (6th Cir. 2021). "When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Accordingly, "[w]hen the plaintiff has alleged an intention to engage in a

5

course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* (quotation omitted).

On the contrary, at the pleading stage, a plaintiff "needed only to plead general facts that would suggest that . . . [he] reasonably feared [actions] might be taken as a result of [his desired] conduct." *Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023) (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015)). In fact, plaintiffs need not admit that they plan to pursue that conduct. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *see also* State DOE Brief at *11 (quoting *Susan B. Anthony List* and noting that "[a]n 'arguable' conflict is sufficient [for a plaintiff to bring a constitutional challenge] under binding precedent").

"[A]ccepting Plaintiffs' allegations as true and drawing all inferences in their favor," if Plaintiffs' fears of prosecution are not "unreasonable" or "imaginary or wholly speculative," a motion to dismiss should be denied. *Block*, 74 F.4th at 410 (quoting *Russell*, 784 F.3d at 1049); *Susan B. Anthony List*, 573 U.S. at 165 (quoting *Babbitt*, 442 U.S. at 298)); *see also Green Party of Tennessee v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (plaintiffs had standing where Tennessee had not enforced or threatened to enforce an election law statute because the State had not "explicitly disavowed enforcing it in the future"); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014) (plaintiff's need to alter conduct to avoid violating an election law "amounts to a credible fear of enforcement") (internal quotation marks omitted).[6] Moreover, an injury satisfies the imminence requirement when the

---

[6] When challenging the constitutionality of federal regulations, the State of Tennessee has advanced exactly the same argument. State DOE Brief at *12; *supra* n.1. The district court agreed, concluding that the state plaintiffs had to choose between the threat of legal consequences or altering their conduct in conformance with the challenged regulations. *State of Tennessee, et al. v.*

conduct that "allegedly violates the law" would continue "in the relatively near future," such as at the next primary election. *State of Tennessee*, 2024 WL 2984295, at *6 (quoting *Kentucky v. Biden*, 23 F.4th 585, 602 (6th Cir. 2022)). Plaintiffs clear this hurdle because they already have and plan to continue to exercise their right to vote in primary elections, or have been chilled from doing so, even where this conduct might allegedly violate the unconstitutionally vague Section 115.[7]

The State argues that Plaintiffs must establish a "certain threat of prosecution," (D.E. 50 ("State Mem.") at 9), but the Sixth Circuit recently explained that "at the pleading stage, the plaintiff 'need[] only to plead general facts that would suggest that . . . [he] reasonably feared [actions] might be taken as a result of [his desired] conduct.'" *Block*, 74 F.4th at 410; *see also* State DOE Brief, 2021 WL 5757129, at *12 ("a plaintiff need only show a credible threat of prosecution under the challenged law or regulation to establish that [an] enforcement action is certainly impending") (internal citation and quotation marks omitted).

## 2.     *The Individual Plaintiffs have standing.*

The Plaintiffs easily meet this burden. Their fear of prosecution under Section 115 is neither "imaginary" nor "speculative." *Babbitt*, 442 U.S. at 298. Lawson reasonably fears prosecution if he votes in the Knox County Republican primary in August because he has voted in general elections for both Democrats and Republicans and has made financial contributions to candidates of both parties. Given his history of supporting both parties, Lawson is deterred and will continue to be deterred from voting in his preferred primary – and possibly any primary at all – because of his fear of prosecution. Compl. ¶ 15.

---

*U.S. Department of Education, et al.*, 615 F. Supp. 3d 807, 823 (E.D. Tenn. 2022), *aff'd* --- F. 4th ----, 2024 WL 2984295 (6th Cir. June 14, 2024).

[7] The State claims that Individual Plaintiffs do not have standing as to the district attorneys in districts in which they do not reside, but Plaintiff LWVTN has members in those districts and has standing as discussed below.

Hart feared prosecution after voting in primary elections and continues to fear prosecution based on: (1) individuals attacking him for voting in the Republican primary because they did not consider him a "bonafide Republican" after he wrote an article in the *Tennessee Lookout*; (2) his name being mentioned in mailers denouncing cross-party voting; (3) the Madison County Republican party threatening legal action against those whom they did not deem Republicans and who voted in the Republican primary; (4) the Madison County Election Commission posting sheets distributed at the school board primary election warning of Section 115(b) even before 115(c) became law, (5) the meeting in which Defendant Hargett discussed how a district attorney could enforce the statute against cross-over voters in the primary; (6) District Attorney Pickens confirming to Hart that there was "heat" to prosecute Hart; and (7) the message to a constituent in which Tennessee Representative Chris Todd called Mr. Hart a "felon." Compl. ¶¶ 16-17

Ambassador Ashe voted in the March 2024 Republican primary and reasonably fears prosecution because of his weekly op-ed column in *The Knoxville News Sentinel,* in which he often criticizes members of the Tennessee Republican party. Ashe is concerned about prosecution because the Republican Party may not consider him a bona fide member. He continues to fear prosecution in the upcoming primary election in August. Compl. ¶ 18.

