# EXHIBIT A

2021 WL 5757129 (E.D.Tenn.) (Trial Motion, Memorandum and Affidavit)
United States District Court, E.D. Tennessee,
Knoxville Division.

THE STATE OF TENNESSEE, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al., Defendants.

No. 3:21-cv-00308-CEA-DCP.
October 8, 2021.

**Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss**

Steve Marshall, Attorney General of Alabama, A. Barrett Bowdre [*], Deputy Solicitor General, State of Alabama, Office of the Attorney General, 501 Washington Ave., Montgomery, AL 36130, (334) 242-7300, barrett.bowdre@alabamaag.gov, Counsel for State of Alabama.

Mark Brnovich, Attorney General of Arizona, Kate B. Sawyer [*], Assistant Solicitor General, Office of the Arizona Attorney General, 2005 N. Central Ave., Phoenix, AZ 85004, (602) 542-8304, kate.sawyer@azag.gov, Counsel for State of Arizona.

Christopher M. Carr, Attorney General of Georgia, Drew F. Waldbeser [*], Deputy Solicitor General, Office of the Georgia Attorney General, 40 Capitol Square, S.W., Atlanta, GA 30334, (404) 458-3378, dwaldbeser@law.ga.gov, Counsel for State of Georgia.

Lawrence G. Wasden, Attorney General of Idaho, W. Scott Zanzig [*], Deputy Attorney General, Office of the Idaho Attorney General, P.O. Box 83720, Boise, ID 83720, (208) 332-3556, scott.zanzig@ag.idaho.gov, Counsel for State of Idaho.

Theodore E. Rokita, Attorney General of Indiana, Thomas M. Fisher [*], Solicitor General, Office of the Indiana Attorney General, IGC-South, Fifth Floor, 302 West Washington St., Indianapolis, in 46204, (317) 232-6255, tom.fisher@atg.in.gov, Counsel for State of Indiana.

Lynn Fitch, Attorney General of Mississippi, Justin L. Matheny [*], Deputy Solicitor General, State of Mississippi, Office of the Attorney General, P.O. Box 220, Jackson, MS 39205, (601) 359-3680, justin.matheny@ago.ms.gov, Counsel for State of Mississippp.

Eric S. Schmitt, Attorney General of Missouri, D. John Sauer [*], Solicitor General, Office of the Missouri Attorney General, P.O. Box 899, Jefferson City, MO 65102, (573) 751-8870, john.sauer@ago.mo.gov, Counsel for the State of Missouri.

Austin Knudsen, Attorney General of Montana, Davis M.S. Dewhirst, Solicitor General, Christian B. Corrigan [*], Assistant Solicitor General, Office of the Montana Attorney General, 215 North Sanders, P.O. Box 201401, Helena, MT 59620, (406) 444-2707, christian.corrigan@mt.gov, Counsel for State of Montana.

Alan Wilson, Attorney General of South Carolina, J. Emory Smith, Jr. [*], Deputy Solicitor General, Office of the South Carolina Attorney General, P.O. Box 11549, Columbia, SC 29211, (803) 734-3680, esmith@scag.gov, Counsel for State of South Carolina.

Jason R. Ravnsborg [*], Attorney General of South Dakota, Office of the South Dakota Attorney General, 1302 East Highway 14, Suite 1, Pierre, SD 57501, (605) 773-3215, jason.ravnsborg@state.sd.us, Counsel for State of South Dakota.

Herbert H. Slatery Iii, Attorney General and Reporter of Tennessee, Andree S. Blumstein, Solicitor General, Sarah K. Campbell [*], Associate Solicitor General, Clark L. Hildabrand [*], Brandon J. Smith [*], Assistant Solicitors General, Matthew D. Cloutier, Assistant Attorney General, Office of the Tennessee Attorney General and Reporter, P.O. Box 20207, Nashville, TN 37202, (615) 741-7908, matt.cloutier@ag.tn.gov, Counsel for State of Tennessee.

Treg R. Taylor, Attorney General of Alaska, Jessica M. Alloway [*], Solicitor General, State of Alaska, 1031 West Fourth Avenue, Suite 200, Anchorage, AK 99501, (907) 465-3600, jessie.alloway@alaska.gov, Counsel for State of Alaska.

Leslie Rutledge, Attorney General of Arkansas, Nicholas J. Bronni [*], Solicitor General, Vincent M. Wagner, Deputy Solicitor General, Office of the Arkansas Attorney General, 323 Center St., Suite 200, Little Rock, AR 72201, (501) 682-6307, nicholas.bronni@arkansasag.gov, Counsel for State of Arkansas.

Derek Schmidt, Attorney General of Kansas, Kurtis K. Wiard [*], Assistant Solicitor General, Office of the Kansas Attorney General, 120 S.W. 10th Ave., Topeka, KS 66612, (785) 296-2215, kurtis.wiard@ag.ks.gov, Counsel for State of Kansas.

Daniel Cameron, Attorney General of Kentucky, Marc Manley [*], Assistant Attorney General, Courtney E. Albini, Assistant Solicitor General, Office of the Kentucky Attorney General, 700 Capital Ave., Suite 118, Frankfort, KY 40601, (502) 696-5300, marc.manley@ky.gov, Counsel for Commonwealth of Kentucky.

Jeff Landry, Attorney General of Louisiana, Elizabeth B. Murrill [*], Solicitor General, J. Scott St. John [*], Deputy Solicitor General, Louisiana Department of Justice, 1885 N. Third St., Baton Rouge, LA 70804, (225) 326-6766, emurrill@ag.louisiana.gov, stjohnj@ag.louisiana.gov, Counsel for State of Louisiana.

Douglas J. Peterson, Attorney General of Nebraska, James A. Campbell [*], Solicitor General, Office of the Nebraska Attorney General, 2115 State Capitol, Lincoln, NE 68509, (402) 471-2682, jim.campbell@nebraska.gov, Counsel for State of Nebraska.

Dave Yost, Attorney General of Ohio, Benjamin M. Flowers [*], Solicitor General, Office of the Ohio Attorney General, 30 E. Broad St., 17th Floor, Columbus, OH 43215, (614) 446-8980, bflowers@ohioago.gov, Counsel for State of Ohio.

John M. O'Connor, Attorney General of Oklahoma, Zach West [*], Assistant Solicitor General, Office of the Attorney General, State of Oklahoma, 313 N.E. 21st St., Oklahoma City, OK 73105, (405) 522-4798, zach.west@oag.ok.gov, Counsel for State of Oklahoma.

Patrick Morrisey, Attorney General of West Virginia, Lindsay S. See [*], Solicitor General, Office of the West Virginia Attorney General, State Capitol Bldg. 1, Room E-26, Charleston, WV 25305, (681) 313-4550, lindsay.s.see@wvago.gov, Counsel for State of West Virginia.

* Admitted Pro Hac Vice

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................................. ii
INTRODUCTION .............................................................................................................................. 1
BACKGROUND ................................................................................................................................ 3
LEGAL STANDARDS ....................................................................................................................... 8
ARGUMENT ..................................................................................................................................... 9
I. The States' Claims Are Justiciable. ................................................................................................ 9

A. Plaintiffs Have Standing. ................................................................................................... 9

B. Plaintiffs' Claims Are Ripe. ............................................................................................... 14

C. APA Review Is Proper. ...................................................................................................... 15

II. The Complaint States Viable Claims. .................................................................................. 20

A. The challenged documents are final agency actions. ............................................................ 20

B. The challenged documents are legislative rules that were subject to, but did not comply with, the APA's notice-and-comment requirements. .......................................................................... 22

C. The Department's Interpretation and Fact Sheet are arbitrary and capricious. ......................... 24

D. The EEOC Document exceeds the EEOC's statutory authority and violates the agency's own regulations. ..................................................................................................................... 25

E. The Interpretation and Fact Sheet are contrary to law. ......................................................... 27

1. The Interpretation and Fact Sheet are contrary to Title IX. .................................................. 27

2. The Interpretation and Fact Sheet violate the Constitution. .................................................. 32

F. The EEOC Document is contrary to law. ............................................................................ 38

1. The EEOC Document is contrary to Title VII. .................................................................... 38

2. The EEOC Document violates the Constitution. .................................................................. 39

CONCLUSION ................................................................................................................... 40

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ..................................... 15, 20

*Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299 (11th Cir. 2021) .... 29, 31

*Adams v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th 1369 (11th Cir. 2021) .... 31

*Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286 (11th Cir. 2020) . 31

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ........................................................................................ 10, 12

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ........ 23

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ....................................................................................... 11

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ................................................................................................ 33, 34

*Assoc. of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, --- F.4th ---, 2021 WL 4097325 ....................................................... 14

*B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va.) ..... 14

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979) ................................... 9

*Bangura v. Hansen*, 434 F.3d 487 (6th Cir. 2006) .............................. 16

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) .............................................. 14, 18, 19

*Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985) .. 34

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................. 20

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) .............................. *passim*

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ................................... 16

*Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489 (6th Cir. 2008) ...... 39

*Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) .................................... 19

*Causey v. Ford Motor Co.*, 516 F.2d 416 (5th Cir. 1975) ................... 39

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228 (6th Cir. 1985) ........................................................................................ 10

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .................................. 40

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........................... 13

*Colorado v. Toll*, 268 U.S. 228 (1925) .............................................. 10

*Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407 (1942) ...... 22

*Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008) ................................................................................................ 10

*Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798 (D.C. Cir. 2006) ............ 21

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ................... 12

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ............................ 12, 23, 35

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 ... 25

*Detroit Edison Co. v. EPA*, 496 F.2d 244 (6th Cir. 1974) .................... 22

*Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666 (6th Cir. 2005) .................................................. 22

*Doe v. Luzerne Cnty.*, 660 F.3d 169 (3d Cir. 2011) ............................. 39

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ............... 24, 25

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................. 24

*Florida v. Weinberger*, 492 F.2d 488 (5th Cir. 1974) ......................... 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) .................................................. 19

*Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.*, No. 3:12-CV-00158 JWS, 2013 WL 1628639 (D. Alaska Apr. 15, 2013) . 16

*Gen. Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ....................... 23

*Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976) ................................. 26

*Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010) .................................................. 20

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) .................................. 29, 31, 32

*Jackson v. Richards Med. Co.*, 961 F.2d 575 (6th Cir. 1992) .............. 40

*Jama v. Dep't of Homeland Sec.*, 760 F.3d 490 (6th Cir. 2014) .......... 15

*Kentucky v. Yellen*, --- F. Supp. 3d ---, 2021 WL 4394249 (E.D. Ky. Sept. 24, 2021) .................................................. 35

*King v. Burwell*, 576 U.S. 473 (2015) ......................................... 37

*Klein v. U.S. Dep't of Energy*, 753 F.3d 576 (6th Cir. 2014) ............. 12

*Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002) ....................... 36

*La. Dep't of Justice v. Edwards*, 233 S.3d 76, 81 (La. Ct. App. 2017) . 11

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ....................... 38

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................. 12

*Lusardi v. McHugh*, 2015 WL 1607756 (EEOC Apr. 1, 2015) ........... 14

*Maine v. Taylor*, 477 U.S. 131 (1986) ........................................ 10

*Marlow v. U.S. Dep't of Educ.*, 820 F.2d 581 (2d Cir. 1987) .............. 18

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .............................. 9, 10, 11, 12

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ............................. 11

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020) ............................ 11

*McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016) ....................... 14

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ..................... *passim*

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016) .................................................. 30