Palmer reasonably fears prosecution if he votes in a primary after learning of Section 115. Palmer has occasionally placed signs supporting Democratic candidates in his front lawn over the years, though he planned on voting in the March 2024 Republican primary. Palmer chose not to vote due to his fear of prosecution, which could in turn damage his ability to serve as the Chairman of The Industrial Development Board of Roane County. Compl. ¶ 19.

The foregoing demonstrates Plaintiffs feared that voting in a primary election would subject them to prosecution under Section 115 – a fear that is "reasonably founded in fact." *Russell*,

784 F.3d at 1049; *Platt*, 769 F.3d at 452 (holding that a plaintiff's need to alter conduct to avoid violating an election law "amounts to a 'credible fear of enforcement'").

The State tries to overcome this by relying on the factors found in *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016). State Mem. at 9. That reliance is misplaced. First, *McKay* addressed whether there was an injury at the summary judgment stage, not at the motion to dismiss stage. 823 F.3d at 868 ("While mere allegations might have been enough to survive a standing challenge at the motion to dismiss stage, they are insufficient to carry McKay past summary judgment.") (internal quotation marks omitted). Second, while the Sixth Circuit has found them useful for finding a credible threat of prosecution, the *McKay* factors are not exhaustive and each one need not be established. *Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). Further, the factors are only used where there is no other indicia of imminent enforcement and where the allegations involved a "subjective chill" of protected speech. *McKay*, 823 F.3d at 869.[8]

Plaintiffs can separately establish imminence because they have already suffered harm from Defendants' threats, such as Defendant Pickens' statement to Hart and Defendant Hargett's statement about his intention to enforce Section 115, which chill Plaintiffs' wish to vote in the next primary election. *State of Tennessee*, 2024 WL 2984295 at *6 ("For pre-enforcement challenges, a party may establish imminence with 'an adequate showing that sometime in the relatively near future' it will 'continue' an action that 'allegedly violates the law.'"). With another primary in August and no disavowal of enforcement of Section 115, Plaintiffs are left with a Hobson's choice of whether to risk prosecution by voting in a primary or to forego exercise of their right to vote.

---

[8] In any event, "some combination" of the factors is present here. *See Cameron*, 995 F.3d at 550. Enforcement of Section 115 is easier and more likely given the legislature's recent passage of Section 115(c) and the warnings and threats of prosecutions. Moreover, the State has not "disavow[ed] enforcement of the challenged statute" against any Plaintiff, or anyone else for that matter. *Id.*

Importantly, the Sixth Circuit recently distinguished *McKay* in *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019 (6th Cir. 2024), in part because of nature of the challenged law. In *Kareem*, the plaintiff challenged two state criminal election laws, while *McKay* involved a flexible administrative order. 95 F.4th at 1025. As in *Kareem*, Plaintiffs challenge a criminal statute under which the threat of punishment "significantly heightens the risk of chilled expression." *Id.*

Moreover, as in *Kareem*, Plaintiffs offer "additional evidence supporting a credible threat of enforcement." *Id.* First, Defendant Hargett's speech that demonstrates his intention to begin enforcing Section 115, a process in which he plays an investigatory role even if he is not the prosecutor himself. Compl. ¶ 16. Second, Republican candidates in Williamson County who challenged elections based on "crossover voting" and identified voters who allegedly would be unable to vote in the primary election. *Id.* at ¶ 72. Third, disputes over a similar "discord over bonafides and crossover voting" in Hamilton County and whether a candidate for U.S. Congress in the 5th Congressional district could appear on the Republican primary ballot. *Id.* Fourth, Chairman Rudd discussing how two individuals are "currently under indictment … for organizing crossing over into the other party's primary" on the Tennessee House floor. *Id.* at ¶ 73. Fifth, Defendant Jason Lawson, DA for the 15th District, providing advice to Mae Beavers, Chairman of the Wilson County Republican Party, on how the prosecution process should proceed in light of evidence that someone violated Section 115. *Id.* at ¶ 75.

In light of these facts, all individual Plaintiffs have met their burden to allege injury-in-fact. *See, e.g.*, *Steffel*, 415 U.S. at 459; *Green Party of Tennessee*, 791 F.3d at 696; *Crookston v. Johnson*, 370 F. Supp. 3d 804, 811 (W.D. Mich., 2018) (plaintiff had standing where "future elections are certainties" and the plaintiff would have engaged in conduct in future elections if not for criminal penalties proscribed by state law); *Hill v. Williams*, No. 16-CV-02627-CMA, 2016

WL 8667798, at *2 (D. Colo. Nov. 4, 2016) (injury-in-fact where plaintiff received a warning from an employee of the Attorney General's Office even though the Attorney General and various DAs disavowed an intent to prosecute).