*Missouri v. Holland*, 252 U.S. 416 (1920) ................................. 10

*NAACP v. Meese*, 615 F. Supp. 200 (D.D.C. 1985) ....................... 16

*Nat'l Council for Adoption v. Blinken*, 4 F.4th 106 (D.C. Cir. 2021) .... 24

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ........ 21

*NFIB v. Sebelius*, 567 U.S. 519 (2012) .................................. 35, 36

*Nichols v. Muskingum Coll.*, 318 F.3d 674 (6th Cir. 2003) ............... 8

*NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969) ....................... 22

*NRDC v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) ......................... 24

*Oh. Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ................. 15

*Ohio v. Yellen*, --- F. Supp. 3d ---, 2021 WL 2712220 (S.D. Ohio July 1, 2021) .................................................. 33

*Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015) ................. 40

*Online Merchs. Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021) ....... 13

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021) ........... 23, 27

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ........ 33

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ....................... 21

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ............. 15

*Pharm. Res. & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31 (D.D.C. 2015) .................................. 21

*In re Plavix Mktg., Sales Practices and Prod. Liab. Litig. (No. II)*, 974 F.3d 228 (3d Cir. 2020) .................................... 30

*POET Biorefining, LLC v. EPA*, 970 F.3d 392 (D.C. Cir. 2020) .......... 23

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ...................... 37

*Romeo Cmty. Schs. v. U.S. Dep't of Health, Educ., & Welfare*, 438 F. Supp. 1021 (E.D. Mich. 1977), *aff'd*, 600 F.2d 581 (6th Cir. 1979) ..... 18, 19

*Sackett v. EPA*, 566 U.S. 120 (2012) ..................................................... 2, 16, 19

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253 (6th Cir. 2009) (en banc) ................................................................. 12, 33, 34

*Sch. Dist. of Saginaw, Mich. v. U.S. Dep't of Health, Educ., & Welfare*, 431 F. Supp. 147 (E.D. Mich. 1977) ................................................ 19

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) ................. 30

*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995) ....................... 22, 23

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) ........... 25

*South Dakota v. Dole*, 483 U.S. 203 (1987) ......................................... 34, 35, 36

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .................... passim

*Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (en banc) ................... 18

*Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029 (6th Cir. 2018) .................. 22, 23

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ..................................... 12, 21, 22, 26

*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) ........... 1, 3, 17, 18

*Texas v. United States*, No. 16-11534, 2017 WL 7000562 (5th Cir. Mar. 3, 2017) ....................................................................................... 3

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ...................... 17, 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016) ..... 20

*United States v. De Leon*, 810 Fed. Appx. 384 (6th Cir. 2020) ........... 14

*United States v. Virginia*, 518 U.S. 515 (1996) .................................. 29

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .................................................................................................. 11, 34

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) .............. 39

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) .............. 11

**Constitutional Provisions and Statutes**

5 U.S.C. § 553 ...................................................................................... 22

5 U.S.C. § 704 ...................................................................................... 15

5 U.S.C. § 706(2) ................................................................................. 9

5 U.S.C. § 706(2)(C) ............................................................................ 26

20 U.S.C. § 1234g(a) ........................................................................... 17

20 U.S.C. § 1234g(b) ........................................................................... 18

20 U.S.C. § 1681(a) ............................................................................. 28, 30

20 U.S.C. § 1681(a)(1)-(9) ................................................................... 28

20 U.S.C. § 1681(a)(2) ......................................................................... 29

20 U.S.C. § 1681(a)(6)(B) .................................................................... 29

20 U.S.C. § 1681 et seq. ...................................................................... 1

20 U.S.C. § 1682 ................................................................................. 17, 18

20 U.S.C. § 1683 ................................................................................. 17, 18

20 U.S.C. § 1686 ................................................................................. passim

42 U.S.C. § 2000d-2 ............................................................................ 17

42 U.S.C. § 2000e-2(a)(1) .................................................................... 2, 30, 38

42 U.S.C. § 2000e-5(b) ........................................................................ 13

42 U.S.C. § 2000e-12(a) ...................................................................... 26

2021 Tenn. Pub. Acts, ch. 40, § 1 ....................................................... 10

2021 Tenn. Pub. Acts, ch. 452, § 6 ..................................................... 10

Ohio Rev. Code § 4743.10(A)-(B) ....................................................... 11

Tenn. Code Ann. § 49-6-2904(b)(2) ..................................................... 10

Tenn. Code Ann. § 49-7-2405(a)(2) ..................................................... 10

U.S. Const. amend. I ............................................................................ 36

U.S. Const. amend. X ........................................................................... 8, 37, 39

U.S. Const. amend. XIV ....................................................................... 40

U.S. Const. art. I, § 1 ........................................................................... 37

U.S. Const. art. I, § 8 ........................................................................... 32

U.S. Const. art. III ............................................................................... 9, 10

**Other Authorities**

29 C.F.R. § 1695.1(b)(1) .................................................................. 26

29 C.F.R. § 1695.2(d) ...................................................................... 26

29 C.F.R. § 1695.6(a) ...................................................................... 26

34 C.F.R. § 100.8(a)(1) .................................................................... 18

34 C.F.R. § 100.9 ............................................................................. 17

34 C.F.R. § 100.10 ........................................................................... 17

34 C.F.R. § 100.11 ........................................................................... 17

34 C.F.R. § 106.33 ........................................................................... *passim*

34 C.F.R. § 106.37(c) ....................................................................... 23, 28

34 C.F.R. § 106.40(b)(1) .................................................................. 29

34 C.F.R. § 106.41(b) ...................................................................... *passim*

118 Cong. Rec. 5,807 (1972) .......................................................... 28

45 Fed. Reg. 30,802 (May 9, 1980) ................................................ 28

85 Fed. Reg. 30,026 (May 19, 2020) .............................................. 29

Anthony J. Bellia Jr., *Article III and the Cause of Action*, 89 Iowa L. Rev. 777, 826 (2004) ....................................................................... 11

EEOC, Fact Sheet: Bathroom Access Rights for Transgender Employees Under Title VII of the Civil Rights Act of 1964 (May 2, 2016), https://bit.ly/3yfe5h9 .................................................................. 3

EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://bit.ly/3zgP7iP ...................................................................................... 1

Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021) .................................................................................... *passim*

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021) .............. 4

Fed. R. Civ. P. 12(b)(1) ................................................................... 8, 9

Fed. R. Civ. P. 12(b)(6) ................................................................... 8

Letter from Herbert H. Slatery III et al. to President Biden (July 7, 2021), https://bit.ly/3sNdNNn ......................................................... 7

Letter of U.S. Senators Josh Hawley and Mike Lee to EEOC Chair Burrows (July 14, 2021), https://bit.ly/3myFacP ................................ 7

OCR Recent Resolution Search, U.S. Dep't of Educ., https://bit.ly/3FjTY6f ........................................................................................ 15

State of Tennessee, The Budget: Fiscal Year 2021-22, https://bit.ly/3AizM0N ........................................................................................ 35

U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students (May 13, 2016), https://bit.ly/3BlfhkT ............................................... 3

U.S. Dep't of Educ., Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), https://bit.ly/3ksLLDj ......................... 5

U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: Bostock v. Clayton Cnty. (Jan. 8, 2021), https://bit.ly/3mwKI7H ......................... 5

U.S. Dep't of Justice et al., Back-to-School Address for Transgender Students (Aug. 17, 2021), https://bit.ly/3B8NvZn ............................... 6, 7

U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+Harassment in Schools, https://bit.ly/3sQjZnM ................. 5

U.S. Dep't of Educ., OCR, Revised Letter of Impending Enforcement Action (Aug. 31, 2020), https://bit.ly/3DoCLGZ ............................... 6

U.S. Dep't of Justice, Memorandum Regarding Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://bit.ly/2WpV5zq ................................. 4

## INTRODUCTION

For the second time in less than a decade, federal administrative agencies have attempted to effect radical social change in our nation's schools and workplaces by purporting to "interpret" federal antidiscrimination laws to prohibit discrimination based on gender identity. Just as they did in 2016, when their unlawful actions were quickly enjoined nationwide, *see Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016), the Department of Education ("Department") and the Equal Employment Opportunity Commission ("EEOC") have once again told States and other regulated parties that they must ignore biological sex when it comes to athletics, locker rooms, pronouns, and who knows what else, or face enforcement actions.

The Department declared that it "interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination" based on "sexual orientation and gender identity" and vowed to "fully enforce Title IX" in that manner. Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637, 32,637, 32,639 (June 22, 2021) ("Interpretation"). And the EEOC Chair issued a "technical assistance document" declaring that Title VII's prohibition of discrimination "because of ... sex" prevents employers from maintaining showers, locker rooms, and bathrooms that are separated based on biological sex and requires employers to use a transgender employee's preferred pronouns. EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://bit.ly/3zgP7iP ("EEOC Document").

These actions by the Department and the EEOC Chair are procedurally and substantively unlawful, in violation of the Administrative Procedure Act ("APA"). They are procedurally unlawful because, among other reasons, they impose new substantive obligations on States and other regulated entities without adhering to the APA's notice-and-comment requirements, which are designed to ensure public participation. And they are substantively unlawful because the agencies' purported "interpretations" of Title IX and Title VII squarely conflict with the text of those statutes and violate the Constitution.

Contrary to the agencies' assertions, their interpretations are not required by *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *Bostock* held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of ... sex" under Title VII. *Id*. at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "assum[ed]" that the term "sex" means "biological distinctions between male and female," *id*. at 1739, and it made clear that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues that were not before the Court such as "sex-segregated bathrooms, locker rooms, and dress codes," *id*. at 1753. The agencies' initial guidance to regulated entities after *Bostock* confirmed that the decision was narrow and did not extend to Title IX or call into question sex-separated living facilities or sex-specific dress codes.

Defendants have moved to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction and failure to state a claim. This Court should deny that motion. Jurisdiction exists because enforcement of the challenged guidance would injure Plaintiffs by, among other things, interfering with their sovereign authority to enact and enforce their own laws. This pre- enforcement challenge is ripe for review because Plaintiffs face a credible threat of enforcement that is forcing them to choose between complying with the guidance, at the expense of their sovereign interests, or risking substantial financial penalties. And APA review is proper because waiting to raise their arguments as defenses after the agencies "drop the hammer" is not an adequate remedy. *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Finally, Plaintiffs' complaint adequately alleges procedural and substantive violations of the APA.

## BACKGROUND

In 2016, the Department and the DOJ issued a "Dear Colleague" letter announcing a radically new interpretation of the term "sex" in Title IX. U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students (May 13, 2016), https://bit.ly/3BIfhkT. The letter advised Title IX recipients that the Departments would "treat a student's gender identity as the student's sex for purposes of Title IX." *Id*. at 2. That meant that school staff must "use pronouns and names consistent with a transgender student's gender identity" and "allow transgender students" to access locker rooms, showers, and restrooms "consistent with their gender identity." *Id*. at 3. The same year, the EEOC issued a fact sheet declaring that Title VII prohibits employment discrimination based on gender identity and requires employers to allow transgender employees to use restrooms

and locker rooms consistent with their gender identity. EEOC, Fact Sheet: Bathroom Access Rights for Transgender Employees Under Title VII of the Civil Rights Act of 1964 (May 2, 2016), https://bit.ly/3yfe5h9.

A broad coalition of States and other regulated parties promptly challenged these agency actions under the APA, and a federal district court deemed the actions procedurally and substantively unlawful and enjoined their enforcement nationwide. *Texas*, 201 F. Supp. 3d at 828-34. The court held that the guidance was procedurally unlawful because it violated the APA's notice-and-comment requirement for legislative rules, *id.* at 828-30, and substantively unlawful because it contravened the statutory text, *id.* at 831-34. The federal defendants initially appealed the decision but later voluntarily dismissed the appeal. *See Texas v. United States*, No. 16-11534, 2017 WL 7000562 (5th Cir. Mar. 3, 2017).