Plaintiffs' injuries are fairly traceable to the statute that the Defendants either interpret, administer, or enforce. The burden to allege traceability is "relatively modest" and even an indirect harm may be "fairly traceable." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (internal citations omitted). Moreover, Plaintiffs' injuries would be redressed by the declaratory and injunctive relief sought in the complaint, which would prohibit Defendants from enforcing Section 115. Here, Plaintiffs would no longer fear prosecution or experience voter intimidation if this Court were to issue the requested declaratory and injunctive relief. Defendants incorrectly contend that no Plaintiff has standing to sue Hargett and Goins because they lack prosecutorial authority. State Mem. at 7. But Hargett and Goins are proper defendants as to the posting of the challenged signs pursuant to Section 115(c), which falls within their authority over election administration rather than any decision to prosecute. Thus, Plaintiffs have properly alleged all elements of standing: injury-in-fact, traceability, and redressability. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

B. <u>The League Has Standing</u>

The State's challenges to the League's standing also fail. As discussed above, standing "'is not intended to be a particularly high bar; instead, the doctrine serves to prevent a litigant from raising another's legal right.'" *Brasfield & Gorrie, LLC v. Harrod Concrete & Stone Co.*, 534 F. Supp. 3d 747, 754–55 (E.D. Ky. 2021) (citing 59 Am. Jur. 2d Parties § 29 (2020)). The League has articulated specific harm to both itself and to its members, each of which is sufficient to find standing, particularly at the motion to dismiss stage.

1. *Organizational Standing: The League Has Pled Specific Diversion of Resources and Impairment of Mission Tied to the Challenged Statutes.*

The Sixth Circuit has long recognized organizational standing when an organization experiences a "frustration" of its mission due to an unconstitutional law. *E.g.*, *Hughes v. Peshina*, 96 F. App'x 272, 274 (6th Cir. 2004) (organization had standing where it "divert[ed] its resources away from the other housing services it provide[d] . . . *frustrating its mission of insuring fair housing practices*." (emphasis added)); *League of Women Voters of Michigan v. Johnson*, 352 F. Supp. 3d 777, 801 (E.D. Mich. 2018), *rev'd and remanded with regard to intervenors only*, 2018 WL 10096237 (6th Cir. Dec. 20, 2018) ("An organization suffers an injury in fact when its mission is 'perceptibly impaired' by the challenged action, which it may show through a 'demonstrable injury to the organization's activities' and a 'consequent drain on the organization's resources.'").[9]

Recognizing that the League has adequately pled diversion of resources, the State relies on *Fair Elections Ohio* to argue that such an expenditure is insufficient to confer standing. 770 F.3d 456. But this argument has been rejected by the Sixth Circuit. In *Online Merchants Guild v.*

---

[9] The State filed a Notice of Supplemental Authority (D.E. 53) noting the recent decision in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 144 S.Ct. 1540, 1563 (2024). That case is distinguishable. In *FDA*, the Alliance for Hippocratic Medicine (the "Alliance") claimed they had standing "based on their incurring costs to oppose FDA's actions." 144 S.Ct. at 1563. But the Court determined that the Alliance's costs were simply part of its litigation strategy, *i.e.*, not a part of a non-litigation mission. The Alliance (an organization formed not long before the lawsuit was filed) was formed *in order to* challenge the legality of mifepristone. The Court found that the Alliance's activity was simply an example of "expending money to gather information and advocate against the defendant's action" and that an "organization cannot manufacture its own standing in that way." *Id.* at 1563-64. This is consistent with longstanding law from both the Supreme Court and the Sixth Circuit. *See, e.g., Spann v. Colonial Vill., Inc.,* 899 F.2d 24, 27 (D.C. Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.")). *Alliance* did not purport to overrule standing based on diversion of resources but rather to analyze an organization like the Alliance under the pertinent legal test. The Alliance stands in sharp contrast to the League of Women Voters of Tennessee, which has existed since 1920, has longstanding mission objectives independent of this litigation, and whose resources are being demonstrably diverted based on voter confusion and concern over threatening signs and signals from state officials that they will prosecute voters.

*Cameron*, the Sixth Circuit held that expenditures by the plaintiff organization responding to the purportedly illegal action satisfied organizational standing requirements. 995 F.3d at 547-49. The *Online Merchants Guild* defendants—much like Defendants here—argued that the plaintiff's "expenditures [failed] to establish direct organizational standing because they fall within its mission to advocate for the interests of online merchants." *Id.* at 548. The Sixth Circuit held that defendant's "sweeping proposition" that there is no diversion of resources, and thus no injury-in-fact, where an organizational plaintiff's new expenditures are actually part of the organization's mission, would contradict "various earlier—and thus controlling—cases . . . from this circuit, not to mention Supreme Court precedent, all of which affirm that within-mission organizational expenditures are enough to establish direct organizational standing." *Id.* at 548; *see also League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719, 728–29 (S.D. Ohio 2020) (finding organizational standing despite the fact that there was "not a change in law" but rather a "significant change in circumstances").[10] The Court should similarly reject the State's arguments here and find that the League has organizational standing.

Turning to the allegations in the Complaint, which the Court must accept as true, the League has sufficiently pled harm to the organization both on an "impairment of mission" basis as well as a "diversion of resources" basis. Specifically, the League cannot focus on other planned initiatives *or* give accurate (or even helpful) advice to its members and voters because of the challenged statutes themselves, the presence of the threatening signs at polling locations, the announced prosecutorial intentions, and the patchwork enforcement regime:

---

[10] *See also Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 806 (E.D. Mich. 2020) ("Contrary to defendant's suggestion that the Sixth Circuit rejected the diversion of resources theory of standing in *Fair Elections Ohio v. Husted*, the theory is alive and well in this Circuit. As plaintiffs point out, a multitude of cases support this theory." (citing cases)).