One would imagine that, following this initial failed attempt to rewrite federal antidiscrimination law, federal agencies would think twice before trying it again. Not so. Shortly after taking office, President Biden directed federal agencies to "fully implement" the Administration's policy of prohibiting "discrimination on the basis of gender identity and sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021). President Biden sought to justify this broad mandate by claiming that, "[u]nder *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX ... along with [its] respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation." *Id.* But *Bostock* was not so sweeping. It held only that Title VII prohibits an employer from "fir[ing] someone simply for being homosexual or transgender," *Bostock*, 140 S. Ct. at 1737, while declining to "prejudge" other "federal or state laws that prohibit sex discrimination" or other actions such as "sex-segregated bathrooms, locker rooms, and dress codes," *id.* at 1753.

On March 26, 2021, the Civil Rights Division of the DOJ released a memorandum concluding that Title IX "prohibit[s] discrimination on the basis of gender identity and sexual orientation." U.S. Dep't of Justice, Memorandum Regarding Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://bit.ly/2WpV5zq. The Department and the EEOC Chair soon issued their interpretations of Title IX and Title VII, respectively. Neither agency engaged in notice and comment.

**Department of Education**. On June 22, 2021, the Department's Office for Civil Rights ("OCR") published its Interpretation of Title IX in light of *Bostock.* The Department interpreted "Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." Interpretation, 86 Fed. Reg. at 32,637. The Department noted that the Interpretation represented a change in position. *See id.* (acknowledging that it "at times has stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity"). In fact, it was a complete about-face from the Department's position just months before. On January 8, 2021, after *Bostock* was decided, a Department memorandum concluded that "sex" in Title IX "should be construed to mean biological sex, male or female." U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: Bostock v. Clayton Cnty. (Jan. 8, 2021), https://bit.ly/3mwKI7H ("Richey Memorandum"). The Department did not explain its change in position or consider covered institutions' reliance on the Department's prior guidance and regulations.

In its new Interpretation, the Department declared that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department" and that the Interpretation will "guide the Department in processing complaints and conducting investigations." Interpretation, 86 Fed. Reg. at 32,639.

On June 23, 2021, an Acting Assistant Secretary for the Department issued a "Dear Educator" letter and a "Fact Sheet" on "Confronting Anti-LGBTQI+ Harassment in Schools." U.S. Dep't of Educ., Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), https://bit.ly/3ksLLDj; U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools, https://bit.ly/3sQjZnM (together with Dear Educator Letter, "Fact Sheet"). The Fact Sheet identifies discrete examples of purportedly discriminatory conduct that the Department "can investigate." Fact Sheet. That conduct includes preventing a "transgender high school girl" from competing on the "girls' cheerleading team" or using the "girls' restroom," as well as declining to use a transgender student's preferred name or pronouns. *Id.* The Fact Sheet encourages students who have been

"treated unfairly ... because of sexual orientation or gender identity" to "[c]onsider filing a complaint" with the DOJ's Civil Rights Division or the Department's OCR. *Id.* Again, the Fact Sheet represented an about-face from the Department's earlier post-*Bostock* guidance, which concluded that the "controlling statutory and regulatory text" require educational institutions to regulate access to sex-separated living facilities and athletic teams based on *biological sex* and would not prohibit institutions from "referring to a student using sex-based pronouns that correspond to the student's biological sex." Richey Memorandum at 4, 7, 9. [1]

On August 17, 2021, officials from the Department and DOJ, among other federal agencies, addressed transgender students directly in a "back-to-school" video. U.S. Dep't of Justice et al., Back-to-School Address for Transgender Students (Aug. 17, 2021), https://bit.ly/3B8NvZn. Defendant Kristen Clarke, Assistant Attorney General for Civil Rights at the DOJ, took the position that conduct that violates the agencies' guidance—such as preventing a transgender student "from playing on a sports field [or] accessing the bathroom" consistent with the student's gender identity—is "against the law" and made clear that Defendants are "ready to act to defend" the rights of transgender students. *Id.* at 1:07-1:27.

**EEOC**. On June 15, 2021, EEOC Chair Charlotte Burrows published a "technical assistance document" on the EEOC website that purports to "explain[] what the *Bostock* decision means for LGBTQ+ workers (and all covered workers) and for employers across the country." EEOC Document. This document was published "upon approval of the Chair of the U.S. Equal Employment Opportunity Commission." *Id.* There is no indication that the full EEOC voted on whether to approve the document or even on whether to issue the document at all.

After surveying Title VII's general requirements, the EEOC Document provided examples of employer actions that would constitute sex discrimination under *Bostock*. Those examples include "[p]rohibiting a transgender person from dressing or presenting consistent with that person's gender identity," prohibiting a transgender person from using the "bathrooms, locker rooms, or showers" that correspond to the person's gender identity, and using "pronouns or names that are inconsistent with an individual's gender identity." *Id.*

Though the EEOC Document disclaims any binding legal effect, it directs people to contact the EEOC with reports of discrimination, including by filing a formal charge. *Compare id.* ("The contents of this document do not have the force and effect of law and are not meant to bind the public in any way."), *with id.* (encouraging "applicants and employees of ... state and local government employers" to "contact the EEOC for help in deciding what to do next").

On July 7, 2021, a group of state Attorneys General led by Tennessee's Attorney General Herbert H. Slatery III—and including all Plaintiff States—sent a letter to President Biden detailing the procedural and substantive shortcomings in these agency actions. Letter from Herbert H. Slatery III et al. to President Biden (July 7, 2021), https://bit.ly/3sNdNNn. U.S. Senators raised similar concerns about the EEOC Document. Letter of U.S. Senators Josh Hawley and Mike Lee to EEOC Chair Burrows (July 14, 2021), https://bit.ly/3myFacP.

Because the agencies declined to reconsider their interpretations, on August 30, 2021, Plaintiffs sued for declaratory and injunctive relief. Compl., ECF No. 1. The Complaint asserts thirteen claims alleging procedural and substantive violations of the APA. The Complaint alleges that the Interpretation and Fact Sheet (1) are legislative rules issued in violation of the APA's notice-and-comment requirements; (2) are arbitrary and capricious; (3) violate Title IX; (4) violate the Spending Clause; (5) violate the First Amendment; (6) violate the separation of powers; and (7) violate the Tenth Amendment. *See id.* at Counts I-VI (PageID#21-27). The Complaint alleges that the EEOC Document (1) exceeds the EEOC's statutory authority; (2) is a legislative rule issued in violation of the APA's and the EEOC's notice-and-comment requirements; (3) violates Title VII; (4) violates the separation of powers; (5) violates the Tenth Amendment; and (6) unlawfully abrogates the States' sovereign immunity. *Id.* at Counts VIII-XIII (PageID#28-31). Finally, the Complaint asserts a claim for a declaratory judgment. *Id.* at Count XIV (PageID#32). Plaintiffs filed a motion for a preliminary injunction on September 2, 2021. *See* PI Mot., ECF. No.10; PI Mem., ECF No. 11. That motion remains pending.

## LEGAL STANDARDS

When a defendant moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss a complaint for lack of jurisdiction, "the plaintiff has the burden of proving jurisdiction." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) (internal quotation marks omitted). In reviewing the motion, a court "may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction." *Id*. But "where a defendant argues that the plaintiff has not alleged sufficient facts ... to create subject matter jurisdiction," the district court must accept "the allegations in the complaint as true." *Id*.

In deciding whether a complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff." *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021). The court "must accept the complaint's factual allegations as true and draw all reasonable interferences in [the plaintiff's] favor." *Id*. Dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*. (internal quotation marks omitted).

Under the APA, agency action is unlawful and must be "set aside" when (as relevant here) it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

## ARGUMENT

### I. The States' Claims Are Justiciable.

Defendants' motion under Rule 12(b)(1) should be denied because Plaintiffs have satisfied their burden to establish subject matter jurisdiction. They have standing to bring this pre- enforcement challenge. Their claims are ripe. And review under the APA is proper.

### A. Plaintiffs Have Standing.

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be addressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (internal quotation marks and brackets omitted). A plaintiff bringing a pre-enforcement challenge "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id*. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Importantly, the Supreme Court has instructed that a State's sovereignty interests are "entitled to special solicitude" in Article III standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 518-20 (2007).

Plaintiffs easily satisfy the injury-in-fact requirement because they not only intend to—but in many cases already have—exercised their sovereign authority to enact and enforce laws that are at least "arguably proscribed" by the challenged guidance. [2] *Susan B. Anthony List*, 573 U.S. at 162. It is well settled that a State "has a sovereign interest[]" in "creat[ing] and enforce[ing] a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."). And a long line of precedent confirms that States may seek injunctive relief in federal court to protect that interest. *See, e.g.*, *Massachusetts*, 549 U.S. at 520 (allowing Massachusetts to seek relief under the APA to "protect[] its quasi- sovereign interests"); *Colorado v. Toll*, 268 U.S. 228, 229-30 (1925) (allowing Colorado to challenge federal regulations alleged "to interfere with the sovereign rights of the State"); *Missouri v. Holland*, 252 U.S. 416, 431 (1920) (allowing Missouri to challenge federal action that allegedly "invade[d] the sovereign right of the State"); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985)

(allowing Ohio to challenge agency regulation "to vindicate its own law"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (explaining that "[f]ederal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy" Article III).

Defendants argue that allegations of an "arguabl[e]" conflict with the challenged guidance are "speculative" and insufficiently "concrete" to support standing. MTD Mem. 7, ECF No. 49-1 (PageID#360). [3] But "[n]othing in the [Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law." *Susan B. Anthony List*, 573 U.S. at 163. An "arguable" conflict is sufficient under binding precedent. Nor does *Massachusetts v. Mellon*, 262 U.S. 447 (1923), *see* MTD Mem. 7 (PageID#360), preclude Plaintiffs from relying on sovereignty injuries to establish standing. The law challenged in *Mellon* merely required Massachusetts to "share ... the field of state power" by helping implement a federal program. 262 U.S. at 485. It did not interfere with the State's authority to enforce its own laws. And the Supreme Court has limited *Mellon* to its facts because it is "hard to reconcile" with later decisions holding that States had standing based on injuries to their sovereign interests. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015) (internal quotation marks omitted) (collecting decisions); *see also Massachusetts*, 549 U.S. at 520 n.17. [4] *Mellon* does not bar Plaintiffs' claims.

Even if Plaintiffs' sovereignty injuries were insufficient to support standing, enforcement of the challenged guidance would cause other concrete harms that independently satisfy the injury- in-fact requirement. The threat of enforcement puts Plaintiffs at risk of losing their federal educational funding and exposes them to damages liability. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (future loss of federal funds sufficient to establish standing); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). It subjects Plaintiffs to administrative burdens and compliance costs. *See Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261-62 (6th Cir. 2009) (en banc) (plurality opinion) (compliance costs sufficient to establish standing). And it harms the health and welfare of Plaintiffs' educational institutions, employers, and citizens by infringing on their constitutionally protected interests in bodily privacy and safety and their First Amendment rights. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607 (explaining that "a State has a quasi-sovereign interest in the health and well-being ... of its residents in general" that may "suffice[] to give the State standing to sue as *parens patriae*").