> Indeed, the top subject of voter inquiries to the League leading up to the March 5, 2024 primary was Sections 115(b) and (c). The vagueness of Sections 115(b) and (c) frustrated the ability of LWVTN to advise voters concerning their eligibility.

> [G]iven the League's core mission and activities to educate, inform, engage, and assist voters, the statute prevents LWVTN from fulfilling its primary function of providing voter information because it does not know how to inform its members and the general public accurately and effectively on voting issues related to the upcoming primaries. . . .

(Compl. at ¶¶ 22-24.)

In the prior case, Judge Richardson found the League lacked standing, not because its expenditure of resources or impairment of mission were not tied to the challenged statutes, but because the Court determined that the alleged expenditures were too speculative given that there had not yet been a showing of voter confusion or intimidation. *See, e.g., Ashe*, 2024 WL 923771, at *11. This concern is no longer present. Unfortunately, having failed to secure an injunction before the March 5, 2024 primary, the voter confusion and intimidation that the League predicted have now come to pass:

> During election seasons, LWVTN sees an uptick in the number of requests by phone or by email from members of the public with specific questions regarding their own eligibility to vote or their access to a ballot. *LWVTN experienced a similar uptick in inquiries related to the recent March 5, 2024 primary, but significantly more questions focused on the challenged provisions and whether the voter would be eligible to vote in the upcoming primary. Indeed, the top subject of voter inquiries to the League leading up to the March 5, 2024 primary was Sections 115(b) and (c).* The vagueness of Sections 115(b) and (c) frustrated the ability of LWVTN to advise voters concerning their eligibility. Moreover, *LWVTN received reports from members and other persons about Tennessee voters being deterred from voting during the March 5, 2024 primary because they were concerned about their eligibility given Sections 115(b) and/or (c).*

(Compl. at ¶ 22 (emphasis added); *see also, e.g.,* Decl. of Debby Gould, D.E. 44-5, at ¶ 36 ("Before and after the March 5th primary, I received many communications from LWVTN members and poll observers related to confusion around Sections 115(b) and (c) and frustration about how the law is deterring Tennesseans from voting."); Supplemental Decl. of Debby Gould, attached as

**Exhibit 1**, at ¶ 6 (describing and attaching unsolicited email from Knoxville voter stating that in the last primary she "did not vote in the Republican primary because [she] was afraid and confused" and that "the new law kept [her] from voting in the primary of [her] choice.").)

The State attempts to cast the League's actions as "efforts and expense to advise others how to comport with the law" and "efforts and expense to change the law," and that therefore the challenged statutes "do not impair or impede the League's mission." State Mem. at 13 (citing *Husted*, 770 F.3d at 460). But the League's efforts are far from advising citizens "how to comport with the law." How could the League do so with such unconstitutional vagueness and a patchwork enforcement regime? The League's core mission of voter turnout, voter education, and voter engagement have been hijacked by the challenged statutes. The League's allegations are that it spent an inordinate amount of time and money dealing with the ramifications of these laws, as well as the attendant confusion, fear, and intimidation among its members and the voters it serves.

Just as importantly, the prior Court's chief concern with the League's expenditures (diversion of resources) was whether they would *actually* occur. This is no longer an issue:

> During the 2023-24 fiscal year, LWVTN invested a considerable amount of its most valuable asset—volunteer time—addressing the impact of Sections 115(b) and (c). LWVTN spent over 225 collective volunteer hours responding to the new law. Additionally, over $1,000 was spent on support services and resources connected with that volunteer time. Had that time and money not been spent on responding to Sections 115(b) and (c), the League would have dedicated those resources to developing two time-sensitive pilot projects that were included in the budget for fiscal year 2023-24. . . . The urgent need to address the impact of Sections 115(b) and (c) on Tennessee's voters required LWVTN to forego plans for the two pilot projects.

(Compl. at ¶ 25.) This diversion of resources and impairment to the League's mission was budgeted to continue after the filing of this lawsuit. (Compl. at ¶¶ 26-27 (detailing $10,600 in additional anticipated expenses relating to Section 115).) And, as shown in the supplemental declaration of Debby Gould, President of LWVTN (Exhibit B), those expenditures *have been made*

(and will continue, absent the Court's intervention): "As of today, the League has already spent $8,406.95 of the budgeted items described in my prior Declaration connected directly to Sections 115(b) and (c). (Ex. B at ¶ 7.)

Absent the challenged statutes, the newly announced zeal for the enforcement, and the consequent fear, confusion, and intimidation among voters (including members of the League), the League would be focusing its time, energy, and monetary resources on other projects and other initiatives. This is the *sine qua non* of organizational standing: impairment of mission and diversion of resources because of the challenged statutes.