Plaintiffs' injuries are directly traceable to the challenged guidance and would be redressed by the declaratory and injunctive relief sought in the complaint, which would prohibit Defendants from enforcing their unlawful interpretations. *See Texas v. EEOC*, 933 F.3d 433, 449 (5th Cir. 2019) (holding that "[a]n injunction forbidding EEOC and the Attorney General from enforcing" guidance would "safeguard Texas's sovereign interests" and redress the State's injuries). Plaintiffs also satisfy the more "relaxed" redressability standard that applies to procedural claims. *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)). That standard merely requires Plaintiffs to show "some possibility that the requested relief will prompt" the agency to "reconsider" its decision. *Massachusetts*, 549 U.S. at 518. There is at least "some possibility" that requiring Defendants to consider public comments and provide a reasoned explanation for their positions will prompt reconsideration here. [5]

Defendants contend that any exposure to damages liability is "speculative and not traceable to the EEOC Document" because the EEOC "cannot bring Title VII enforcement actions against States." MTD Mem. 8 (PageID#361). But the EEOC *does* facilitate settlement agreements with States, which often include damages, and it refers matters to the DOJ for enforcement. *See* PI Opp. 11 (PageID#309); *see also* 42 U.S.C. § 2000e-5(b). Relying on *Clapper v. Amnesty International USA*, 568 U.S. 398, 418 (2013), Defendants claim that any compliance injuries would be "self-inflicted," MTD Mem. 8 (PageID#361). But the injuries in *Clapper* were self- inflicted because the threat of future harm was "speculative." 568 U.S. at 416. Not so here.

For at least two reasons, Plaintiffs have established that a "credible threat" of enforcement exists. *Susan B. Anthony List*, 573 U.S. at 159. *First*, Defendants "ha[ve] not disavowed enforcement." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 551 (6th Cir. 2021). To the contrary, the Department has vowed to "fully enforce" its guidance and rely on it "in processing complaints and conducting investigations." Interpretation, 86 Fed. Reg. at 32,639. And the EEOC Document expressly invites employees

to "fil[e] a charge of discrimination against ... a state ... employer." EEOC Document. *Second*, Defendants' "history of past enforcement" lends their threats additional credibility. *Online Merchs. Guild*, 995 F.3d at 550 (internal quotation marks omitted). The DOJ recently filed a statement of interest opposing a West Virginia law that "exclud[es] transgender girls from participating in single-sex sports restricted to girls." Statement of Interest of the United States at 1, *B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42 (footnote omitted). And Defendants enforced similar guidance during a previous administration. *See, e.g.*, *Lusardi v. McHugh*, 2015 WL 1607756, at *6 (EEOC Apr. 1, 2015) (finding that restricting a transgender female employee from using the women's restroom and using "male pronouns" to refer to the employee violated Title VII); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 855 (S.D. Ohio 2016) (noting OCR finding that Highland violated Title IX by refusing to allow a transgender girl to use the girls' restroom).

Defendants stress that an enforcement action must be "certainly impending" to satisfy the injury-in-fact requirement and fault Plaintiffs for failing to "identify [a] pending enforcement action against them." MTD Mem. 7 (PageID#360). But the whole point of a pre-enforcement challenge is to stop enforcement *before* it occurs. So "certainly impending" cannot mean *already* pending. Rather, a plaintiff need only "show a 'credible threat of prosecution' under the challenged law or regulation to establish that [an] enforcement action is certainly impending." *Assoc. of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, --- F.4th ---, 2021 WL 4097325, at *10 (quoting *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016)). Plaintiffs have made that showing.

### B. Plaintiffs' Claims Are Ripe.

Defendants protest that the claims in this case are not ripe. MTD Mem. 4-5 (PageID#357-58). But the "prudential considerations" they raise do not affect this Court's subject matter jurisdiction. *United States v. De Leon*, 810 Fed. Appx. 384, 388 (6th Cir. 2020) (resolving a constitutional challenge despite prudential ripeness concerns); *see also Susan B. Anthony List*, 573 U.S. at 167 (doubting the "continuing vitality of the prudential ripeness doctrine").

Regardless, Defendants' ripeness arguments lack merit. Plaintiffs' claims are fit for review because they present "purely legal" issues that "will not be clarified by further factual development." *Susan B. Anthony List*, 573 U.S. at 167 (internal quotation marks omitted). All of Plaintiffs' claims—both procedural and substantive—turn on the content of the challenged guidance documents, which already specify factual situations that Defendants consider unlawful. Nothing more is required to adjudicate Plaintiffs' claims. And delaying review would cause Plaintiffs significant hardship by allowing Defendants to use the "fear of future sanctions" to "force immediate compliance" with the guidance. *Oh. Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967). It is no secret that the Department uses the threat of withholding funding to compel compliance with its guidance. A search of OCR complaints filed since 2010 reveals that nearly every target entered into a resolution agreement and agreed to comply with the Department's position rather than contest it. *See* OCR Recent Resolution Search, U.S. Dep't of Educ., https://bit.ly/3FjTY6f. Plaintiffs should not be put the choice of either abandoning enforcement of their laws or risking the loss of federal funding. There is no reason to place "sovereign [States] at such risk when so little would be gained by doing so and so much might be lost." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974).

### C. APA Review Is Proper.

Defendants contend that this Court lacks jurisdiction over Plaintiffs' APA claims either because there is an adequate alternative remedy or because Title IX's enforcement scheme is exclusive. MTD Mem. 8 (PageID#361). [6] They are wrong on both scores.

Plaintiffs' ability to raise their claims as defenses in "future enforcement action," MTD Mem. 9 (PageID#362), is not the sort of adequate remedy contemplated in 5 U.S.C. § 704. Section

704 ensures "that the APA's general grant of jurisdiction to review agency decisions is not duplicative of more specific statutory procedures for judicial review." *Bangura v. Hansen*, 434 F.3d 487, 501 (6th Cir. 2006). But that provision must be construed

narrowly, so as not to "defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

When administrative action imposes immediate consequences on regulated parties, courts routinely allow pre-enforcement challenges even if the parties could raise the same arguments as defenses in an eventual enforcement action. For example, *Sackett* allowed a pre-enforcement challenge to an EPA compliance order even though "judicial review ordinarily comes by way of a civil action brought by the EPA." 566 U.S. at 127. Because the plaintiffs could not "initiate that process" and instead had to "wait for the Agency to drop the hammer" while accruing daily penalties, "APA review" was the only "adequate remedy." *Id.* at 127, 131; *see also Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.*, No. 3:12-CV-00158 JWS, 2013 WL 1628639, at *6 (D. Alaska Apr. 15, 2013) (allowing challenge to a yet-to-be-enforced penalty assessment despite the possibility of a "later-filed enforcement proceeding"). [7]

The same reasoning applies here. The challenged guidance forces Plaintiffs to choose between complying with the guidance, which would cause irreparable injury, or violating the guidance at the risk of significant financial penalties. Like the proposed alternatives in *Sackett* and *Furie*, the latter option would require Plaintiffs to "wait for the [agencies] to drop the hammer," *Sackett*, 566 U.S. at 127, since there is no way for Plaintiffs to initiate the enforcement action. That is not an adequate remedy. The district court rightly rejected the same "alternative remedy" argument when States challenged nearly identical guidance from the Department and EEOC in 2016. *See Texas*, 201 F. Supp. 3d at 826-27.

Defendants' argument that Congress intended to preclude APA review fares no better. District court jurisdiction over pre-enforcement challenges to agency action is precluded only if Congress's intent to preclude jurisdiction is "fairly discernible in the statutory scheme." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (internal quotation marks omitted). In *Thunder Basin*, the Court held the Mine Safety and Health Act satisfied that standard because it established a "comprehensive enforcement structure" and the Act's legislative history revealed a "clear concern with channeling and streamlining the enforcement process." *Id.* at 216.

Defendants contend that the "review process ... found in Title IX" is "remarkably similar" to the one in *Thunder Basin* because it provides for an administrative hearing followed by judicial review in the circuit court. MTD Mem. 10 (PageID#363). But the only provision of Title IX that addresses judicial review is 20 U.S.C. § 1683, which provides that:

> Any department or agency action taken pursuant to section 1682 of this title *shall be subject to such judicial review as may otherwise be provided by law for similar action* taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) *may obtain judicial review of such action in accordance with chapter 7 of Title 5 ....*

(Emphasis added). Thus, the "elaborate procedural scheme," MTD Mem. 9 (PageID#362), that Defendants reference is established not by Title IX's "statutory scheme" but instead by Department regulations and other statutes governing procedures for specified agency actions, including withholding federal funding. *See* PI Opp. 10 (PageID#308) (citing 34 C.F.R. §§ 100.9-.11; 20 U.S.C. § 1234g(a); 42 U.S.C. § 2000d-2).

But the "agency action taken pursuant to section 1682," 20 U.S.C. § 1683, that is being challenged in this case is *not* the withholding of federal funds. It is the issuance of "rules, regulations, or orders of general applicability." 20 U.S.C. § 1682. And courts have held that *the APA* is the relevant law that provides for judicial review of Title IX rules. *Romeo Cmty. Schs. v. U.S. Dep't of Health, Educ., & Welfare*, 438 F. Supp. 1021, 1028 (E.D. Mich. 1977) (allowing pre-enforcement APA challenge to

Title IX regulation), *aff'd*, 600 F.2d 581 (6th Cir. 1979); *cf. Marlow v. U.S. Dep't of Educ.*, 820 F.2d 581, 582 (2d Cir. 1987) (concluding that similar judicial- review provision in Rehabilitation Act did not preclude APA review of "a determination that a recipient has not violated section 504" because "[t]he statute by which federal agency action 'similar' to that [action] is made reviewable is the Administrative Procedure Act"). Indeed, Title IX's statutory scheme "explicitly contemplates a cause of action under the A.P.A. for redress of unlawful agency action 'not otherwise subject to judicial review.'" *Romeo*, 438 F. Supp. at 1029 (quoting 20 U.S.C. § 1683). Because no "elaborate statutory framework exists covering Plaintiffs' claims," there is no reason to think that Congress intended to preclude APA review. *Texas*, 201 F. Supp. 3d at 826 (rejecting identical argument in challenge to similar guidance).

Defendants' contrary argument relies on *Highland*, *see* MTD Mem. 10-11 (PageID#363- 64), but that decision is not binding and was wrongly decided for at least four reasons. *First*, *Highland* improperly inferred Congress's intent from the *regulations* rather than the statutory scheme. 208 F. Supp. 3d at 862 (citing 34 C.F.R. § 100.8(a)(1)). *Second*, it erroneously concluded that "the judicial review provided 'for similar action' in § 1683 references the general provision for judicial review of funding termination decisions in 20 U.S.C. § 1234g(b)." *Id.* *Third*, it relied on inapposite cases involving attempts to enjoin *pending* administrative proceedings that were initiated under *Title VI*. *Id.* (citing *Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (en banc), and *Sch. Dist. of Saginaw, Mich. v. U.S. Dep't of Health, Educ., & Welfare*, 431 F. Supp. 147 (E.D. Mich. 1977)). *Fourth*, it erroneously discounted *Cannon v. University of Chicago*, 441 U.S. 677 (1979), and *Sackett*. *Highland*, 208 F. Supp. 3d at 862-64.

This case is distinguishable from *Thunder Basin* in another important respect. The statutory claims in *Thunder Basin* "ar[o]se under the Mine Act and f[e]ll squarely within the Commission's expertise." 510 U.S. at 214. The claims here, by contrast, include procedural challenges and claims that the guidance violates Title IX and the Constitution. These claims are "wholly collateral" to Title IX's administrative-review scheme and do not involve the sort of fact- driven compliance questions that might benefit from administrative review. *See id.* at 212 (internal quotation marks omitted); *see also Romeo*, 438 F. Supp. at 1028 (finding no "factual issue for which an extensive administrative record need be compiled").