2. *Representational Standing: The League Has Pled Specific Diversion of Resources and Impairment of Mission Tied to the Challenged Statutes.*

With respect to representative standing, an organization "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n.*, 432 U.S. 333, 343 (1977). The State does not challenge representative standing on the basis of the second or third elements; rather, they argue that the League "never identif[ies] a member who has suffered (or is about to suffer) a concrete and particularized injury." State Mem. at 14 (internal quotation omitted). Aside from the legally incorrect assertion that the League has to actually give the name of a specific member[11]

---

[11] *See, e.g., Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 463 (1958) (reversing order for production of NAACP member lists); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024) ("Indeed, there is longstanding Supreme Court authority supporting standing for organizations whose injured members are not named."). *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) is consistent with this case law. There, the Sixth Circuit did not take issue with the use of two "John Doe" members of the Association; it took issue with the allegations of harm as to those two "named" members themselves.

when the League has alleged that one or more of its members have suffered injuries, the supplemental affidavit of Debby Gould (Ex. B) establishes both the harm at issue and names a specific member.[12] As discussed above, the enactment of sections 115(b) and 115(c)—together with the public statements of Defendant Hargett, the District Attorney Defendants, and others— establishes the (1) harm traceable to Section 115(c) (i.e., voter confusion, intimidation, and fear and lack of ability by LWVTN members and poll workers to engage and inform voters) and (2) a reasonable fear of prosecution on behalf of Plaintiffs and other voters. As such, the League has demonstrated representational standing as well.

## IV. STATE DEFENDANTS DO NOT HAVE SOVEREIGN IMMUNITY

In a two-page aside, the State also argues that Defendants enjoy sovereign immunity, notwithstanding the well-settled *Ex Parte Young* exception for actions seeking to enjoin prospective enforcement of unconstitutional statutes by state officials. *Ex parte Young*, 209 U.S. 123 (1908); *Diaz v. Mich. Dep't of Corrections*, 703 F.3d 956, 964 (6th Cir. 2013). The sovereign immunity argument is just a repackaging of the State's standing arguments. As discussed above, those arguments fail at the pleadings stage, whether cast as standing or immunity defenses.

Although States, state agencies, and their officials enjoy 11th Amendment and sovereign immunity for their official actions, such immunity does not extend to actions for prospective relief, such as enjoining enforcement of an illegal statute. *See, e.g.*, *Hile v. Michigan*, 86 F.4th 269, 274 (6th Cir. 2023); *Morgan v. Bd. of Prof'l Responsibility*, 63 F.4th 510, 515-18 (6th Cir. 2023); *L.E. by Esquivel v. Lee*, No. 3:21-cv-00835, 2024 WL 1349031, *11-12 (M.D. Tenn. Mar. 29, 2024); *Durham v. Martin*, 388 F. Supp. 3d 919, 935-37 (M.D. Tenn. 2019). The State argues that the

---

[12] If the Court believes that the few additional clarifications in the Supplemental Declaration are critical to the standing analysis, Plaintiffs request leave to amend their Complaint.

individual Plaintiffs are somehow not "really threatened" with enforcement of the challenged law. State Mem. at 17. As noted above, in response to such a facial attack, all that is required is that the complaint allege facts sufficient to show that the case falls within the *Ex parte Young* exception. *Russell*, 784 F.3d at 1049. Plaintiffs have done so here.

The application of *Ex parte Young* to Defendants Hargett and Goins is well illustrated by *Russell v. Lundergan-Grimes*, a challenge by a landowner to Kentucky's 300-foot electioneering prohibition. In addition to local officials who had previously removed signs from his property, Russell sued the Kentucky Attorney General and Kentucky State Board of Elections (KSBE). The Sixth Circuit held that *Ex parte Young* applied to the Attorney General because of his shared role in enforcement and prosecution of election law violations. *Id*. at 1047. Even though the KSBE lacked such prosecutorial powers, it administered the challenged law and had a role in its implementation. *Id*. at 1048-49. That role was sufficient to bring the state officials within the *Ex parte Young* exception when sued in their official capacities for injunctive relief to restrain implementation of the unconstitutional ban. *Id*. This same analysis governs Defendants Hargett and Goins here, who administer the challenged law, investigate alleged violations, and may refer matters to local DA's for prosecution. Complaint ¶¶ 28, 29; Tenn. Code Ann. §§ 2-4-108(a); 2-11-202. They have "some connection" to the challenged law to bring the claims within *Ex parte Young*. *See Prairie Band Potawotami Nation v. Wagnon*, 476 F.3d 818, 827-28 (10th Cir. 2007).

With respect to the individual District Attorneys, the State returns to its theme that Plaintiffs have failed to allege sufficient certainty as to prosecution to secure prospective injunctive relief under *Ex parte Young*. Again, what is required at this stage is sufficient *allegations* to show entitlement to such relief. *Russell*, 748 F.3d at 1049. *See generally* Compl. ¶¶ 15-22, 70-76, 102-05. Plaintiffs name as defendants state officials who administer and enforce the challenged law, in

their official capacity only, and seek only prospective declaratory and injunctive relief. Complaint ¶¶ 28-53. Such claims for prospective relief against state officials sued in their official capacity fall squarely within the *Ex parte Young* exception. *Russell*, 784 F.3d at 1045-49.