This case is instead analogous to *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), which involved a separation-of-powers challenge to the Public Company Accounting Oversight Board. The Board argued that the Sarbanes-Oxley Act precluded district-court review by empowering the Securities and Exchange Commission to review any Board rule or sanction, with judicial review in the Court of Appeals. *Id.* at 489. The Court disagreed for reasons that apply equally here: the Act's "text" did not "expressly limit the jurisdiction that other statutes confer on district courts," *id.*; the "constitutional claims" at issue were "outside the Commission's competence and expertise," *id.* at 491; and precluding review would require the plaintiffs to "bet the farm ... by taking the violative action before testing the validity of the law," *id.* at 490 (internal quotation marks omitted).

## II. The Complaint States Viable Claims.

### A. The challenged documents are final agency actions.

The Interpretation and Fact Sheet and the EEOC Document are final agency actions reviewable under the APA. An agency action is "final" if it (1) "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature," and (2) is one by which "*rights or obligations have been determined*, or from which *legal consequences will flow*." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). The Supreme Court has "long taken" a "pragmatic," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016), and "flexible" approach to finality, *Abbott Labs.*, 387 U.S. at 149-50.

Defendants do not dispute that the challenged guidance documents satisfy the first *Bennett* requirement. The parties' disagreement centers on the second requirement. But legal consequences plainly will flow from the Interpretation and Fact Sheet because Title IX recipients that do not comply with the guidance will risk the loss of substantial federal funds. *See, e.g.*, *Hawkes*, 136 S. Ct. at 1815 (agency action was final where it warned regulated parties that, if they engage in certain conduct,

"they do so at the risk of significant criminal and civil penalties"). Defendants counter that the guidance has "no *independent* legal effect" because "[t]he only consequences come from violating Title IX or its implementing regulations." MTD Mem. 12 (PageID#365) (emphasis added). But the whole problem with the challenged guidance documents is that they impermissibly *rewrite* existing law. Unlike *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010), the Department did not simply "restate or report what already exists in the relevant body of statutes, regulations and rulings," *id.* at 432. It attempted to create *new law* in violation of the APA's procedural requirements.

Defendants further argue that the Interpretation and Fact Sheet are not final because they "merely express [the Department's] view of what the law requires of a party," MTD Mem. 12 (PageID#365) (quoting *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 808 (D.C. Cir. 2006)), and do not "require[] or prohibit[] recipients of federal funds to take any action," *id.* But that argument is belied by the challenged documents themselves, which specify factual situations the Department considers unlawful, *see* Fact Sheet, and vow to "fully enforce[]" the Department's view, Interpretation, 86 Fed. Reg. at 32,639. Even *Center for Auto Safety* acknowledges that a "general statement[] of policy" may constitute final agency action if it is "binding on its face or in practice." 452 F.3d at 807. [8] And "sometimes even interpretive rules may be subject to pre-enforcement judicial review as final agency actions." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015) (explaining that "regulated entities are not without recourse" to challenge an interpretive rule). What matters is the actual *effect* of the challenged actions, not how Defendants describe them.

The EEOC Document also constitutes final agency action. Legal consequences will flow from the guidance because it invites applicants and employees to contact the EEOC and "file a charge of discrimination" if employers violate the guidance, EEOC Document, creating a risk that employers who do not comply with the guidance will be subject to enforcement actions and potential liability. The EEOC Document is thus "final agency action" because it "has the effect of committing the agency itself to a view of the law that, in turn, forces [employers] either to alter [their] conduct, or expose [themselves] to potential liability." *Texas*, 933 F.3d at 446 (internal quotation marks omitted).

Defendants argue that no legal consequences will flow from the EEOC Document because the opening of an administrative investigation is not itself a final agency action. MTD Mem. 13 (PageID#366). But the EEOC Document is not analogous to the opening of an administrative investigation. It purports to "explain[] what the *Bostock* decision means ... for employers across the country." EEOC Document. It binds the agency "to a particular legal position" and "dictates" in advance how "EEOC must assess claims" of discrimination based on transgender status. *Texas*, 933 F.3d at 441, 445. The EEOC Document "does not merely comment on a single employer's practices; it tells EEOC staff and all employers what sort of policy is unlawful." *Id.* at 445.

### B. The challenged documents are legislative rules that were subject to, but did not comply with, the APA's notice-and-comment requirements.

"The APA sets different procedural requirements for 'legislative rules' and 'interpretive rules': the former must be promulgated pursuant to notice-and-comment rulemaking; the latter need not." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (citing 5 U.S.C. § 553). A rule that "intends to create new law, rights or duties" is legislative. *Id.* (internal quotation marks omitted). And "a rule that 'adopts a new position inconsistent with any of the Secretary's existing regulations' is necessarily legislative." *Id.* (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (alteration adopted)). One of the "central purposes" of the notice-and-comment requirement is "to give those with interests affected by rules the chance to participate in [their] promulgation." *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 678 (6th Cir. 2005). The requirement "assure[s] fairness and mature consideration of rules of general application." *Id.* (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality opinion)).

Importantly, the analysis for whether a rule is interpretive or legislative turns on the substance of the documents, not the "particular label" an agency uses. *Detroit Edison Co. v. EPA*, 496 F.2d 244, 249 (6th Cir. 1974) (quoting *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 416 (1942)). "It is well-established that an agency may not escape the notice and comment

requirements ... by labeling a major substantive legal addition to a rule a mere interpretation." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000).

The Department's Interpretation and Fact Sheet and the EEOC Document are legislative rules. Start with the Interpretation and Fact Sheet. Those documents "create new law," *Azar*, 908 F.3d at 1042, by imposing on educational institutions a new obligation not to discriminate based on gender identity—an obligation that appears nowhere in Title IX itself and that *Bostock* did not impose either, *see* pp. 27-32, *infra*. They announce the Department's position that refusing to allow transgender students to use living facilities or compete on sports teams consistent with their gender identity violates Title IX. That position squarely conflicts with Title IX itself and its implementing regulations, which expressly permit sex-separated living facilities and athletic teams. *See* 20 U.S.C. § 1686; PI Mem. 14 (PageID#148) (citing 34 C.F.R. §§ 106.33, 106.37(c), 106.41(b)). The Interpretation and Fact Sheet "effec[t] a substantive change in the regulations" by "adopt[ing] a new position inconsistent with ... [the Department's] existing regulations" and are thus "necessarily legislative." *Azar*, 908 F.3d at 1042 (first alteration in original) (quoting *Shalala*, 514 U.S. at 100). And they are being "applied by the agency in a way that indicates [they are] binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002).

Defendants may not simply point to *Bostock* to justify their change in position, since that decision was "narrow" and "limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). The Interpretation and Fact Sheet did not merely "remind parties of existing statutory or regulatory duties" but rather imposed *new* duties and "chang[ed] the text" of the statute and regulations they "profess[ed] to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). Because neither Title IX, its implementing regulations, nor *Bostock* "compels or logically justifies" the Department's Interpretation or Fact Sheet, those documents are legislative rules issued in violation of the APA's notice-and-comment requirements. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021).

Because the Interpretation and Fact Sheet are legislative rules, the Department was required to give the public notice and an opportunity to participate. Indeed, it is hard to imagine an issue more in need of public input and deliberation. The Interpretation and Fact Sheet impose obligations on schools at every level across the country and implicate core privacy and safety interests, athletic opportunities for female students, and First Amendment rights. The Department's failure to adhere to notice and comment was a clear violation of the APA.

The EEOC Document, too, goes well beyond the text of Title VII to impose new duties on employers and is thus a legislative rule. Defendants attempt to defend the EEOC Document as an "interpretation" of Title VII by claiming that it is consistent with the "EEOC's previous administrative decisions, which *Bostock* supports." MTD Mem. 16 (PageID#369). But *Bostock* could not possibly support the EEOC's administrative decisions concerning restrooms or pronouns because the Supreme Court did not consider those issues. 140 S. Ct. at 1737-38. And announcing the agency's definitive position about what the "*Bostock* decision means for ... employers across the country," EEOC Document, is a far cry from the EEOC's previous fact-specific administrative decisions. The EEOC Document was issued not just to "put[] the public on notice of *pre-existing* legal obligations or rights," but to "speak with the force of law" and "creat[e] legal effects" for employers. *NRDC v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). It is a legislative rule that was issued in violation of the APA's notice-and-comment requirements.

### C. The Department's Interpretation and Fact Sheet are arbitrary and capricious.

"When an agency changes its existing position," it must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). It must also consider any "reliance interests" that its previous position "engendered." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (quoting *Encino*, 136 S. Ct. at 2126). The Interpretation and Fact Sheet flouted these requirements.

The Department failed to adequately acknowledge that its guidance conflicted with the Department's initial post-*Bostock* guidance and longstanding regulations, let alone provide "good reasons" for its change. *Bostock* cannot provide the requisite

"good reasons" because it did not address Title IX. Moreover, the Department had *already* considered whether *Bostock* required it to change its interpretation of Title IX and concluded that it did not. *See* pp. 5-6 & n.1, *supra*.

The Department also failed to consider "whether there was 'legitimate reliance' on the" prior guidance and regulations. *Regents,* 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996)). Educational institutions relied on the Department's longstanding regulations. For example, had they known the Department would eventually interpret Title IX to prohibit discrimination based on gender identity, they may have offered more single-occupant living facilities. Defendants contend these reliance interests were "not implicated" because the challenged guidance does not "disallow sex-separated facilities or athletic teams." MTD Mem. 16 (PageID#369). That argument blinks reality. The Interpretation and Fact Sheet require educational institutions to allow a transgender female—i.e., a biological male—to use living facilities and compete on athletic teams designated for biological females. Given that Defendants and the public all understood "sex" to mean *biological* sex for decades after Title VII and Title IX were enacted, the Interpretation and Fact Sheet implicate serious reliance interests. And Defendants do not dispute that they failed to consider those interests.

### D. The EEOC Document exceeds the EEOC's statutory authority and violates the agency's own regulations.

The EEOC Document exceeds the EEOC's statutory authority because neither the full EEOC nor an individual EEOC Commissioner has authority to issue rules or regulations. "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976). [9] The "technical assistance document" that the EEOC Chair published, however, purports to define regulated entities' obligations under Title VII and dictate how employers structure their workplaces down to the pronouns they (and their employees) must use. Accordingly, the EEOC has issued regulations "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C); *see also Texas*, 933 F.3d at 451 (concluding that the EEOC "overstepped its statutory authority" in issuing guidance that amounted to "a substantive rule"). The EEOC Document must be set aside for that reason alone.

The EEOC Document also violates the EEOC's own regulations. It was issued "upon approval of the Chair of the U.S. Equal Employment Opportunity Commission"—*not* the entire Commission. *See* EEOC Document. This unilateral action violates an EEOC regulation requiring approval of "significant guidance" by "a Commission vote." 29 C.F.R. § 1695.2(d). The EEOC Document is a "significant" document because it was "disseminated to regulated entities or the general public and [can] reasonably be anticipated ... [t]o raise novel legal or policy issues arising out of legal mandates [and] the President's priorities." *Id*. § 1695.1(b)(1). And because the EEOC Document is a "significant guidance document," the EEOC's own regulations also required "a period of notice and public comment of at least 30 days." *Id*. § 1695.6(a).