## V. PLAINTIFFS HAVE PROPERLY PLED THAT SECTION 115 IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD

The Complaint lays out in plain terms the constitutional infirmities of Sections 2-7-115(b) and (c). These allegations exceed the threshold for notice pleading under *Iqbal*, 556 U.S. at 678, and related cases. As explained (and incorporated by cross-reference) in Plaintiffs' brief in support of their motion for preliminary inju\nction, the State violates the Due Process Clause when it requires—under threat of criminal penalty—that Tennesseans be "bona fide" members of a political party to vote in a primary without providing any definition or method for demonstrating such bona fides. (D.E. 44 ("PI Mem.") at 18-24.) Likewise, Sections 2-7-115(b) and (c) are unconstitutionally overbroad because they chill Tennesseans from engaging in political speech or casting a primary ballot out of fear that their "bona fide" political affiliation could be called into question. As stated in the Complaint and discussed below, each of the plaintiffs have engaged in core First Amendment political speech and, as a result, fear retaliation—indeed criminal prosecution—under a vague criminal statute when they vote in a primary. They reasonably believe that to both speak their minds and vote their conscience exposes them to threat of prosecution under Section 115. This is a First Amendment freedom of speech and association claim subject to overbreadth challenge and a facial attack.

The State's Motion to Dismiss largely declines to address the merits of Plaintiffs' claims as pled. Instead, the State attempts to sidestep vagueness and overbreadth altogether by arguing that Plaintiffs should have brought a different claim under the *Anderson-Burdick* doctrine used to challenge undue burdens on the right to vote. State Mem. at 18 ("Plaintiffs cannot repackage a

voting-rights claim as a First Amendment overbreadth claim."). But that is a straw man; it is the State that attempts to rewrite the well-pled claims in the Complaint.

The State's argument relies on a series of unsupported logical leaps: (1) that Plaintiffs' core claim is a "voting rights claim," (2) that Plaintiffs therefore needed to bring a challenge pursuant to *Anderson-Burdick* balancing analysis, (3) that *Anderson-Burdick* doctrine bars Plaintiffs from bringing a First Amendment claim, and (4) that because Plaintiffs do not have a First Amendment claim, they cannot bring an overbreadth or facial vagueness challenge to Sections 2-7-115(b) and (c). State Mem. at 17-19. Each of these assertions is mistaken in whole or in part. First, the State begins with a faulty premise, citing *Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023), for the categorical proposition that "voting-rights claims—even those that might implicate First Amendment rights—are subject to the Supreme Court's *Anderson-Burdick* framework, not the usual First Amendment analyses." State Mem. at 18. But *Lichtenstein* held, to the contrary, that "the Supreme Court *has not applied the* Anderson-Burdick *test to all First Amendment claims in the election or voting context*. For example, it has applied strict scrutiny—not *Anderson-Burdick* balancing—to many election laws[.]" 83 F.4th at 593 (emphasis added). Indeed, in *Lichtenstein* itself, the plaintiffs brought claims under both the First Amendment and *Anderson-Burdick* side-by-side and the Sixth Circuit analyzed each, determining that a First Amendment analysis governed. *Id.* at 593–94. This contradicts the State's contention that all claims implicating voting are automatically channeled into one framework.

The touchstone of Plaintiffs' Complaint is straightforward: the State has imposed an unconstitutionally vague criminal penalty that chills individuals both from voting in primaries and also from engaging in other forms of core political expression. The Complaint's First Amendment overbreadth claim is an appropriate analytical lens for at least two reasons. First, Plaintiffs

challenge the chilling effect caused by the threat of criminal prosecution rather than an election regulation that prevents them from voting. In *Lichtenstein*, the court outlined categories of cases where courts typically apply *Anderson-Burdick*, including when reviewing administrative barriers a person must surmount in order to vote, such as photo identification requirements, *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), or regulations "prevent[ing] some . . . voters from casting in-person early ballots." *Obama for Am. v. Husted*, 697 F.3d 423, 425 (6th Cir. 2012); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (*Anderson-Burdick* applies to administrative "mechanics of the electoral process").[13] But the issue here is not that there is a hurdle barring Plaintiffs from casting a ballot, it is that the State has failed to even explain what the hurdle requires and threatens voters with criminal prosecution if they vote and get it wrong.

Consider as an example a state seeking to prevent vote-buying schemes by enacting a statute prohibiting "inducing any individual to vote for or against a candidate." Even if the state's purpose were entirely legitimate, such a law would likely be overbroad because it sweeps in large swaths of constitutionally protected advocacy on behalf of candidates. It would be both inconsistent with precedent and passing strange to evaluate such a law under *Anderson-Burdick* simply because the law involves voting -- it would not even be clear how to weigh the burden of prosecution threats under the balancing analysis. Instead, the most appropriate lens, as here, would be First Amendment overbreadth. Nothing in *Lichtenstein* or *Anderson-Burdick* precedent would preclude such a claim.

---

[13] The State incorrectly suggests that where *Anderson-Burdick* applies, a plaintiff loses their First Amendment claims. To the contrary, the Sixth Circuit has clarified that the analysis is based on *both* the First and Fourteenth Amendment. *Obama for Am.* 697 F.3d at 430 n.2. That makes sense because the act of voting can constitute political expression simultaneously protected by the First Amendment. *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 313-16 (2004) (Kennedy, J., concurring).