Defendants do not dispute that the EEOC Document was issued without approval of the Commission and without notice and comment. They instead contend that the Commission was not required to follow these procedures because the EEOC Document was not significant guidance. MTD Mem. 19-20 (PageID#372-73). But it is hard to imagine an action more likely "to raise novel legal or policy issues" than a nationwide mandate to employers concerning pronoun, restroom, and locker room usage for transgender employees. That is true even if was not "the first time the EEOC has taken a position on these issues." MTD Mem. 20 (PageID#373). Given *Bostock*'s express reservation of those issues and continued litigation in the lower courts, those issues were nothing if not "novel."

Nor do Defendants dispute that the EEOC lacks statutory authority to promulgate substantive rules. *See id*. at 20 (PageID#372). They claim that the EEOC Document does not exceed the EEOC's limited authority because it "expressly disclaims any legal effect on its own." *Id*. But it is the *practical effect* of the guidance that controls, not its label. *See* pp. 22-23, *supra*.

### E. The Interpretation and Fact Sheet are contrary to law.

**1. The Interpretation and Fact Sheet are contrary to Title IX.**

The Interpretation and Fact Sheet are substantively unlawful because their purported interpretation is contrary to Title IX. The Department's Interpretation and Fact Sheet essentially erase 20 U.S.C. § 1686 from the statute, conflict with Title IX's implementing regulations, and ignore relevant physiological differences between the two sexes that justify differential treatment in certain contexts such as living facilities and athletics.

The Department cannot simply point to *Bostock* to justify its interpretation of Title IX. *Bostock* concerned only Title VII, expressly noted that "other federal or state laws that prohibit sex discrimination"—like Title IX—were not "before" the Court, and refused to "prejudge any such question" about what those statutes require. 140 S. Ct. at 1753; *see also Pelcha*, 988 F.3d at 324 ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself."). And as the Sixth Circuit recently explained, "Title VII differs from Title IX in important respects." *Meriwether*, 992 F.3d at 510 n.4. It therefore "does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.*

The Department must instead justify its interpretation based on Title IX itself. But the Interpretation and Fact Sheet squarely conflict with Title IX. Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As *Meriwether* emphasized, Title IX—unlike Title VII—also *expressly authorizes* separation based on sex in certain circumstances. 992 F.3d at 510 n.4. Most notably, Title IX makes clear that the statute's prohibition of sex discrimination does not prevent entities from "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686; *see* 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh, the chief Senate sponsor of Title IX) (explaining that covered institutions may "permit differential treatment by sex ... in sports facilities or other instances where personal privacy must be preserved"). It also expressly allows certain single-sex educational institutions and organizations. 20 U.S.C. § 1681(a)(1)-(9).

The Department's own regulations are even more specific in this regard. They allow covered programs to "provide separate toilet, locker room, and shower facilities on the basis of sex," as long as the "facilities provided for students of one sex" are "comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33; *see* 45 Fed. Reg. 30,802, 30,960 (May 9, 1980) (similar). The Department allows covered programs to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), and even *requires* universities to consider sex in allocating athletic scholarships, *id.* at § 106.37(c). These regulations underscore that "[p]hysical differences between men and women ... are enduring" and that the "'two sexes are not fungible'" but rather have "[i]nherent differences." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) (internal quotation marks omitted).

As the Department has always construed the term, "sex" in Title IX refers only to biological sex, and not gender identity. *E.g.*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020) ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification."). That was the ordinary meaning of the term when Title IX was enacted. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1322 (11th Cir. 2021) (W. Pryor, C.J., dissenting) (collecting dictionary definitions from time of enactment), *rh'g en banc granted*, 9 F.4th 1369 (11th Cir. 2021); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting) (same), *cert. denied*, 141 S. Ct. 2878 (2021).

Statutory context confirms this binary understanding of "sex." *See* 20 U.S.C. § 1681(a)(2) (allowing institution to change "from .... admit[ting] only students of one sex to ... admit[ting] students of *both sexes*") (emphasis added)); *id.* § 1681(a) (6)(B) (referring to organizations whose "membership ... has traditionally been limited to persons of *one sex*") (emphasis added)). And the Department's regulations provide further evidence of this understanding. *See* 34 C.F.R. § 106.41(b) (covered institutions "may operate or sponsor separate teams for members of each sex"); *id.* § 106.40(b)(1) (prohibiting discrimination based on pregnancy); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes.").

Because Title IX expressly authorizes separation based on biological sex in myriad contexts, it precludes the Department's view that a covered program may not prevent an individual of one sex from using facilities or competing on athletic teams designated for the other sex, or otherwise differentiate between the sexes in circumstances where those differences matter.

The text of Title IX is materially different from Title VII in another respect: Title IX prohibits discrimination "on *the basis* of sex," 20 U.S.C. § 1681(a) (emphasis added), rather than "because of ... sex," 42 U.S.C. § 2000e-2(a)(1). That distinction is significant. *Bostock* concluded that Title VII's prohibition on discrimination "because of" sex imposed a but-for causation requirement, which the Court acknowledged "can be a sweeping standard." 140 S. Ct. at 1739. It followed from that standard that "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred," even if the primary reason for the termination was that the employee is homosexual or transgender. *Id.* at 1741-42. Title IX, by contrast, prohibits only discrimination "on *the basis* of sex." That language makes clear that biological sex must be the *sole* reason for the discrimination. "A statutory provision's use of the definite article 'the,' ... indicates that Congress intended the term modified to have a singular referent." *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 387-88 (S.D.N.Y. 2006).

Against all this, the Department's attempts to justify its interpretation of Title IX are unavailing. Interpretation, 86 Fed. Reg. at 32,638. *First*, the Department concluded that there is a "textual similarity" between Title IX and Title VII. However, the two statutes in fact contain materially different language. The Department asserted that the *Bostock* opinion used "because of" and "on the basis of" interchangeably. *Id.* But "[j]udicial opinions are not statutes." *In re Plavix Mktg., Sales Practices and Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 235 (3d Cir. 2020). The dispositive question is what *Congress* intended. And Congress's use of different language indicates that it intended "to convey a different meaning." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1578 (2016) (Thomas, J., concurring in the judgment).

*Second*, the Department asserted that both Title VII and Title IX "specifically protect individuals against discrimination." Interpretation, 86 Fed. Reg. at 32,638. True enough. But the relevant question is what constitutes prohibited discrimination under each statute. Given the textual differences between Title VII and Title IX, what is discrimination under one statute is not necessarily discrimination under the other.

*Third*, the Department contended that Title VII and Title IX are similar because neither statute contains an exception for discrimination against homosexual or transgender individuals. *Id.* That argument is a non-starter. An exception for such discrimination would be necessary only if the statutes otherwise prohibited it.

*Fourth*, the Department wrongly concluded that Title IX *unambiguously* prohibits sexual- orientation and gender-identity discrimination. *Id.* Not so. At the very least, the fact that Title IX expressly allows sex-separated living facilities precludes any conclusion that the statute *unambiguously* prohibits covered programs from requiring individuals to use living facilities that correspond to their biological sex.

*Finally*, the Department observed that lower federal-court decisions support its interpretation of Title IX. *See id.* at 32,639 (citing *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020); *Grimm*, 972 F.3d at 616). But the *Adams* decision is no longer good law. After the panel replaced its original opinion with a narrower one that "d[id] not reach the Title IX question," *Adams*, 3 F.4th at 1304, the Eleventh Circuit granted rehearing en banc and vacated even the narrower opinion, *Adams v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th 1369 (11th Cir. 2021). And the Fourth Circuit's decision in *Grimm* suffers from the same shortcomings as the Department's Interpretation. Requiring a school to allow "a biological female who identifies as male[] to use the male restroom compromises the separation as explicitly authorized by Title IX." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting). Notably, the Department also failed even to mention *Meriwether* or any other decisions that would undermine its Interpretation.

Defendants offer no real response to these arguments. They do not even cite 20 U.S.C. § 1686, the provision that allows educational institutions to "maintain[] separate living facilities for the different sexes." They cite only the *regulation* that allows schools to provide sex-separated living facilities, *see* MTD Mem. 18 (PageID#371) (citing 34 C.F.R. § 106.33), and argue that

this *regulation* "cannot override the statutory prohibition against discrimination," *id*. (emphasis omitted) (quoting *Grimm*, 972 F.3d at 618). But § 1686 is not a regulation. It is statutory language that *Congress* enacted at the same time as the prohibition of sex discrimination. And it squarely forecloses the Department's interpretation.

Defendants fail to cite any dictionaries from the time surrounding the enactment of Title IX to support their assumption that "sex" encompasses gender identity. And they neglect to mention that *Bostock* "proceed[ed] on the assumption that 'sex' ... refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739. As Plaintiffs have explained, the plain language and statutory structure of Title IX make clear that "sex" means biological sex. The Department's Interpretation and Fact Sheet—which interpret Title IX to allow a member of one "sex" to use living facilities and compete on athletic teams designated for the other "sex"—simply cannot be reconciled with Title IX or the Department's longstanding regulations.

### 2. The Interpretation and Fact Sheet violate the Constitution.

The Interpretation and Fact Sheet are also contrary to law because they violate the Spending Clause and structural constitutional safeguards.

**Spending Clause**. The Interpretation and Fact Sheet violate the Spending Clause for three separate reasons. They impose conditions that (1) were not clearly established by Congress; (2) are unconstitutionally coercive; and (3) require Plaintiffs to violate the First Amendment.

Congress enacted Title IX pursuant to its Spending Clause authority. "The legitimacy of Congress' power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the contract." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (internal quotation marks omitted). "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*.

As explained above, Title IX does not unambiguously prohibit transgender discrimination. Nor does it unambiguously prohibit institutions from separating athletic teams or living facilities based on biological sex. Both the statute and its implementing regulations expressly allow sex- separated facilities, *see* 20 U.S.C. § 1686; 34 C.F.R. § 106.33, and longstanding regulations expressly authorize sex-separated sports teams, 34 C.F.R. § 106.41(b). Because Congress did not "*provide*[] *clear notice to the States* of their [purported] obligation" to ignore the biological sex of transgender students, the Department may not impose that obligation under the guise of an "interpretation." *Pontiac*, 584 F.3d at 271 (plurality opinion).

Defendants attempt to water down the Spending Clause's clear-notice rule to require nothing more than notice that *some* condition is attached to the receipt of funds. MTD Mem. 20 (PageID#373). But a statute enacted pursuant to the Spending Clause must "furnish[] clear notice regarding the liability at issue" in specific cases. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (asking "whether ... a state official would clearly understand that one of the obligations of the [Individuals with Disabilities in Education] Act is the obligation to compensate prevailing parents for expert fees"). Congress must tell States not only "that there *are* conditions," but also "*what* those conditions are." *Ohio v. Yellen*, --- F. Supp. 3d ---, 2021 WL 2712220, at *12 (S.D. Ohio July 1, 2021), *appeal pending*, No. 21-3787 (6th Cir.).

Defendants are thus mistaken that Title IX is constitutional simply because Plaintiffs are "clearly on notice that they must comply with the antidiscrimination provisions of Title IX." MTD Mem. (PageID#373). By that logic, the statute at issue in *Arlington* would have provided clear notice too, because it clearly imposed an obligation to compensate prevailing parents for certain "costs," which allegedly included expert fees. 548 U.S. at 297. Allowing the federal government to impose brand-new conditions on States under the guise of statutory interpretation would undermine the purposes of the clear-notice requirement.