Furthermore, Sections 2-7-115(b) and (c) infringe not just on voting but also on Plaintiffs' political advocacy and protected speech far away from the ballot box. The State contends that Plaintiffs did not "identify exactly what expressive conduct is supposedly restricted," Mot. at 20. But the Complaint includes a panoply of allegations concerning the chilling effect on Plaintiffs' political speech. For instance, Ambassador Ashe "writes a weekly op-ed column for The Knoxville News-Sentinel in which he regularly criticizes former President Trump and elected Tennessee Republicans" leading him to "reasonably fear[] that the people in control of today's Tennessee Republican Party may not consider him a bona fide member affiliated with the party and could seek to prosecute him." Compl. ¶ 18. Likewise, Hart wrote an article in the *Tennessee Lookout* explaining his vote in the Republican mayoral primary in Madison County, then was informed that he was under heat to be prosecuted. *Id*. And Palmer planned to vote in the March 2024 Republican Primary but refrained after learning of Sections 2-7-115(b) and (c) because he had occasionally placed campaign signs supporting Democratic candidates in his yard. Compl. ¶ 19. Lawson gives openly to candidates of both parties and is worried about voting in either primary as a result. Compl. ¶ 15. Plaintiff LWVTN also has a constitutionally protected right to communicate with voters and encourage them to participate as voters. But the law at issue has a palpable chilling effect on the League's core mission and right to communicate with Tennesseans about voting. Compl. ¶ 23. While overbreadth challenges properly rely on the potential impact of a law on would-be speakers, this is hardly an abstract problem. The Complaint contains clear,  concrete allegations delineating the chilling effect already occurring.

The State's remaining objections collapse because they rest on false premises. It asserts, for example, that "Plaintiffs cannot allege that First Amendment freedoms are . . . infringed." Mot. at 21. But as noted *supra*, the First Amendment and often "strict scrutiny—not Anderson-Burdick

balancing—[apply] to many election laws." *Lichtenstein*, 83 F.4th at 593. So Plaintiffs can and have alleged an independent First Amendment violation. But Defendants' have further misunderstood the doctrine by implying that a First Amendment claim is a necessary predicate for any vagueness challenge. Not so. The *Kolender* plaintiff brought only due process and Fourth Amendment claims, not one under the First Amendment. *See* 461 U.S. at 355. As the Supreme Court has explained, "imprecise laws can be attacked on their face under *two different doctrines*. First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights . . . Second, *even if an enactment does not reach a substantial amount of constitutionally protected conduc*t, it may be impermissibly vague[.]" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (emphasis added) (internal quotation omitted); *see also id*. at 55 (rejecting First Amendment claim but affirming facial invalidation under vagueness analysis). Though related, these doctrines represent independent claims with distinct, complementary analytical lenses. Here, the criminal sanctions at issue are aimed directly at citizens' political allegiances and impose substantial, overbroad burdens on their First Amendment right to free speech and association. But setting those concerns aside entirely, "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." *Morales*, 527 U.S. at 55.

Finally, even presuming *Anderson-Burdick* were applicable, there would be no legitimate state interest in preventing crossover voting through such an ambiguous eligibility requirement. A threat of criminal prosecution for voting is certainly "severe." *Crawford*, 553 U.S. at 190. There are many tools available to a state seeking to regulate participation in political primaries. But if it chooses to impose criminal penalties on those engaged in crossover voting, the State must meet its constitutional obligations to provide notice to citizens about what behavior is forbidden and not to chill protected speech.

## VI. THE COURT SHOULD NOT ABSTAIN UNDER THE *PULLMAN* DOCTRINE

The State objects to Plaintiffs "opportunistically" defending their constitutional rights, and asks the Court to abstain from ruling under the *Pullman* Doctrine until a state court resolves Section 115's many ambiguities.[14] But this approach has already been rejected. *See Fowler v. Benson*, 924 F.3d 247, 255 (6th Cir. 2019) (citing *Zwickler v. Koota*, 389 U.S. 241, 251 (1967) ("abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim")).

The State also fails to acknowledge the severe limitations of the *Pullman* Doctrine, which "is an extraordinary and narrow exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it." *Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017) (quoting *Cty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959)). But the Doctrine is a "judge-made doctrine of abstention" that should be applied "only in narrowly limited 'special circumstances.'" *Garvin v. Rosenau*, 455 F.2d 233, 237 (6th Cir. 1972) (quoting *Zwickler*, 389 U.S. at 248). This is, in part, because "application of *Pullman* abstention results in significant financial and time burdens on the parties . . . ." *Id.* at 750. "In order to 'give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims,' *Pullman* abstention should rarely be applied." *Porter v. Jones*, 319 F.3d 483, 492 (6th Cir. 2003).

The *Pullman* Doctrine is inapplicable in this case.

As a general rule, abstention is not appropriate in cases challenging the constitutionality of a statute on grounds of vagueness and overbreadth, for the reasons that such statutes often are not subject to a saving construction, which would eliminate or narrow the federal issues, and that delayed resolution of state law questions implicating important federal constitutional rights should be avoided.