Defendants' argument also once again ignores that § 1686 expressly *allows* educational institutions to maintain separate living facilities for the different sexes. The question is not whether the prohibition on sex discrimination, standing alone, provides clear notice to States but whether Title IX *as a whole* provides clear notice. *See Pontiac*, 584 F.3d at 271 (plurality opinion) (explaining

that the Court must "look to the provisions of the whole law" (quoting *Pennhurst*, 451 U.S. at 18)). It is inconceivable that a reasonable state official would have understood Title IX to prohibit educational institutions from maintaining living facilities separated by biological sex.

Defendants claim that "the parameters" of funding conditions "can permissibly be set out in agency interpretations, guidance, or regulations." MTD Mem. 21 (PageID#374). But the sole authority they cite for that proposition, *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 670 (1985), did not consider that issue because the statute itself provided the "requisite clarity," *id.* at 666. It follows from our constitutional structure that agencies may *not* cure the unconstitutional ambiguity of a statutory condition. While the Spending Clause empowers Congress to place conditions on federal funds, it requires Congress to do so unambiguously. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). If Congress fails to satisfy that requirement, no amount of agency clarification can save Congress's unlawful action. Even if an agency can cure statutory ambiguity, the Department has not done so here. The Department's longstanding regulations expressly *allow* sex-separated living facilities and sports teams.

The Department's guidance also violates the Spending Clause because it uses the threat of withholding substantial federal funding to coerce Plaintiffs into adopting the agency's preferred policies. Congress may not use "financial inducements to exert a 'power akin to undue influence.'" *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J.). While a threatened loss of only a "small percentage" of a State's federal highway funds was not coercive, *Dole*, 483 U.S. at 211, a threatened loss of "over 10 percent of a State's overall budget" was "economic dragooning" and unconstitutionally coercive. *NFIB*, 567 U.S. at 581. In Tennessee, the Tennessee Department of Education received *$1.5 billion* in federal funding in the most recent fiscal year, and Tennessee's public higher education institutions received an additional *$88 million*. Compl. ¶ 14, ECF No. 1 (PageID#5). If Tennessee does not comply with the guidance, it risks losing over *twenty percent* of its education budget and over *three percent* of its overall budget. *See* State of Tennessee, The Budget: Fiscal Year 2021-22 A-19, https://bit.ly/3AizM0N. This "is much more than 'relatively mild encouragement'—it is a gun to the head." *NFIB*, 567 U.S. at 581 (quoting *Dole*, 483 U.S. at 211); *see also Kentucky v. Yellen*, --- F. Supp. 3d ---, 2021 WL 4394249, at *4 (E.D. Ky. Sept. 24, 2021) (American Rescue Plan Act is unconstitutionally coercive because it offered States funds "equal to roughly *one-fifth* of their general fund revenues for the preceding year").

Defendants contend that "there is no coercion where the only issue is the interpretation of a longstanding condition on federal funding." MTD Mem. 22 (PageID#375). But that argument ignores that the sheer amount of federal funding at stake can render a statute unconstitutionally coercive. The "financial inducement" here is "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *Dole*, 483 U.S. at 211). Even if the amount of funding alone were not coercive, the Department's threat to withhold *existing* Title IX funding if States fail to comply with the *new* obligations imposed by the Interpretation and Fact Sheet undoubtedly crosses the line. *See id.*

The Interpretation and Fact Sheet also violate the Spending Clause because they "induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. By threatening to withhold funds from Plaintiffs unless they engage in conduct that would violate the First Amendment rights of their students and employees, the challenged guidance imposes unconstitutional conditions on the receipt of federal funds.

The Department's position that the use of biologically accurate pronouns could constitute unlawful discrimination runs headlong into the First Amendment. *Meriwether* held that a state university "flouted" the First Amendment and "violated [a professor's] free-speech rights" when it punished the professor for declining to use a student's "preferred pronouns." 992 F.3d at 511-12. The Department's guidance also conflicts with religious liberty. *Bostock* emphasized that the First Amendment, the Religious Freedom Restoration Act, and federal antidiscrimination laws all provide robust protections for religious employers and employees. 140 S. Ct. at 1754. The Department did not even acknowledge the potential conflict between its interpretation of Title IX and the religious-freedom rights of the entities and individuals that the statute regulates.

Defendants accuse Plaintiffs of attempting to "extend" the unconstitutional-conditions doctrine, MTD Mem. 23 (PageID#376), but Plaintiffs seek only to enforce the "unexceptionable" proposition that the spending power "may not be used to induce the

States to engage in activities that would themselves be unconstitutional," *Dole*, 483 U.S. at 210. [10] Defendants also accuse Plaintiffs of "fail[ing] to plead any concrete facts" to show that Plaintiffs will be required to violate the First Amendment. MTD Mem. 23 (PageID#376). But the conflict between the Department's guidance and the Sixth Circuit's decision in *Meriwether* is as "concrete" as it gets. The Department interprets Title IX to *require* educational institutions to use a transgender student's preferred pronouns, *see* Fact Sheet, while *Meriwether* held that a state university "flouted" the First Amendment by punishing a professor for declining to use such pronouns, 992 F.3d at 511-12. And if Defendants are right that whether a particular application of the guidance will violate the First Amendment is a "fact-intensive" inquiry, MTD Mem. 24 (PageID#377), that only proves that the sweeping pronouncements contained in the Interpretation and Fact Sheet are unlawful. [11]

**Structural Provisions**. The Interpretation and Fact Sheet also violate important structural constitutional safeguards. The Department's purported "interpretation" of Title IX is not a permissible reading of the statute and instead constitutes an unlawful exercise of Congress's legislative authority that exceeds the agency's jurisdiction. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in ... Congress."). Even if Title IX were ambiguous, the issues the Interpretation and Fact Sheet address are ones of "deep ... political significance" that must be decided by Congress, not an unelected administrative agency. *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation marks omitted). Nor may an administrative agency interpret a statute in a manner that intrudes so significantly on Plaintiffs' traditional authority to protect the privacy and safety of their citizens without clear evidence that Congress intended that result. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

Defendants contend that their "interpretation that Title IX bars discrimination on the basis of sexual orientation and gender identity is no more an intrusion on Congress's legislative authority than the Supreme Court's similar conclusion regarding Title VII in *Bostock*." MTD Mem. 25 (PageID#378). Since three Supreme Court Justices thought that intrusion was unprecedented, it is hard to see how that argument helps Defendants. *Bostock*, 140 S. Ct. at 1755 (Alito, J., dissenting, joined by Thomas, J.) ("A more brazen abuse of our authority to interpret statutes is hard to recall."); *id.* at 1836 (Kavanaugh, J., dissenting) ("[T]he implications of this Court's usurpation of the legislative process will likely reverberate in unpredictable ways for years to come."). Regardless, the intrusion here is even greater than in *Bostock*. Unlike the federal judiciary, administrative agencies lack any constitutionally prescribed role in our system of government. *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power on it."). And Title IX expressly allows regulated parties to maintain living facilities that are separated by sex.

### F. The EEOC Document is contrary to law.

#### 1. The EEOC Document is contrary to Title VII.

The EEOC Document is contrary to Title VII because it unreasonably extends *Bostock*'s reasoning to circumstances that were not before the Court. *Bostock* resolved only a single question: whether *terminating* an employee "simply for being homosexual or transgender" constitutes discrimination "'because of ... sex'" in violation of Title VII. 140 S. Ct. at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court expressly did "not purport to address bathrooms, locker rooms, or anything else of the kind" and acknowledged that "policies or practices" other than termination "might or might not qualify as unlawful discrimination." *Id.* at 1753.

Nor does it necessarily follow from *Bostock*'s reasoning that an employer who declines to use a transgender employee's preferred pronouns or to allow a transgender woman to use the women's restroom is violating Title VII. As the DOJ recognized earlier this year before reversing course, sex-separated bathrooms, locker rooms, and the like do not discriminate based on transgender status. U.S. Dep't of Justice, Application of *Bostock v. Clayton County* 4 (Jan. 17, 2021). Sex-separated bathrooms are permissible under Title VII—as they have always been, *see, e.g.*, *Causey v. Ford Motor Co.*, 516 F.2d 416, 424 (5th Cir. 1975)—because they do not treat any employees "worse than others who are similarly situated," *Bostock*, 140 S. Ct. at 1740. Moreover, the government's compelling interests in protecting privacy justify separating living facilities based on biological

sex. *See, e.g., Doe v. Luzerne Cnty.*, 660 F.3d 169, 176-77 (3d Cir. 2011) (an individual has "a constitutionally protected privacy interest in his or her partially clothed body" that is "particularly" strong "while in the presence of members of the opposite sex"); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) ("[T]he constitutional right to privacy ... includes the right to shield one's body from exposure to viewing by the opposite sex[.]"). While "[a]n individual's homosexuality or transgender status *is not relevant* to employment decisions" about hiring and firing, *Bostock*, 140 S. Ct. at 1741 (emphasis added), *sex is relevant* to decisions about locker rooms and the like where differences between the two sexes matter. [12]

### 2. The EEOC Document violates the Constitution.

The EEOC Document also violates the Constitution in several respects. Like the Department's guidance, the EEOC Document violates the separation of powers and the Tenth Amendment by usurping Congress's lawmaking authority and infringing on areas of traditional state authority. *See* pp. 37-38, *supra*. The EEOC Document is an especially egregious violation of these fundamental principles because Congress has never delegated substantive rulemaking authority to the EEOC. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 583 (6th Cir. 1992).

In addition, the EEOC Document constitutes an unlawful attempt to abrogate Plaintiffs' sovereign immunity. Congress may abrogate the States' sovereign immunity pursuant to its authority to enforce the Fourteenth Amendment only to remedy violations of the Constitution by the States; it may not substantively redefine a State's constitutional obligations. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). But Congress has never identified any pattern of discrimination against homosexual or transgender individuals by the States, let alone one that amounted to a constitutional violation. Neither the Supreme Court nor the Sixth Circuit has held that discrimination based on transgender status is unconstitutional. *Cf. Ondo v. City of Cleveland*, 795 F.3d 597, 608-10 (6th Cir. 2015) (holding that homosexuals are not a suspect or quasi-suspect class and rejecting equal protection claim under rational-basis review).

Defendants respond that an employer's obligation to treat transgender employees consistent with their gender identity, regardless of context, flows from the "direct holding of the Supreme Court in *Bostock*," not the EEOC Document. MTD Mem. 25 (PageID#378). But that was not the holding of *Bostock*. So even if *Bostock*'s interpretation of Title VII is a lawful abrogation of the States' sovereign immunity, it does not follow that the EEOC Document is too.