---

[14] Under the doctrine "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984).

*Record Revolution No. 6, Inc. v. City of Parma*, 638 F.2d 916, 925 (6th Cir. 1980), *vacated on other grounds*, 456 U.S. 968 (1982). Courts have recognized that "the delay that comes from abstention may itself chill the First Amendment rights at issue." *Porter*, 319 F.3d at 492-93 (citing *Zwickler*, 389 U.S. at 252).

Moreover, although the State asserts that state courts "may" interpret Section 115 in a way dodges the constitutional questions, State Mem. at 24, it offers no reasonable interpretation of the plain language of the statute that can save it. Abstention is not appropriate unless the statute at issue "is obviously susceptible to a limiting construction." *Amusement Devices Ass'n v. State of Ohio*, 443 F. Supp. 1040, 1049 (S.D. Ohio 1977) (quoting *Zwickler*, 389 U.S. at 251 n.14); *see also Planned Parenthood of Cent. New Jersey v. Farmer*, 220 F.3d 127, 150 (3d Cir. 2000) ("If the statute is not obviously susceptible of a limiting construction, then . . . it is the duty of the federal court to exercise its properly invoked jurisdiction.").[15] Section 115 cannot be salvaged and State's abstention request should be denied.

## CONCLUSION

For all these reasons, the State's Motion to Dismiss should be denied.

---

[15] *See also Farmer*, 220 F.3d at 150 ("even applying 'judicial surgery,' [courts] are not empowered to completely rewrite statutes"); *Record Revolution No. 6, Inc.*, 638 F.2d at 925 ("The Ohio courts, like federal courts, cannot rewrite the language of a statute. Only such judicial rewriting of the [] ordinances could save their constitutionality. This factor strongly undercuts the argument for abstention.") (internal citations omitted); *Tennessee Educ. Ass'n v. Reynolds*, No. 3:23-cv-00751, 2024 WL 1942430, at *15 (M.D. Tenn. May 2, 2024) ("Even if Tennessee courts resolved dozens of cases related to the Act, there is little reason to think that it would change the core issue: that the language within the four corners of the Act simply does not set out a meaningful standard."); *Michigan Wolfdog Ass'n, Inc. v. St. Clair County*, 122 F. Supp. 2d 794, 801 (E.D. Mich. 2000) (when "a state statute is so vague that persons to whom it applies cannot understand what is required of them, then a federal court need not abstain because it is unlikely that a state court could narrowly interpret the statute enough to avoid a constitutional question").

Dated: July 1, 2024

Respectfully submitted,

/s/ R. Culver Schmid
R. Culver Schmid, BPR No. 011128
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
265 Brookview Centre Way, Suite 600
Knoxville, TN 37919
Tel.: (865) 971-5103
cschmid@bakerdonelson.com

Gary Shockley, BPR No. 010104
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, TN 37203
Tel.: (615) 726-5600
gshockley@bakerdonelson.com

Eric G. Osborne, BPR No. 029719
Christopher C. Sabis, BPR No. 030032
William L. Harbison, BPR No. 007012
Micah N. Bradley, BPR No. 038402
Frances W. Perkins, BPR No. 040534
Brettson J. Bauer, BPR No. 039289
Sherrard Roe Voigt & Harbison, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
eosborne@srvhlaw.com
csabis@srvhlaw.com
bharbison@srvhlaw.com
mbradley@srvhlaw.com
fperkins@srvhlaw.com

*Counsel for Plaintiffs Victor Ashe, Phillip
Lawson, Gabe Hart & James R. Palmer*

John E. Haubenreich, BPR No. 029202
The Protect Democracy Project
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
Tel.: (202) 579-4582
john.haubenreich@protectdemocracy.org

Orion Danjuma (*pro hac vice*)
The Protect Democracy Project

82 Nassau St. #601
New York, NY 10038
Tel.: (202) 579-4582
orion.danjuma@protectdemocracy.org

Collin P. Wedel (*pro hac vice*)
Arsham Ali Askari (*pro hac vice*)
Christine Karaoglanian (*pro hac vice*)
Sidley Austin LLP
350 South Grand Avenue
Los Angeles, CA 90071
Tel.: (213) 896-6000
cwedel@sidley.com
aaliaskari@sidley.com
ckaraoglanian@sidley.com

Rebecca B. Shafer (*pro hac vice*)
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Tel.: (312) 853-7000
rshafer@sidley.com

Jillian Sheridan Stonecipher *(pro hac vice)*
Sidley Austin LLP
1501 K Street NW
Washington, D.C. 20005
Tel.: (202) 736-8000
jstonecipher@sidley.com

*Counsel for Plaintiff League of Women Voters of Tennessee*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2024 a true and exact copy of the foregoing Response in Opposition to Motion to Dismiss is being served via the Court's CM/ECF system and email upon the following:

Zachary L. Barker
Assistant Attorney General
Public Interest Division
P.O. Box 20207
Nashville, Tennessee 37202
Zachary.Barker@ag.tn.gov

Dawn Jordan
Special Counsel
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Dawn.Jordan@ag.tn.gov

*/s/ Eric G. Osborne*
Eric G. Osborne