### CONCLUSION

Because Plaintiffs' claims are justiciable and legally sufficient, Defendants' motion to dismiss should be denied. Respectfully submitted,

/s/ A. Barrett Bowdre

STEVE MARSHALL

Attorney General of Alabama

A. BARRETT BOWDRE*

Deputy Solicitor General

State of Alabama

Office of the Attorney General

501 Washington Ave.

Montgomery, AL 36130

(334) 242-7300

Barrett.Bowdre@AlabamaAG.gov

*Counsel for State of Alabama*

/s/ Kate B. Sawyer

MARK BRNOVICH

Attorney General of Arizona

KATE B. SAWYER*

Assistant Solicitor General

Office of the Arizona Attorney General

2005 N. Central Ave.

Phoenix, AZ 85004

(602) 542-8304

Kate.Sawyer@azag.gov

*Counsel for State of Arizona*

/s/ Matthew D. Cloutier (BPR # 036710)
HERBERT H. SLATERY III

*Attorney General and Reporter of Tennessee*

ANDRÉE S. BLUMSTEIN

Solicitor General

SARAH K. CAMPBELL*

Associate Solicitor General

CLARK L. HILDABRAND*

BRANDON J. SMITH*

Assistant Solicitors General

MATTHEW D. CLOUTIER

Assistant Attorney General

Office of the Tennessee Attorney General and Reporter

P.O. Box 20207

Nashville, TN 37202

(615) 741-7908

Matt.Cloutier@ag.tn.gov

***Counsel for State of Tennessee***

/s/ Jessica M. Alloway

TREG R. TAYLOR

*Attorney General of Alaska*

JESSICA M. ALLOWAY*

Solicitor General

State of Alaska

1031 West Fourth Avenue, Suite 200

Anchorage, AK 99501

(907) 465-3600

jessie.alloway@alaska.gov

***Counsel for State of Alaska***

/s/ Nicholas J. Bronni

LESLIE RUTLEDGE

Attorney General of Arkansas

NICHOLAS J. BRONNI*

Solicitor General

VINCENT M. WAGNER

Deputy Solicitor General

Office of the Arkansas Attorney General

323 Center St., Suite 200

Little Rock, AR 72201

(501) 682-6307

nicholas.bronni@arkansasag.gov

***Counsel for State of Arkansas***


/s/ Drew F. Waldbeser

CHRISTOPHER M. CARR

Attorney General of Georgia

DREW F. WALDBESER*

Deputy Solicitor General

Office of the Georgia Attorney General

40 Capitol Square, S.W.

Atlanta, GA 30334

(404) 458-3378

dwaldbeser@law.ga.gov

***Counsel for State of Georgia***

/s/ W. Scott Zanzig

LAWRENCE G. WASDEN

Attorney General of Idaho

W. SCOTT ZANZIG*

Deputy Attorney General

Office of the Idaho Attorney General

P.O. Box 83720

Boise, ID 83720

(208) 332-3556

scott.zanzig@ag.idaho.gov

***Counsel for State of Idaho***

/s/ Thomas M. Fisher

THEODORE E. ROKITA

Attorney General of Indiana

THOMAS M. FISHER**

Solicitor General

Office of the Indiana Attorney General

IGC-South, Fifth Floor

302 West Washington St.

Indianapolis, IN 46204

(317) 232-6255

Tom.Fisher@atg.in.gov

***Counsel for State of Indiana***

/s/ Kurtis K. Wiard
DEREK SCHMIDT

Attorney General of Kansas

KURTIS K. WIARD*

Assistant Solicitor General

Office of the Kansas Attorney General

120 S.W. 10th Ave.

Topeka, KS 66612

(785) 296-2215

kurtis.wiard@ag.ks.gov

*Counsel for State of Kansas*

/s/ Marc Manley

DANIEL CAMERON

Attorney General of Kentucky

MARC MANLEY*

Assistant Attorney General

COURTNEY E. ALBINI

Assistant Solicitor General

Office of the Kentucky Attorney General

700 Capital Ave., Suite 118

Frankfort, KY 40601

(502) 696-5300

Marc.Manley@ky.gov

*Counsel for Commonwealth of Kentucky*

/s/ Elizabeth B. Murrill

JEFF LANDRY

Attorney General of Louisiana

ELIZABETH B. MURRILL*

Solicitor General

J. SCOTT ST. JOHN*

Deputy Solicitor General

Louisiana Department of Justice

1885 N. Third St.

Baton Rouge, LA 70804

(225) 326-6766

emurrill@ag.louisiana.gov

stjohnj@ag.louisiana.gov

***Counsel for State of Louisiana***

/s/ Justin L. Matheny

LYNN FITCH

Attorney General of Mississippi

JUSTIN L. MATHENY*

Deputy Solicitor General

State of Mississippi

Office of the Attorney General

P.O. Box 220

Jackson, MS 39205

(601) 359-3680

justin.matheny@ago.ms.gov

***Counsel for State of Mississippi***

/s/ D. John Sauer

ERIC S. SCHMITT

Attorney General of Missouri

D. JOHN SAUER*

Solicitor General

Office of the Missouri Attorney General

P.O. Box 899

Jefferson City, MO 65102

(573) 751-8870

John.Sauer@ago.mo.gov

***Counsel for the State of Missouri***

/s/ Christian B. Corrigan

AUSTIN KNUDSEN

Attorney General of Montana

DAVIS M.S. DEWHIRST

Solicitor General

CHRISTIAN B. CORRIGAN*

Assistant Solicitor General

Office of the Montana Attorney General

215 North Sanders

P.O. Box 201401

Helena, MT 59620

(406) 444-2707

Christian.Corrigan@mt.gov

***Counsel for State of Montana***
/s James A. Campbell

DOUGLAS J. PETERSON

Attorney General of Nebraska

JAMES A. CAMPBELL*

Solicitor General

Office of the Nebraska Attorney General

2115 State Capitol

Lincoln, NE 68509

(402) 471-2682

jim.campbell@nebraska.gov

**Counsel for State of Nebraska**

/s/ Benjamin M. Flowers

DAVE YOST

Attorney General of Ohio

BENJAMIN M. FLOWERS*

Solicitor General

Office of the Ohio Attorney General

30 E. Broad St., 17th Floor

Columbus, OH 43215

(614) 446-8980

bflowers@OhioAGO.gov

**Counsel for State of Ohio**

/s/ Zach West

JOHN M. O'CONNOR

Attorney General of Oklahoma

ZACH WEST*

Assistant Solicitor General

Office of the Attorney General

State of Oklahoma

313 N.E. 21st St.

Oklahoma City, OK 73105

(405) 522-4798

Zach.West@oag.ok.gov

***Counsel for State of Oklahoma***

s/ J. Emory Smith, Jr.

ALAN WILSON

Attorney General of South Carolina

J. EMORY SMITH, JR.*

*Deputy Solicitor General*

Office of the South Carolina Attorney General

P.O. Box 11549

Columbia, SC 29211

(803) 734-3680

esmith@scag.gov

***Counsel for State of South Carolina***

/s/ Jason R. Ravnsborg

JASON R. RAVNSBORG*

Attorney General of South Dakota

Office of the South Dakota Attorney General

1302 East Highway 14, Suite 1

Pierre, SD 57501

(605) 773-3215

Jason.Ravnsborg@state.sd.us

*Counsel for State of South Dakota*

/s/ Lindsay S. See

PATRICK MORRISEY

Attorney General of West Virginia

LINDSAY S. SEE*

Solicitor General

Office of the West Virginia Attorney General

State Capitol Bldg. 1, Room E-26

Charleston, WV 25305

(681) 313-4550

lindsay.s.see@wvago.gov

*Counsel for State of West Virginia*


**\*Admitted Pro Hac Vice**


## Footnotes

1     In August 2020, moreover, the Department's OCR issued a letter adhering, after *Bostock*, to its earlier finding that Connecticut school systems had *violated* Title IX by *allowing* transgender females—i.e., biological males—to compete against biological females. *See* U.S. Dep't of Educ., OCR, Revised Letter of Impending Enforcement Action (Aug. 31, 2020), https://bit.ly/3DoCLGZ.

2     *Eg.*, 2021 Tenn. Pub. Acts, ch. 40, § 1 (providing that "[a] student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth"); 2021 Tenn. Pub. Acts., ch. 452, § 6 (giving public school students, teachers, and employees a private right of action against a school that "intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other persons [are] present"); Tenn. Code Ann. § 49-6- 2904(b)(2) (providing students a right to "[e]xpress religious viewpoints in a public school"); *id.* § 49-7-2405(a)(2), (a)(10) (providing, with certain limitations, that public higher education institutions in Tennessee "shall be committed to giving students the broadest possible latitude to speak, write, listen, challenge, learn, and discuss any issue" and that "no faculty will face adverse employment action for classroom speech"); *see also* Compl. ¶ 99 (PageID#19-20) (citing other state laws).

3     Defendants urge this Court to dismiss ten Plaintiffs because the Complaint does not specifically allege that those States have laws that arguably conflict with the challenged guidance. MTD Mem. 5 n.1 (PageID#358). As long as one plaintiff has demonstrated standing, however, a court need not consider whether the other plaintiffs can independently

demonstrate standing. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977); *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020). And those States *do* have laws that arguably conflict with the guidance. *See, e.g.*, *La. Dep't of Justice v. Edwards*, 233 S.3d 76, 81 (La. Ct. App. 2017) (construing state laws to "prohibit discrimination based on a person's biological sex"); Ohio Rev. Code § 4743.10(A)-(B).

4    *Mellon* also conflated standing with both the merits, *see* Anthony J. Bellia Jr., *Article III and the Cause of Action*, 89 Iowa L. Rev. 777, 826 (2004), and the political question doctrine, which the Supreme Court has since clarified occupies only a "narrow" field, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).

5    Defendants suggest in a footnote that an injunction preventing enforcement by the EEOC would not redress Plaintiffs' injuries because "the EEOC would still be able to apply the reasoning from its administrative decisions." MTD Mem. 16 (PageID#369). But the EEOC would still be bound by any judgment that the substance of its guidance is unlawful and could not circumvent that judgment by relying on its administrative decisions. The DOJ Defendants likewise would be bound by that judgment and could not circumvent it by relying on their March 2021 memorandum.

6    The "adequate remedy bar of § 704 "determine[s] whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014).

7    *NAACP v. Meese*, 615 F. Supp. 200 (D.D.C. 1985), is inapposite. It involved an attempt to enjoin the Attorney General from seeking to reopen consent decrees in other cases. The plaintiffs "almost by definition ... ha[d] an adequate remedy" because they could "oppos[e] the Attorney General's motions in the court in which he files his papers." *Id.* at 203.

8    Courts have repeatedly rejected federal agencies' expansive reading of *Center for Auto Safety*. *See, e.g.*, *Pharm. Res. & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 44 (D.D.C. 2015) (rejecting reliance on this case because it did not involve an interpretive rule that required regulated parties to "change their behavior").

9    The EEOC instead has authority only "to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter." 42 U.S.C. § 2000e-12(a).

10    Defendants argue that "the 'unconstitutional conditions' doctrine does not apply 'to cases between two sovereigns.'" MTD Mem. 23 (PageID#376) (quoting *Koslow v. Pennsylvania*, 302 F.3d 161, 174 (3d Cir. 2002)). But *Koslow* concerned only whether Congress may require States to relinquish their *own* constitutional rights. 302 F.3d at 173-74.

11    The Department regulation providing that funding recipients are not required to violate the Constitution, MTD Mem. 25 n.6 (PageID#378), was further reason for the Department to consider and expressly address the First Amendment implications of its guidance.

12    Tellingly, counsel for the plaintiffs in *Bostock* stated at oral argument that sex-separated bathrooms are "not discriminatory because" no one is "subjected to a disadvantage." Tr. of Oral Arg. at 12-13, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Nos. 17-1618, 17-1623); *see also* Reply Br. for Resp'ts at 19-21, *Altitude Express, Inc. v. Zarda*, 140 S. Ct. 1731 (2020), 2019 WL 4464222, at *19-21; Reply Br. for Pet'r at 23, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), 2019 WL 4464221, at *23 ("Sex-specific dress, bathroom, fitness, or other policies may be justified as bona fide occupational qualifications ..., and they may not even be discriminatory at all because they do not constitute '*disadvantageous* terms or conditions of employment.'" (quoting *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 118 (2d Cir. 2018)).

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.