IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PHILLIP LAWSON, et al.,          )
                                 )
        Plaintiffs,              )          NO. 3:24-cv-00538
                                 )
v.                               )          JUDGE RICHARDSON
                                 )
TRE HARGETT, et al.,             )
                                 )
        Defendants.              )

**MEMORANDUM OPINION**

On November 29, 2023, Victor Ashe ("Ashe"), Phil Lawson ("Lawson"), and the League

of Women Voters of Tennessee ("the League") filed a lawsuit in this Court against Tre Hargett,

Tennessee Secretary of State ("Hargett"), Mark Goins, Tennessee Coordinator of Elections

("Goins"), and Jonathan Skrmetti, Tennessee Attorney General ("Skrmetti") seeking to invalidate

as unconstitutional two Tennessee election provisions (Tenn. Code Ann. § 2-7-115(b) ("Section

115(b)") and Tenn. Code Ann. § 2-7-115(c) ("Section 115(c)") (collectively, "Sections 115(b) and

(c)")) and to enjoin Hargett, Goins, and Skrmetti from enforcing those laws. Specifically, the

plaintiffs alleged that Section 115(b) is unconstitutionally vague in violation of their right to due

process of law under the Fourteenth Amendment to the United States Constitution, and that

Sections 115(b) and (c) each deter voting and chill their freedom of political speech in violation of

the First and Fourteenth Amendments to the United States Constitution. This Court dismissed that

action for lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), on the basis that

the plaintiffs lacked standing as required under Article III of the United States Constitution. *Ashe*

*v. Hargett*, No. 3:23-CV-01256, 2024 WL 923771 (M.D. Tenn. Mar. 4, 2024) ("*Ashe I*").

Less than two months after the Court dismissed the complaint in *Ashe I*, the same Plaintiffs, joined this time by Gabe Hart ("Hart") and James Palmer ("Palmer"),[1] filed this lawsuit ("*Ashe II*") again challenging Sections 115(b) and (c) on the same grounds and seeking declaratory and injunctive relief. The array of Defendants was very different than it was in *Ashe I*. This time, as in *Ashe I*, Hargett and Goins were named. But this time, unlike last time, Skrmetti was not named. And this time, unlike last time, District Attorney Generals (which Plaintiffs call "District Attorneys," without the "General," contrary to the Tennessee custom) from various (and indeed most of) Tennessee's judicial districts[2] were named. Notably, these District Attorneys (DAs)[3] are all state officials rather than local officials. *Scott v. Forgey*, No. 1:22-CV-113, 2022 WL 16857326, at *6 (E.D. Tenn. Nov. 10, 2022) ("In Tennessee, district attorneys general are state officials."); Tenn. Code Ann. § 9-4-1101(2) ("'State employee' means any person who is a state official, including . . . district attorneys general.").

Pending before the Court is Defendants'[4] motion to dismiss (Doc. No. 49, "Motion") the claims against them set forth in the Complaint (Doc. No. 1) filed by Plaintiffs on May 1, 2024.

---

[1] Herein, the Court uses the term "Plaintiffs" to refer collectively to Ashe, Lawson, Hart, Palmer, and the League. The Court uses the term "Individual Plaintiffs" to refer to Ashe, Lawson, Hart, and Palmer.

[2] As is a matter of public record, most of Tennessee's judicial districts comprise more than one county, so most district attorneys in Tennessee have official duties with respect to more than one county. Presumably, this is one reason why district attorneys in Tennessee are not considered county (or any other kind of local) officials, but rather state officials.

[3] In some places herein where the term "DAs" is used, the context may make clear that the references is actually to district attorneys generally, and not to all or a subset of the particular district attorneys named herein.

[4] Herein, the Court uses the term "Defendants" to refer collectively to all Defendants, namely, Hargett, Goins, and the following District Attorneys: Steven Finney, District Attorney for the 1st Judicial District of Tennessee; Barry P. Staubus, District Attorney for the 2nd Judicial District of Tennessee; Jimmy Dunn, District Attorney for the 4th Judicial District of Tennessee; Ryan Desmond, District Attorney for the 5th Judicial District of Tennessee; Charme Allen, District Attorney for the 6th Judicial District of Tennessee; Dave Clark, District Attorney for the 7th Judicial District of Tennessee; Jared Effler, District Attorney for

Defendants filed a memorandum (Doc. No. 50, "Memo") in support of the Motion, followed by a notice of supplemental authority (Doc. No. 52, "Notice"). Plaintiffs filed a response (Doc. No. 58, "Response") in opposition, to which Defendants filed a reply (Doc. No. 61, "Reply").

Vis-a-vis *Ashe I*, the instant case has more Plaintiffs, more (and different kinds of) Defendants, and some additional allegations. And yet, as explained below, just like *Ashe I*, the instant case suffers from lack of subject-matter jurisdiction, and so the Motion (Doc. No. 49) will be granted.

<u>FACTUAL ALLEGATIONS</u>[5]

The Individual Plaintiffs are residents of, and voters registered in, various counties in Tennessee. (Doc. No. 1 at ¶¶ 15–19). Specifically, Ashe and Lawson are residents of, and

---

the 8th Judicial District of Tennessee; Russell Johnson, District Attorney for the 9th Judicial District of Tennessee; Shari Tayloe, District Attorney for the 10th Judicial District of Tennessee; Coty Wamp, District Attorney for the 11th Judicial District of Tennessee; Courtney Lynch, District Attorney for the 12th Judicial District of Tennessee; Craig Northcott, District Attorney for the 14th Judicial District of Tennessee; Jason Lawson, District Attorney for the 15th Judicial District of Tennessee ("DA Lawson"); Jennings Jones, District Attorney for the 16th Judicial District of Tennessee; Ray Whitley, District Attorney for the 18th Judicial District of Tennessee; Robert Nash, District Attorney for the 19th Judicial District of Tennessee; Glenn Funk, District Attorney for the 20th Judicial District of Tennessee; Stacey Edmonson, District Attorney for the 21st Judicial District of Tennessee; Brent Cooper, District Attorney for the 22nd Judicial District of Tennessee; Mark Davidson, District Attorney for the 25th Judicial District of Tennessee; Jody Pickens, District Attorney for the 26th Judicial District of Tennessee ("DA Pickens"); Colin Johnson, District Attorney for the 27th Judicial District of Tennessee; Steve Mulroy, District Attorney for the 30th Judicial District of Tennessee; and Hans Schwendimann, District Attorney for the 32nd Judicial District of Tennessee, collectively.

All Defendants are sued in their official capacity only.

[5] The facts herein are taken from the Complaint (Doc. No. 1). Because the Court construes the Motion as a facial attack on standing, the facts in the Complaint are accepted as true purposes of the instant Motion, except to the extent that they are qualified herein (as for example by "Plaintiffs allege") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not be provable as true.

Where the Court does qualify an allegation herein (for example, by using "Plaintiffs allege"), the Court does so because the allegation is either (a) unsupported by sufficient factual matter, or (b) a legal conclusion couched as a factual allegation. In either case, the Court need not accept the allegation as true under the applicable legal standard discussed herein.

registered voters in, Knox County, Tennessee. (*Id*. at ¶ 15, 18). Hart is a resident of, and registered voter in, Madison County, Tennessee. (*Id*. at ¶ 16). Palmer is a resident of, and registered voter in, Roane County, Tennessee. (*Id*. at ¶ 19). The League is a non-profit, non-partisan political organization whose mission is to empower voters and defend democracy. (*Id*. at ¶ 20). The League accomplishes this mission in part by helping Tennessee citizens register to vote, educating voters about the issues, and encouraging voters to be active participants in democracy by engaging with elected officials and their policy decisions. (*Id*.).

While as a general matter Tennesseans must register to vote in order to vote, they do not and cannot register as members of any party. (*Id*. at ¶ 58). Instead, when the state holds primary elections, a would-be voter who otherwise is eligible to vote must select at the polling place which party's ballot (e.g., Democratic or Republican) he or she intends to fill out. (*Id*.). In a given primary, no voter may fill out a ballot for more than one party. (*Id*.). Once a voter has made his or her selections and deposited his or her ballot, the voter's choice of party ballot is marked and maintained as public record. (*Id*.). Since there are no formal party voter rolls, voters may (and often do) switch to vote in a different party's primary from one election to the next. (*Id*.).

Ostensibly to deter voting by supporters of one political party in the primary election of another political party (i.e., "cross-over voting"), the Tennessee State Legislature passed Sections 115(b) and (c) Section 115(b). Section 115(b), signed into law in 1972, requires that a person seeking to vote in a particular party's primary election be a "bona fide member of and affiliated with" that party or "declare[ ] allegiance" to that party at the time the voter seeks to vote.[6] (*Id*. at

---

[6] Specifically, Section 115(b) states, in relevant part:

A registered voter is entitled to vote in a primary election for offices for which the voter is qualified to vote at the polling place where the voter is registered if:

¶ 60–62). Failure to do so may result in criminal prosecution. (*Id*. at ¶ 62). Only the DAs are empowered to prosecute violations of Section 115(b). See Tenn. Code Ann. § 2-11-202(a)(5)(A)(1).

Section 115(c), enacted in May 2023, requires that the officer of elections at each polling place post prominent notices to warn voters that they will be subject to prosecution if they vote in the primary of a particular party but neither are a "bona fide member of or affiliated with that political party" nor "declare allegiance to that party" (i.e., if they do not comply with either of the alternative requirements of Section 115(b) for voting on that party's primary). (*Id*. at ¶¶ 66–67).

The relevant portion of Section 115(c) states:

> (1) On primary election days, a sign that is a minimum of eight and one-half inches by eleven inches (8.5″x11″) with a yellow background and bold, black text containing the following language must be posted in each polling place:
>
> > **It's the Law! Please Read... It is a violation of Tennessee Code Annotated, Section 2-7-115(b), and punishable as a crime under Tennessee Code Annotated, Section 2-19-102 or Section 2-19-107, if a person votes in a political party's primary without being a bona fide member of or affiliated with that political party, or to declare allegiance to that party without the intent to affiliate with that party.**
>
> (2) The officer of elections at each polling place shall ensure that the sign prescribed by subdivision (c)(1) is posted in a prominent, highly visible location within the polling place.

Tenn. Code Ann. § 2-7-115(c). (Doc. No. 50 at 12.).

---

> (1) The voter is a bona fide member of and affiliated with the political party in whose primary the voter seeks to vote; or
>
> (2) At the time the voter seeks to vote, the voter declares allegiance to the political party in whose primary the voter seeks to vote and states that the voter intends to affiliate with that party.

Tenn. Code Ann. § 2-7-115(b).

As noted in Section 115(c), a violation of Section 115(b) is punishable as a crime under Tenn. Code Ann. §§ 2-19-102 and 2-19-107. (Doc. No. 1 at ¶ 67). Section 2-19-107 makes it a felony, for a person who knows that he or she is not entitled to register or vote under Title 2, to register or vote (or attempt to do so) intentionally.[7] (*Id.* at ¶ 64). Thus, a violation of Section 115(b) amounts to a felony only if the violator intentionally registers or votes (or attempt to do so) despite knowing that he or she is not entitled to register or vote under Section 115(b).[8] (*Id.*). Section 2-19-102, by contrast, makes it a misdemeanor for a person either to knowingly do any act that is prohibited by Title 2 of the Tenn. Code Ann. (which includes Section 115(b)) or to knowingly fail to do any act that he or she is required to do by Title 2 (including, as noted, Section 115(b)).[9] (*Id.* at ¶¶ 63–64).

Despite the fact that there have been no known prosecutions under Section 115(b) in the roughly 50 years since it became law, Plaintiffs allege that Defendants, along with other state officials, have recently indicated their intent to begin enforcing it via prosecution. (*Id.* at ¶¶ 71–76). In support of this allegation, Plaintiffs point to a speech made by Defendant Hargett in April 2022 in which he stated "[p]eople need to understand when you go vote in a primary, you are supposed to vote in the primary in which you are a member of the party. . . . The DA [district attorney general] could actually prosecute that if people are willingly going in and voting in the

---

[7] In ¶ 64 of the Complaint, Plaintiffs mistakenly cite to "Section 2-19-207." However, the rest of the Complaint makes clear they intended to refer to "Section 2-19-107."

[8] As relevant here, for purposes of Section 115(b), a person knows that (s)he is not entitled to register or vote if (s)he knows that (s)he is not a bona fide member of or affiliated with the party in whose primary (s)he wishes to vote, and knows that (s)he did not declare allegiance to that party at the time of voting.

[9] Section 2-19-102 prescribes a broader scope of liability in that it applies to every statute under Title 2 of the Tenn. Code Ann., whereas § 2-19-107 prescribes a narrower scope of liability in that applies only to illegal registration of voting or illegal voting (including, of course, violations of Section 115(b)).

other party." (*Id*. at ¶ 71). Plaintiffs point also to the enactment of Section 115(c), recent challenges by Republicans to the outcomes of county elections based on alleged "crossover voting," and a statement made by Chairman Rudd on the Tennessee House Floor, that "there are two people currently under indictment . . . for organizing crossing over into the other party's primary . . . ." (*Id*. at ¶¶ 72-73).

Additionally, two DAs have made statements that Plaintiffs contend show the DAs' intent to begin enforcing Section 115(b) via prosecution. Specifically, DA Lawson, the DA for the Fifteenth Judicial District of Tennessee published a response to a letter from a citizen expressing concerns regarding violations of Sections 115(b) and (c), wherein DA Lawson stated: "As the crime occurs upon the casting of an illegal ballot, and as the early voting period has not yet begun for the election, a crime has not yet been committed. I would advise that in the event that you become aware of anyone breaking any provisions of any law, you should report such to the authorities for an investigation. I have the greatest confidence that once the investigation is completed, law enforcement will respond appropriately." (*Id*. at ¶ 75). Additionally, in or around 2022, DA Pickens informed Hart that he "could be prosecuted for voting in the Republican primary," and that "there[ was] heat on [Pickens] to prosecute [Hart]." (*Id*. at ¶ 16). According to Plaintiffs, all of this demonstrates an increased (and increasing) desire by the State to enforce Section 115(b).

Plaintiffs also assert that because no statutory definitions are provided for the terms "bona fide member of," "affiliated with," or "allegiance to" a political party, Sections 115(b) and (c) are void for vagueness under the Fourteenth Amendment. (*Id*. at ¶¶ 111–16). Plaintiffs further claim that "[b]y combining a prominently threatening sign with an impossibly vague law," Sections

115(b) and (c) violate their rights under the First Amendment "to engage in the political process and to exercise their fundamental right to vote." (*Id*. at ¶¶ 125–28).

Plaintiffs seek a declaration from this Court that Sections 115(b) and (c) are (i) void for vagueness under the Fourteenth Amendment, and (ii) overbroad in violation of the Free Speech Clause of the First Amendment's. (*Id*. at 29). Additionally, Plaintiffs seek an injunction[10] prohibiting Defendants from enforcing Sections 115(b) and (c). (*Id*. at 30).

Via the instant Motion, Defendants seek dismissal of this action pursuant to Fed. R. Civ. P. 12(b)(1) and (6) on grounds that Plaintiffs lack standing to sue and that Plaintiffs' claims are barred by sovereign immunity. (Doc. No. 49 at 1). For the reasons stated below, the Court concludes that it is devoid of subject-matter jurisdiction because Plaintiffs lack standing to sue any Defendant. The Court also concludes alternatively that it lacks subject-matter jurisdiction over Plaintiffs' claims because Defendants are protected by sovereign immunity—meaning that Defendants would have to be dismissed even if Plaintiffs had standing for their claims. These conclusions pretermit the Court's consideration of any other aspects of this case. Accordingly, the Court will decline to consider Defendants' other arguments in favor of dismissal—namely, their argument that Plaintiffs have failed to state a claim upon which relief may be granted.

## LEGAL STANDARD

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). "As always, the party invoking federal jurisdiction has the burden to prove that jurisdiction." *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810

---

[10] Plaintiffs seek both preliminary and permanent injunctive relief. Plaintiffs filed a motion for a preliminary injunction (Doc. No. 43, "Motion for Preliminary Injunction") on May 23, 2024.

(6th Cir. 2015) (citing *Russell v. Lundergan–Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015)). Thus, "where subject matter jurisdiction is challenged under Rule 12(b)(1), as it was here, the *plaintiff* has the burden of proving jurisdiction in order to survive the motion." *Wayside Church v. Van Buren Cnty*., 847 F.3d 812, 817 (6th Cir. 2017) (quoting *Rogers v. Stratton Indus., Inc*., 798 F.2d 913, 915 (6th Cir. 1986)).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Prods., Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish federally cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Gentek Bldg. Products, Inc*., 491 F.3d at 330. "[T]he district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990).

Defendants attack, among other things, Plaintiffs' Article III standing. This constitutes a challenge to subject-matter jurisdiction because Article III "[s]tanding is a jurisdictional requirement[,]" and "[i]f no plaintiff has standing, then the court lacks subject-matter jurisdiction." *Tennessee General Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). Like any challenge to subject-matter jurisdiction generally, a challenge specifically to the plaintiff's standing can be in the form of either a facial attack or a factual attack. *Kale v. Procollect, Inc*., No.

2:20-CV-2776-SHM-TMP, 2021 WL 2784556, at *2 (W.D. Tenn. July 2, 2021) ("Challenges to standing can be facial or factual."); *In re Saffold*, 373 B.R. 39, 43 (Bankr. N.D. Ohio 2007) ("A challenge to standing may be either a facial attack on a pleading or a factual attack.").

"A facial attack on standing challenges the legal sufficiency of the complaint, whereas a factual challenge against standing questions whether the complaint's factual assertions reflect reality." *Shumway v. Neil Hosp., Inc.*, No. 1:21-cv-01059-STA-jay, 2021 WL 5181754, at *1 (W.D. Tenn. Nov. 8, 2021) (citing *Ohio Nat. Life Ins. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

Although Defendants do not clearly state whether they intend that their challenge to standing be factual or facial, the Court finds that Defendants argument as to Plaintiffs' lack of standing is best characterized as a facial challenge because it attacks the sufficiency of the Complaint. Defendants argue, generally, that because the Complaint does not—and cannot— allege that Defendants Goins and Hargett have authority to prosecute Plaintiffs for violating Sections 115(b) or (c), the Complaint has not plausibly alleged that Plaintiffs face actual present harm or a significant possibility of future harm or that any such threat of harm is traceable to Goins or Hargett or likely to be redressed by an injunction against Goins and Hargett (i.e., the Complaint has not plausibly alleged that Plaintiffs have standing to sue Goins and Hargett). (*See* Doc. No. 50 at 7). Defendants also argue that because the Complaint does not allege a certain threat of prosecution by the DAs for violating Sections 115(b) or (c), the Complaint has not plausibly alleged that Plaintiffs face actual present harm or a significant possibility of future harm (i.e., the Complaint has not plausibly alleged that Plaintiffs have standing to sue the DAs) (*Id*. at 8-10). Moreover, Defendants do not rely on matters outside of the Complaint to make their challenge to standing.

Therefore, the Court will construe Defendant's attack as a facial one. So in assessing whether it lacks jurisdiction as Defendants claim, the Court will consider only the sufficiency of the Complaint and "accept the allegations set forth in th[at] complaint as true." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014).[11]

Defendants also challenge the Court's jurisdiction to hear this case based on their contention that sovereign immunity bars Plaintiff's claims.[12] The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The sovereign immunity

---

[11] The Court does not accept as true those allegations in the Complaint that are "conclusory allegations or legal conclusions masquerading as factual conclusions" because such allegations "will not suffice to prevent a motion to dismiss." *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (quoting *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005) (decided in the context of a facial challenge under Rule 12(b)(1))).

[12] Defendants invoke sovereign immunity without any reference to the Eleventh Amendment, which prescribes a certain kind of immunity for States. The concept of sovereign immunity predates the Eleventh Amendment. *See Laborers' Int'l Union of N. Am., Loc. 860 v. Neff*, 29 F.4th 325, 329–30 (6th Cir. 2022) ("When the States entered the federal system, they did so with their sovereignty intact." *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 499 (2021) (quotation omitted)). One feature of sovereignty is immunity from suit. *Id.* Whether reflected in the words of the Tenth or Eleventh Amendments or background principles to the Convention, sovereign immunity protects States and the Federal Government from litigation except in "limited circumstances." *Id.; see also Morgan v. Bd. of Pro. Resp. of the Supreme Ct. of Tenn.*, 63 F.4th 510, 518 (6th Cir. 2023) ("Eleventh Amendment sovereign immunity generally shields states from individuals suing them in federal court unless states waive their immunity or Congress removes it by statute.").

But as a practical matter, since the Eleventh Amendment's passage, the Sixth Circuit usually seems to analyze "sovereign immunity" and "Eleventh Amendment immunity" the same way, treating the latter as a version of the former. A reported Sixth Circuit opinion from a couple of years ago is an outlier, taking a very different approach by treating sovereign immunity and Eleventh Amendment immunity as entirely distinguishable. *See WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513–14 (6th Cir. 2021). But since then, the Sixth Circuit has (again) indicated (re)approval of its pre-*WCI* approach. Specifically, the court in *Morgan* used the phrase "Eleventh Amendment sovereign immunity," 63 F.4th at 515, 518, which suggests that sovereign immunity and Eleventh Amendment immunity should be treated as the same thing. *See Morgan v. Bd. of Pro. Resp. of the Supreme Ct. of Tennessee*, 63 F.4th 510, 515, 518 (6th Cir. 2023).

Confronted with the unenviable task of choosing between a relatively recent, persuasive and ostensibly precedential case (*WCI*) and entirely conflicting line of precedential cases, the undersigned at this juncture feels constrained to follow the more voluminous and recent precedent and treat the two kinds of immunity as generally analytically indistinct from one another.

guaranteed by this Amendment deprives federal courts of subject-matter jurisdiction when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984)).[13]

## DISCUSSION

### I.     Article III Standing

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing is a core component of this "case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The requirement of standing "ensure[s] that federal courts do not exceed their authority," by "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). As just indicated, standing is a jurisdictional requirement. *See Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915–16 (6th Cir. 2002). Thus, if no plaintiff has standing, the court lacks subject-matter jurisdiction. *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). On the other hand, if even one plaintiff has standing, the case survives the Article III-standing challenge. *See United States v. Texas*, 599 U.S. 670, 709 (2023) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing. Because Texas clearly meets our test for Article III standing, it is not necessary to consider whether the other plaintiff, the State of Louisiana, also satisfies that test." (citation omitted)).[14]

---

[13] *O'Bryan* assumed that Rule 12(b)(1) (rather than 12(b)(2)) was applicable to a claim of sovereign immunity (in that case, as it happens, under the Foreign Sovereign Immunities Act). 556 F.3d at 375–76. The Court believes this assumption to be sound, and the parties do not suggest to the contrary.

[14] Notably, however, when only one of multiple plaintiffs is shown to have standing, any infirmities in the standing of the other plaintiff(s) conceivably could be—even if not grounds to dismiss the case for lack of

To have standing, a plaintiff must show that: (1) he suffered an injury, which means "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical[;]" (2) the injury was caused by the person sued; and (3) a court can likely redress the injury. *Lujan*, 504 U.S. at 560 (internal citation and quotation marks omitted). Where, as here, a plaintiff seeks declaratory and injunctive relief with respect to a statute (for example, a declaration that the statute is unconstitutional and an injunction prohibiting the defendant from enforcing it because it is unconstitutional), the plaintiff may challenge the enforcement of a statute before the actual consummation of an injury-in-fact. *See Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). However, "when seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *Id*. "During the pleading stage, the burden remains on the plaintiffs to clearly allege facts that demonstrate each element of standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).

Importantly, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). A plaintiff "must demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 352 (2006). Relatedly, a plaintiff "must demonstrate standing separately for each form of relief sought." *Id*. Likewise, a plaintiff must allege "how the requested relief against *each* of the defendants could redress [the plaintiff's] alleged injuries-in-fact."[15] *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir.

---

subject-matter jurisdiction on standing grounds—grounds to reject the claims (and/or requests for particular forms of relief) of such plaintiff(s) on the merits.

[15] Notably, however, only one plaintiff must demonstrate standing for the case to move forward on a claim against any one defendant. *Parsons v. U.S. Dep't of Just*., 801 F.3d 701, 710 (6th Cir. 2015).

2022). In other words, standing is defendant-specific (even though not plaintiff-specific). This principle is neither intuitive nor self-evidently reflected in the three elements of standing, but on second glance it well may be reflected in the requirement that the injury would be redressed by a favorable court decision—meaning a favorable court decision against the *particular defendant(s)* involved.

The Individual Plaintiffs assert that they have suffered an injury-in-fact in that they are unable to vote in a primary election in Tennessee without fear of being criminally prosecuted. The League similarly claims injury on behalf of its members who fear prosecution, and it also asserts that Section 115(b) requires the League to expend resources to respond to voter confusion about the law and prevents the League from achieving its primary purpose of accurately informing voters about voting laws in Tennessee.

## II.     (Lack of) Standing to Challenge Section 115(b)

### A.  *Ashe I*

In *Ashe I*, this Court dismissed the case for lack of subject-matter jurisdiction after concluding that Ashe and Lawson lacked standing to sue Goins, Hargett, and Skrmetti because they could not establish that their purported injury (fear of being criminally prosecuted for voting in a primary) was traceable to Goins, Hargett, or Skrmetti, respectively, since none of those Defendants had the authority to prosecute violations of Section 115(b). Additionally, the Court reasoned that the relief Ashe and Lawson sought (an injunction prohibiting Goins, Hargett, and Skrmetti from prosecuting violations of 115(b)) would not redress their purported injury because others not thus enjoined—namely, the DAs, who do have authority to prosecute violations of 115(b)—could prosecute Plaintiffs even if they obtained the injunction they sought.

As to the League, which was also a plaintiff in *Ashe I*, the Court concluded that it too lacked standing. Specifically, the Court rejected the League's claim of associational standing on behalf of its individual members who feared prosecution on the same basis on which the Court rejected Ashe and Lawson's assertion of standing. The Court also concluded that the League lacked organizational standing. In doing so, the Court reasoned that the League's anticipated need to divert its resources to respond to the purportedly invalid law was too speculative to constitute an injury-in-fact, and that Sections 115(b) and (c) did not prevent the League from fulfilling its primary mission of educating voters (and thus, did not constitute an injury-in-fact). Moreover, the Court concluded that even if these purported injuries did satisfy the injury-in-fact requirement, the League could not fairly trace them to the actions of Goins, Hargett, or Skrmetti, nor would the injunction the League sought redress its purported injuries.

For the most part, the presence in this case of parties and allegations that were absent from *Ashe I* does not affect the Court's analysis or conclusions from *Ashe I*. And although the presence of previously absent parties and allegations requires an analysis (or a reanalysis) as to whether certain Plaintiffs herein have standing to sue certain Defendants herein, the Court's ultimate conclusion—that all Plaintiffs lack standing to sue any Defendant—remains the same.

B. Individual Plaintiffs' (Lack of) Standing to Sue Defendants for Violating Section 115(b)

i. *Individual Plaintiffs Lack Standing to Sue Goins and Hargett*

Goins and Hargett still lack any authority to prosecute for violations of Section 115(b). Accordingly, the analysis in *Ashe I* as to why the plaintiffs therein lacked standing to sue Goins and Hargett applies equally to Individual Plaintiffs in this case. Individual Plaintiffs "are unable to establish standing because they have not shown that their purported injury (i.e., fear of prosecution under 115(b)) is fairly traceable to [Goins and Hargett] or likely to be redressed by an injunction

prohibiting [Goins and Hargett] from doing something they already lack the power to do—namely, prosecuting Plaintiffs under 115(b)." *Ashe I*, 2024 WL 923771, at *8.

> ii.  *Individual Plaintiffs Lack Standing to Sue the DAs*

Unlike in *Ashe I*, Defendants include the DAs, i.e., district attorneys general in 24 judicial districts of Tennessee. As Plaintiffs correctly point out (and Defendants do not dispute), each of the DAs has authority (in their respective districts) to prosecute individuals for violating Section 115(b). *See* Tenn. Code Ann. § 2-11-202(a)(5)(A)(1). Because of this, Plaintiffs surmise that Individual Plaintiffs have standing to sue the DAs because their purported injury (voting in primary elections without fear of being criminally prosecuted) is traceable to the DAs and their requested injunction in this case (which would enjoin the DAs) would redress that purported injury. But even assuming arguendo that Individual Plaintiffs' purported injury is traceable to the DAs and redressable by the injunction they seek, Individual Plaintiffs still lack standing because they cannot establish the first requirement for Article III standing: injury-in-fact, which the Court in *Ashe I* merely assumed to exist arguendo.

In *Crawford v. United States Department of Treasury*, 868 F.3d 438 (6th Cir. 2017), the Sixth Circuit explained what is required to establish injury for Article III standing in a pre-enforcement challenge like the one Plaintiffs bring here. The Sixth Circuit court wrote:

> In a pre-enforcement challenge to a federal statute, the Supreme Court has held that a plaintiff satisfies the injury requirement of standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, —— U.S. ——, 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979)); *see also Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197, 45 L.Ed.2d 343 (1975); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264, 97 S. Ct. 555, 50 L.Ed.2d 450 (1977) (holding that one of the plaintiffs had standing to challenge a discriminatory zoning law where an injunction against the law would have produced "at least a 'substantial

probability,' *Warth*, 422 U.S. at 504, 95 S. Ct. 2197, that" the plaintiff's desired housing project would "materialize").

The mere *possibility* of prosecution, however—no matter how strong the plaintiff's intent to engage in forbidden conduct may be—does not amount to a "credible threat" of prosecution. Instead, the threat of prosecution "must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S. Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (quoting *Whitmore*, 495 U.S. at 158, 110 S. Ct. 1717). Putting the Supreme Court's language in *Warth*, *Driehaus*, and *Clapper* together: to have standing to bring a pre-enforcement challenge to a federal statute, there must be a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest, and there must be a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct.

*Crawford*, 868 F.3d at 454-55.

More recently, the Sixth Circuit has stated that a plaintiff satisfies the injury requirement of standing in a pre-enforcement challenge by pleading "general facts that would suggest that . . . [he] reasonably feared [actions] might be taken as a result of [his desired] conduct." *Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023) (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015)). "'Fear of prosecution' is sufficient to confer standing when it is 'reasonably founded in fact.'" *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015) (quoting *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1987)). Although past enforcement is not necessary to establish a credible threat of enforcement, it "is good evidence that the threat of enforcement is not chimerical." *Russell*, 784 F.3d at 1049 (quoting *Driehaus*, 573 U.S. at 164).

Under the standard articulated in *Crawford*, a plaintiff must show that the threat of being prosecuted for engaging in certain conduct is *certainly impending*. But under what appears to be a more lenient standard applied in *Russell* and *Block*, a plaintiff need show only fear of prosecution that is "reasonably founded in fact."

Individual Plaintiffs have clearly failed to allege facts establishing that their prosecution is "certainly impending," and therefore they fail to meet the high bar set forth in *Crawford*. But even under the more lenient standard in *Russell* and *Block*, Individual Plaintiffs cannot show a fear that is "reasonably founded in fact."

Plaintiffs have not pointed to any history of enforcement of Section 115(b). As noted above, a history of enforcement is not required to establish a credible fear of prosecution. Nevertheless, the absence of any alleged history of prosecution forecloses a potential path for Plaintiffs to make headway in showing a credible fear of prosecution.

Individual Plaintiffs instead point to a variety of facts that they contend establish that their fear is "reasonably founded in fact." For example, Hart claims to fear prosecution based on:

> (1) individuals attacking him for voting in the Republican primary because they did not consider him a "bonafide Republican" after he wrote an article in the *Tennessee Lookout*; (2) his name being mentioned in mailers denouncing cross-party voting; (3) the Madison County Republican party threatening legal action against those whom they did not deem Republicans and who voted in the Republican primary; (4) the Madison County Election Commission posting sheets distributed at the school board primary election warning of Section 115(b) even before 115(c) became law, (5) the meeting in which Defendant Hargett discussed how a district attorney could enforce the statute against cross-over voters in the primary; (6) District Attorney Pickens confirming to Hart that there was "heat" to prosecute Hart; and (7) the message to a constituent in which Tennessee Representative Chris Todd called Mr. Hart a "felon."

(Doc No. 58 at 8 (citing Doc. No. 1 at ¶¶ 16-17)).

Ashe fears prosecution because of his weekly op-ed column *in The Knoxville News Sentinel*, wherein he frequently criticizes members of the Tennessee Republican party. (*Id*.). And Palmer fears prosecution for voting in a Republican primary election because he has previously placed signs supporting Democratic candidates in his front lawn. (*Id*. (citing Doc. No. 1 at ¶ 19)).

Absent from the Complaint, however, is any statement or action *by the DAs* (or, for that matter, any Defendant) that reasonably indicates their intention to prosecute Individual Plaintiffs

under Section 115(b). At best, Plaintiffs point to a statement from one DA (Pickens) to Hart that Hart "*could be* prosecuted for voting in the Republican primary," and that "there[ was] heat on [Pickens] to prosecute [Hart]." (Doc. No. 1 at ¶ 16) (emphasis added). But without more, these statements are not threats. The first is a statement about what is possible, not about what is likely or intended. And the second, while perhaps suggesting some incentive for DA Pickens to prosecute (i.e., to alleviate the "heat"), does not suggest that he is threatening or likely to do so. Moreover, as Defendants point out, these statements were made in 2022, two years before this lawsuit was even filed. (*Id*.). Yet Plaintiffs do not allege that DA Pickens (or any other individual or body with the authority to do so) has taken any action to initiate prosecution or further investigation. Thus, to the extent that DA Pickens's statements could be construed as a threat, they certainly do not establish a *present* threat of future prosecution that is credible or reasonably founded in fact.

The Complaint also alleges that DA Lawson, the DA for the 15th judicial district, published a letter in January 2024 "announcing an intent to investigate and prosecute citizens accused of violating [Section 115(b)]" and "encouraged citizens to report each other for investigation and prosecution." (Doc. No. 1 at ¶ 23). But the Court does not accept as true this characterization of the letter, because it is an embellishment. As the Complaint makes clear in a later paragraph, the letter DA Lawson published was in response to a letter from a citizen expressing concerns about violations of Sections 115(b) and (c) and stated: "As the crime occurs upon the casting of an illegal ballot, and as the early voting period has not yet begun for the election, a crime has not yet been committed. I would advise that in the event that you become aware of anyone breaking any provisions of any law, you should report such to the authorities for an investigation. I have the greatest confidence that once the investigation is completed, law enforcement will respond appropriately." (*Id*. at ¶ 75).

DA Lawson's response does not demonstrate an intent to prosecute violations of Section 115(b).[16] For starters, his only statement about Section 115 in particular—"[a]s the crime occurs upon the casting of an illegal ballot, and as the early voting period has not yet begun for the election, a crime has not yet been committed"—shows if anything a cautious attitude towards prosecuting Section 115(b), and in no way affirmatively indicates an intention to prosecute *even in the event that the crime of violating Section 115 does occur*. The remainder of the cited portions of DA Lawson's letter refer to *violations of law generally*, not (criminal) violations of Section 115 in particular, and they make the most generic (and unexceptional) observations imaginable in response to the kind of inquiry to which the letter was responding. The letter makes the cookie-cutter (not to say inappropriate) observation, of the kind one would expect from a criminal enforcement official, that citizens should report violations of the law (*any* law) to the authorities for investigation. That statement does not serve to make any threat or promise of prosecution, or even raise reasonable expectations that there would be a prosecution. Nor does the statement that "law enforcement will respond appropriately"; an "appropriate" response by "law enforcement" does not necessarily entail prosecution whenever a violation of law (even a criminal one) has been committed; an appropriate (and undeniably common) law enforcement response could be to forgo prosecution of a particular criminal violation in an effort to preserve scarce prosecutorial (and thus also judicial) resources for other criminal matters deemed more pressing in the district.

So the statements in the letter do not give rise to a reasonable fear of prosecution that is grounded in fact. Rather, this is yet another example of mere speculation of potential future

---

[16] Whether DA Lawson's letter could fairly be construed as "announcing an intent to investigate" (as opposed to prosecute), is not relevant to the issue of standing, because the inquiry before the Court on that issue pertains to whether some or more Plaintiffs have a fear of *prosecution* that is reasonably founded in fact.

prosecution, which (as explained above) is insufficient to establish injury for purposes of Article III standing.[17]

The remaining facts on which Individual Plaintiffs rely to establish their reasonable fear of prosecution do not suffice to establish a reasonable fear, because those facts do not support a likelihood that the DAs will actually prosecute Individual Plaintiffs (or anyone else, for that matter) for violating Section 115(b). Rather, these facts relate to purported beliefs held by individuals or groups without prosecutorial authority—for example, the Madison County Republican Party—about whether Individual Plaintiffs can and/or will be prosecuted under Section 115(b). But a plaintiff's fear of prosecution must be "reasonably founded in fact," not speculation, and the opinions these individuals are speculative; so far as the Complaint indicates, the existence of such opinions do not make it any more or less likely that the DAs will prosecute Individual Plaintiffs. As the undersigned stated in *Ashe I*, "mere speculation of potential future prosecution is not enough to support standing." *Ashe I*, 2024 WL 923771, at *7. The undersigned also stated in *Ashe I* that this principle was driven home to the undersigned just last year with firmness in *McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102, at *2 (6th Cir. June 20, 2023), a case

> in which an in-state plaintiff and out-of-state plaintiffs alleged standing based on the possibility of a particular auctioneering statute being enforced against them. Rejecting the undersigned's then-existing receptiveness to the notion that standing can be supported by the possibility of future prosecution—a broad view of standing much more consistent with Plaintiffs' view than with Defendants' view herein—the Sixth Circuit stated:

---

[17] Additionally, Individual Plaintiffs have not claimed that they have plans to engage in conduct that could potentially violate Section 115(b) in the Fifteenth Judicial District. And they could hardly do so, given the Complaint's allegations that Individual Plaintiffs reside (and are registered voters) in judicial districts other than the Fifteenth District. (*See* Doc. No. 1 at ¶¶ 15-16, 18, 19). As such, any fear of prosecution stemming from DA Lawson's statements are too speculative to constitute injury-in-fact and cannot be traceable to DA Lawson, given that he lacks jurisdiction to prosecute individuals outside of the Fifteenth judicial district for violations of Section 115(b).

> [T]he out-of-state plaintiffs [have not] demonstrated any "substantial risk" of enforcement of the statute against them. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). And the "mere existence of a statute" is not enough "to create a case or controversy within the meaning of Article III." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997). Nor is this case ripe, given that "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).
>
> The district court thought this case was justiciable on the ground that "one can easily imagine [the] State (perhaps under different executive branch leadership) changing its tune in the future; in the throes of enforcement zeal, the State someday could insist that there is no such geographical limitation" to the Tennessee auctioneering statute's enforcement. *McLemore*, 593 F. Supp. 3d at 778. But the Supreme Court has been clear that such "some day" potentialities "do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564. Neither do mere imaginings. This case is non-justiciable.
>
> *Id*. at *2. Although the undersigned does not see eye-to-eye with *McLemore* in several respects, although *McLemore* is distinguishable from the instant case in one respect, and although *McLemore* is not precedential, the undersigned will heed the above-quoted admonitions in *McLemore*, treating them as a here-applicable, context-specific illustration of what *Parson*s made clear: mere speculation is not enough to support standing.

*Ashe I*, 2024 WL 923771, at *8 (footnote omitted). Applying this principle to the requirement of injury as it applies in the instant case, that requirement cannot be established here by mere speculation—based on actions and/or comments by various groups and individuals without prosecutorial authority—that there *could be* a future prosecution. So even under the more lenient standard of *Russell* and *Block*, Individual Plaintiffs have failed to show a credible threat of prosecution and thus cannot satisfy the injury requirement for Article III standing.

To be clear, the Court is not saying either that no one (be it the Individual Plaintiffs or anyone else) will ever be prosecuted for violating Section 115(b) or that every DA's mindset is to decline every potential prosecution of Section 115(b) violations. But the Court does not have to

say that in order to say that the Complaint does not plausibly allege a reasonable fear of prosecution and thus fails to survive the instant facial challenge to standing.

C.  The League's (Lack of) Standing to Sue Defendants for Violating Section 115(b)

An organization may have either standing in its own right (i.e., "organizational standing"), *MX Grp., Inc. v. City of Covington,* 293 F.3d 326, 333 (6th Cir. 2002), or so-called "associational standing"—meaning standing on behalf of its members—"when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181. Therefore, an organization can assert standing in one or both of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions ("organizational standing"); and (2) as a representative of its members who would have standing to sue individually ("associational standing"). *Shelby Cnty. Advocs for Valid Elections*, 2019 WL 4394754, at *5.

i.  *Associational Standing*

Plaintiffs claim associational standing on behalf of members of the League who fear prosecution. But for the same reasons that Individual Plaintiffs' purported fear of prosecution does not confer standing, fear of prosecution held by any individual member of the League likewise is too speculative to constitute an injury-in-fact. Accordingly, the Court rejects Plaintiffs' attempt to assert associational standing on behalf of members of the League.

ii.  *Organizational Standing*

As noted above, the League also claims organizational standing. To demonstrate organizational standing, a plaintiff organization must show that it suffered a "palpable injury as a result of the defendants' actions." *MX Grp.*, 293 F.3d at 333. A plaintiff organization seeking to establish organizational standing must also meet the three elements of standing: an injury-in-fact,

fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable decision from the court. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). But an organization's "mere interest in a problem" cannot confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (internal citation omitted). Rather, the plaintiff organization must show that its "ability to further its goals has been 'perceptively [sic] impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

In *Ashe I*, the League asserted two injuries, both of which (according to the League) "perceptibly impaired" the League's activities. First, the League argued that it had been injured because of the possibility that it might need to divert its resources away from expenditures it otherwise would make (to promote other objectives of the League) in the absence of Defendants' conduct. Second, the League asserted that it could not fulfill its organizational mission without knowing what Section 115(b) prohibits. The Court rejected both the League's asserted injuries. As to the first, the Court reasoned that the League's anticipated need to divert its resources to respond to the purportedly invalid law was too speculative to constitute an injury-in-fact. As to the second, the Court concluded that Sections 115(b) and (c) did not prevent the League from fulfilling its primary mission of educating voters (and thus did not constitute an injury-in-fact).

In the instant case, the League again asserts the same two injuries that it contends confer standing, except insofar as one of them (expenditure/diversion of resources) has been reframed from what was *possible* to what has *actually been done*. The first purported injury is the alleged impairment of its primary mission of providing voter information—impairment allegedly resulting from the purported vagueness of Section 115(b), which the League claims prevents it from

knowing how to accurately inform voters about voting issues related to primary voting. The second is that it has expended (or diverted) resources to respond to a purportedly unconstitutional law in Section 115(b).

As to the first claimed injury, the undersigned's analysis and conclusion from *Ashe I* applies equally here. Regarding the League's alleged "frustration of purpose" in *Ashe I*, the undersigned wrote:

> The League also alleges that Sections 115(b) and (c) prevent the League from fulfilling its primary mission of educating voters because it does not (and cannot) know how to accurately inform its members and the public about voting issues related to the primaries. (Doc. No. 1 at ¶ 18). But the League's purpose is not to offer legal advice. The League's "primary function," per the Complaint, is "providing voter information" to "empower voters and defend democracy." (Doc. No. 1 at ¶¶ 17–18). The League accomplishes its mission by "helping Tennessee citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be active participants in democracy through engaging with elected officials and their policy decisions." (*Id.* at ¶ 17).

> The enforcement of Section 115(b) does not "perceptibly impair" this mission. Rather, the League may continue to engage in all of the conduct described above as furthering its mission regardless of its purported confusion as to what Section 115(b) prohibits. For example, the League can still encourage voters to register to vote in both primary and general elections. The League can also educate voters about the various issues that might impact them or their community by, for example, urging potential voters to elect representatives that will address what Plaintiffs perceive to be a vague law. Thus, the League has not shown that its "ability to further its goals has been 'perceptively [sic] impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless*, 56 F.3d at 716 (citing *Havens*, 455 U.S. at 379).

*Ashe I*, 2024 WL 923771, at *13.

Included in the instant Complaint is an allegation (not present in the *Ashe I* complaint) that a "core component of the League's mission is to advise its members and the public how to participate in the democratic process." (Doc. No. 1 at ¶ 22). But this allegation does not impede the applicability to this case of the Court's analysis from *Ashe I*. Plaintiffs do not allege that this

"advise[ment]" mission is so broad that it encompasses advising members and the public what conduct does and does not run afoul of criminal laws—which would be a very ambitious mission that could be perilous indeed, given the stakes involved. To state the proposition more specifically, Plaintiffs do not allege that the League's "advise[ment]" mission encompasses providing what could amount to legal advice regarding particular criminal laws related to "the democratic process" (including voting). Accordingly, the Court rejects the League's frustration-of-purpose theory on essentially the same grounds that the Court did so in *Ashe I*.[18]

As to the League's diversion-of-resources theory, the Court concluded in *Ashe I* that this purported injury was too speculative because the League showed only that it *anticipated* that it *might* need to divert its resources to respond to confusion that *might* occur from the *possible* enforcement of Section 115(b). The Court in *Ashe I* also held that the plaintiffs' diversion-of-resources injury failed alternatively because the League did not tie its purported injury to a legally recognized right, as required by Sixth Circuit case law. In *Ashe I*, after explaining that the League's purported diversion-of-resources injury was too speculative, the undersigned wrote:

> The League relies also on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) for the proposition that "consequent drain on the organization's resources" constitutes an organizational injury. (Doc. No. 34 at 9–10) (citing *Havens*, 455 U.S. at 379). In *Havens*, the plaintiff—a public interest organization (HOME) whose mission was to "make equal opportunity in housing a reality"— claimed it had organizational standing to challenge renting practices of the defendant, an apartment owner, that were allegedly discriminatory in violation of

---

[18] The Court here notes that allowing an organization to claim injury (to support standing) based on the organization having a purported educational mission that includes delineating a particular law would be a slippery slope. How is a court to determine when a law is sufficiently confusing and uncertain that an organization can claim injury based on its purported educational mission that covers that law? If the parameters are too broad, then an organization with a purported educational mission related to a particular law seeking to challenge that law would effectively be able almost automatically to claim a cognizable injury from the law (due to the law allegedly sewing confusion and uncertainty that the organization purportedly is mission-bound to address via expenditure of educational resources). In this way, the mere existence of laws, which so often could be subject to a claim that they are confusing and uncertain to at least some degree in at least some contexts, would open the gates of standing to organizations that wish to challenge particular laws that supposedly are within the scope of the organization's educational mission.

the Fair Housing Act of 1968. 455 U.S. at 368, 378. As part of a broader "racial steering" practice in which the defendant was allegedly engaged, the defendant lied to black renters, including a member of HOME, about whether any rental units were available. *Id*. at 366. The Supreme Court found that HOME had organizational standing because it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id*. at 379. The Court also found that this injury was "more than simply a setback to the organization's abstract social interests[.]" *Id*.

It is true that a drain on an organization's resources would constitute an organizational injury in some instances. But the Sixth Circuit has counseled against making such a finding where the plaintiff organization cannot tie its alleged injury to a legally recognized right. For example, in *Fair Elections Ohio v. Husted*, the Sixth Circuit denied standing to a voter outreach group (the AMOS Project) challenging state election laws. 770 F.3d [456,] 461 [(6th Cir. 2014)]. The AMOS Group claimed it had organizational standing to sue over a state election law because "it would be required to divert its resources to retraining its volunteers and informing its members and constituents of the risks attendant with getting arrested during the weekend prior to the election." *Id*. at 459 (internal citations omitted).

The Sixth Circuit reversed the district court's conclusion that this alleged injury was sufficient to confer organizational standing. In doing so, the Sixth Circuit distinguished *Havens* by explaining that in *Havens*, unlike in *Husted*, the plaintiff (HOME) suffered a "distinct and palpable" injury to an enforceable right under the Fair Housing Act to truthful housing information. *Id*. at 460, n.1.[19] This right, which was intrinsic to HOME's activities of providing counseling and referral services for low-and moderate-income home seekers, was directly interfered with by the defendants deliberately providing misinformation to members of HOME. *Id*. Thus, HOME diverted its resources to counteract the defendant's misinformation in an effort to enforce its legally recognized right to truthful housing information. As the Sixth Circuit noted in *Husted*, the requirement that an organization tie its injury to a legally recognized right serves as an important standing limitation because without it "an advisor or organization can be deemed to have Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law." *Id*. at 460.

In contrast to the plaintiff organization in *Havens*, the plaintiff organization in *Husted* (the AMOS Project) did not point to any statute granting the organization a right that it had (and the enforcement of which could be aided via diversion of resources). And because the Amos Project did not point to any such statute, it could

---

[19] In *Husted*, the Sixth Circuit distinguished *Havens* also on the grounds that the plaintiff organization in *Havens* (HOME) sought damages, not an injunction. *Id*. (citing *Havens*, 455 U.S. at 378). As the Sixth Circuit pointed out, an allegation of awardable damages is a "classic basis for standing" and "plaintiffs who have standing to bring a damages claim do not necessarily have standing to bring a claim for injunctive relief." *Id*. (citing *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983)). Likewise, *Husted* is distinguishable from this case because Plaintiffs do not seek an award of damages.

not be said that the Amos Project diverted its resources to protect against the interference of, or to enforce, any legally recognized right. Rather, the AMOS Project diverted its resources to advise others on how to comply with existing election law. *See id.*

The League likewise fails to tie its injury to a legally recognized right. The League states that its anticipated diversion of resources would be made to address voter confusion and intimidation. But the League does not (and cannot) point to any statute granting it an enforceable right to clearer information about voting requirements. Nor has the League alleged that Defendants have interfered with any such right by providing false information to the League or any of its members. In short, the League has not alleged any legally recognized right as a basis for organizational standing, and therefore it cannot rely on *Havens* to establish organizational standing. Because the League cannot establish injury-in-fact, it cannot show that it has organizational standing by a diversion-of-resources theory.

*Ashe I*, 2024 WL 923771, at **11-12.

This time around, the League points to several allegations in the instant Complaint (ones absent from the complaint in *Ashe I*) that Plaintiffs contend establish a diversion-of-resources injury that is sufficient to confer standing. Specifically, Plaintiffs point to paragraph 25 of the Complaint, which states:

During the 2023-24 fiscal year, LWVTN invested a considerable amount of its most valuable asset—volunteer time—addressing the impact of Sections 115(b) and (c). LWVTN spent over 225 collective volunteer hours responding to the new law. Additionally, over $1,000 was spent on support services and resources connected with that volunteer time. Had that time and money not been spent on responding to Sections 115(b) and (c), the League would have dedicated those resources to developing two time-sensitive pilot projects that were included in the budget for fiscal year 2023-24. It was anticipated that the major start-up costs for both of these projects would be the significant level of time and energy that the LWVTN's volunteer leadership team would need to devote to building the foundational collaborative relationships needed for successful implementation. The urgent need to address the impact of Sections 115(b) and (c) on Tennessee's voters required LWVTN to forego plans for the two pilot projects.

(Doc. No. 1 at ¶ 25). Additionally, Plaintiffs have alleged that the League budgeted $10,600 to respond to voter confusion and uncertainty created by Sections 115(b) and (c) and pointed to the supplemental declaration of the League's President, Debby Gould ("Gould"), wherein Gould

stated that, as of the time Plaintiffs filed their Response (July 1, 2024), the League had already spent $8,406.95 to respond to such confusion and uncertainty.[20] (Doc. No. 58-2 at ¶ 7).[21]

Despite these additional allegations, the League's diversion-of-resources theory still fails. First, this theory fails because the League still has not tied its purported injury to a legally recognized right. Although Plaintiffs correctly state that in *Ashe I* the undersigned rejected the League's diversion-of-resources theory on the basis that such an injury was too speculative, Plaintiffs fail to acknowledge the undersigned's alternative basis for doing so: the League could not tie its injury to a legally recognized right, as required by Sixth Circuit case law. The instant Complaint does nothing to cure the League's failure in *Ashe I* to tie its injury to a legally recognized right, and (perhaps recognizing this) Plaintiffs make no mention of this failure in their Response. Accordingly, the League's purported diversion of resources is insufficient to confer standing for the reasons stated above in *Ashe I*.

Additionally, the Supreme Court's decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), issued on June 13, 2024, bars the League from establishing an injury for standing purposes based on its diversion of resources.[22] In *Alliance for*

---

[20] Plaintiffs' current argument that Section 115(b) is too confusing and uncertain for the League (or members of the public) to discern whether Section 115(b) would apply to particular conduct is in tension with the fear-based argument made by Individual Plaintiffs as their purported basis for the injury-in-fact requirement of standing. The assumption in Individual Plaintiffs' fear-based argument is that Section 115(b) is sufficiently clear to raise Individual Plaintiffs' fear above the speculative level. But Plaintiffs' current argument with respect to the League is that the law is not sufficiently clear to eliminate the need to educate its members (and the public) on the law. The Court finds it appropriate to note this tension, even though the Court's decision does not ultimately rely on the existence of it.

[21] As indicated above, a facial attack on standing (as Defendants make here) questions merely the sufficiency of the pleading. Thus, the Court may not consider matters outside the Complaint. But even if the Court did consider Gould's declaration (attached to Plaintiff's Response), that would not change the outcome.

[22] The Supreme Court's decision in *Alliance for Hippocratic Medicine* also forecloses the League's purported "frustration of purpose" injury addressed above. In *Alliance for Hippocratic Medicine*, the

*Hippocratic Medicine*, individual doctors and four medical associations sued the FDA, arguing that the FDA's decision to relax its regulatory requirements for mifepristone, an abortion drug, violated the Administrative Procedure Act. *Id*. at 372-74. The Supreme Court first considered the threshold question of whether the plaintiffs had standing to sue under Article III of the Constitution. *Id*. at 378. After determining that the individual doctors lacked standing to sue, the Supreme Court turned to whether the medical associations had standing. *Id*. at 394. The medical associations claimed to have organizational standing "based on their incurring costs to oppose FDA's actions." *Id*. at 394. According to the medical associations, the FDA "'caused' the associations to conduct their own studies on mifepristone so that [they] could better inform their members and the public about mifepristone's risks," and "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education," all of which (according to the medical associations) "caused [them] to spend 'considerable resources' to the detriment of other spending priorities." *Id*. Rejecting the medical association's assertion that standing exists when an organization diverts its resources in response to a defendant's actions, the Supreme Court wrote:

> [A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way.

---

medical associations essentially argued that the FDA "'impaired' their 'ability to provide services and achieve their organizational missions,'" in part by "causing" and "forcing" the medical associations to expend resources to oppose the FDA's actions. *Alliance for Hippocratic Medicine*, 602 U.S. at 394. Although Plaintiffs frames the League's purported injury (or injuries) as being two separate injuries (frustration of purpose and diversion of resources), the League really takes the same position as did the medical associations in *Alliance for Hippocratic Medicine*, essentially arguing that Defendants "frustrated" the organization's purpose *by* "*causing*" the League to expend resources on certain undertakings on which it would not otherwise spend those resources. But as the Supreme Court concluded in *Alliance for Hippocratic Medicine,* here, "[t]hat argument does not work to demonstrate standing" because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*.

*Id*.

Like the Sixth Circuit in *Husted*, the Supreme Court in *Alliance for Hippocratic Medicine* rejected the plaintiffs' reliance on *Havens* for the proposition that standing exists when an organization diverts its resources in response to a defendant's actions. *Id*. at 395. "*Havens* does not support such an expansive theory of standing," the Supreme Court stated. *Id*. And for good reason. If standing existed simply because an organization diverts its resources in response to a defendant's action, "all the organizations in America would have standing to challenge almost every . . . policy they dislike, provided they spend a single dollar opposing those policies." *Id*. Refusing to countenance such a scenario, the Supreme Court explained that *Havens* was "an unusual case" wherein the defendant gave the plaintiff (an issue-advocacy group *and* housing counseling service) false information about apartment availability which "directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id*. In contrast to the circumstances in *Havens*, in *Alliance for Hippocratic Medicine* the FDA's actions of relaxing mifepristone regulations did not "impose any similar impediment to the medical associations' advocacy business," because the medical associations claimed only that the FDA failed to properly collect and disseminate information about mifepristone, which they argued in turn "makes it more difficult for them to inform the public about safety risks." *Id*. Moreover, the medical associations had not pointed to any federal law requiring the FDA to disseminate such information even upon request by members of the public. *Id*. at 395-96.

Similar to the medical associations in *Alliance for Hippocratic Medicine*, the League asserts that the purported vagueness of Section 115(b) makes it more difficult to advise its members and the public how to participate in the democratic process. This alleged impediment is

much closer to the medical associations' purported injury in *Alliance for Hippocratic Medicine* than it is to the plaintiff's injury in *Havens* because (for reasons stated above) it does not directly affect and interfere with the League's core activities of helping Tennessee citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be active participants in democracy. Moreover, like the medical associations, the League has not pointed to any statute granting it an enforceable right to clearer information about voting requirements.

Plaintiffs attempt to distinguish *Alliance for Hippocratic Medicine* on the grounds that in claiming to have standing "based on their incurring costs to oppose the FDA's actions," the medical associations were referring only to costs incurred specifically as part of their litigation strategy, whereas the League has incurred costs related to a non-litigation mission. (Doc. No. 58 at 12, n. 9). But the Supreme Court made no such distinction in *Alliance for Hippocratic Medicine*. To the contrary, the Supreme Court summarized the specific arguments the medical associations made regarding costs they incurred, which included "conduct[ing] their own studies on mifepristone so that [they] could better inform their members and the public about mifepristone's risks," and "'expend[ing] considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Alliance for Hippocratic Medicine*, 602 U.S. at 394. These expenditures are not "simply part of [the medical associations'] litigation strategy" as Plaintiffs assert. Rather, these expenditures—which are similar to the types of expenditures the League has made in response to Defendants' actions—are part of the medical associations' non-litigation mission. Therefore, Plaintiffs' attempt to distinguish *Alliance for Hippocratic Medicine* fails.

Accordingly, the League cannot establish Article III standing to sue Defendants under Section 115(b).

### III. (Lack of) Standing to Challenge Section 115(c)

In *Ashe I*, the Court concluded that the plaintiffs lacked standing to sue under Section 115(c) because they could not establish an injury-in-fact or that enjoining the defendants therein (Hargett, Goins, and Skrmetti) from enforcing Section 115(c) would redress their purported injury. That analysis applies equally in this case. As Plaintiffs acknowledge, what Section 115(c) requires is for the officer of elections at each polling place to post a notice of Section 115(b) in a prominent, highly visible location within the polling place. (Doc. No. 1 at ¶ 68). Thus, Section 115(c) imposes a requirement only on the officer of elections at each polling place. And although it (and the sign that it mandates) does *refer to* requirements and prohibitions imposed *by Section 115(b)*, Section 115(c) imposes on Plaintiffs no requirements or prohibitions. Likewise, although it (and the sign that it mandates) refers to criminal punishment authorized by Section 115(b), Section 115(c) prescribes no punishments nor sanctions of any kind (including criminal punishment or, for that matter, civil fines) against anyone, including individual voters. Accordingly, the Court finds that Plaintiffs have not plausibly alleged an injury from Section 115(c) that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560.

Moreover, even if Plaintiffs could establish an injury-in-fact, Plaintiffs cannot show that enjoining Defendants from enforcing Section 115(c) would redress their injury. Even if Defendants were enjoined from enforcing Section 115(c), election officials would still be required by law (irrespective of any direction from any Defendant) to post the notice at each polling place. Thus, Plaintiffs' assertion that their requested injunction would give them the relief they seek is speculative at best.

Therefore, the Court finds that Plaintiffs do not have standing to sue Defendants with respect to Section 115(c).

## IV. Defendants Are Entitled to Sovereign Immunity

Even if Plaintiffs had standing to sue Defendants, Defendants would be protected by sovereign immunity. The Eleventh Amendment deprives federal courts of subject-matter jurisdiction when a citizen sues a State (including the citizen's own state, based on how the Eleventh Amendment has been construed), unless that State has abrogated that sovereign immunity.[23] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984). A suit against a state official in his official capacity (like the current lawsuit) is treated as a suit against the State. *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 66 (1989). However, an exception to sovereign immunity exists under certain circumstances. Specifically, under *Ex Parte Young*, 209 U.S. 123 (1908), a suit challenging the constitutionality of a state official's action is not treated as a suit against the State (and thus, the defendants are not entitled to sovereign immunity) if it seeks *prospective* relief to end a continuing violation of federal law.[24] *Russell*, 784 F.3d at 1046-47. So despite the general rule entitling them to sovereign immunity, state officers may be enjoined— under the EPY exception—with respect to "their future actions on behalf of the state if those actions would violate the federal Constitution." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1040 (6th Cir. 2022).

However, the EPY exception "does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." *Russell*, 784 F.3d at 1047. "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996) (quoting *1st Westco Corp. v. Sch. Dist. of*

---

[23] The parties agree that no such abrogation exists here.

[24] The Court refers to this exception herein as the "EPY exception."

*Phila.*, 6 F.3d 108, 113 (3rd Cir. 1993)). "Holding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend *Young* beyond what the Supreme Court has intended and held." *Id*. Thus, for the EPY exception to apply, the state official must "threaten and be about to commence proceedings." *Id*. "[T]hat is, it must be likely that the official will enforce the law against the plaintiff." *Doe v. DeWine*, 910 F.3d 842 (6th Cir. 2018) (citing *Russell*, 784 F.3d at 1048); *see also Young*, 209 U.S. at 155–56 ("[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, *and who threaten and are about to commence proceedings*, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." (emphasis added)); *Western Union Tel. Co. v. Andrews*, 216 U.S. 165, 166 (1910) (holding that *Young* applies precisely when a statute authorizes prosecutors to enforce a statute and they threaten and are about to commence proceedings to enforce the statute); *Dombrowski v. Pfister*, 380 U.S. 479, 483 (1965) (noting that federal judicial power is properly exercised when state officers "'threaten and are about to commence proceedings'" (quoting *Young*)); *Kelley v. Metropolitan County Bd. of Educ.*, 836 F.2d 986, 990–91 (6th Cir. 1987) (declining to apply *Young* when defendants had not threatened to enforce any unconstitutional act), *cert. denied*, 487 U.S. 1206 (1988)).

Plaintiffs argue that their claims against the DAs "fall squarely within the [EPY] exception" because the DAs are state officials who administer and enforce the challenged law, the DAs are sued in their official capacity only, and Plaintiffs seek only prospective declaratory and injunctive relief. (Doc. No. 58 at 18-19). But that is not enough for the EPY exception to apply. Plaintiffs must also plead facts (accepted as true for purposes of the instant Motion) sufficient to establish that at least one of the DAs has "threaten[ed to enforce Section 115(b)] and [is] about to commence

proceedings." *Children's Healthcare*, 92 F.3d at 1416. For the reasons stated above with respect to standing to sue the DAs, Plaintiffs fail to allege a threat of enforcement by any of the DAs named as a Defendant. Accordingly, the EPY exception does not apply, and the DAs are entitled to sovereign immunity.

With respect to the question of Hargett and Goins's entitlement to sovereign immunity, the parties quarrel over whether a defendant must have authority to prosecute in order for the EPY exception to apply. Relying primarily on *Russell*, Plaintiffs contend that prosecutorial authority is not required to bring a state official within the EPY exception; rather, it is sufficient that a state official have a role in administering and/or implementing the statute. (Doc. No. 58 at 18). And because Hargett is charged with the "administration of elections in Tennessee" and Goins has the "express duty to 'investigate or have investigated by local authorities the administration of the [State's] election laws and report violations . . . for prosecution,'" (Plaintiffs argue), the EPY exception clearly applies. But even assuming arguendo that the mere authority to "administer" and/or "implement" a statute—without authority to prosecute violations of it—is sufficient enforcement authority to bring a state official within the EPY exception (a point that Defendants challenge), that does not erase the above-mentioned requirement that a state official "threaten and be about to commence proceedings." (*Id.* (quoting Doc. No. 1 at ¶¶ 28-29)). That is, even if the enforcement authority necessary to invoke the EPY exception is broader than prosecutorial authority, it still must be *likely* that the official will enforce the law—via some administrative or investigative action—against the plaintiff. So assuming arguendo that the EPY exception applies even when a state official threatens to merely take some "administrative" action, or to investigate

a possible violation of a statute (without authority to prosecute for a violation), the state official must still "*threaten and be about to commence*" that administrative action or investigation.[25]

The Complaint does not allege any threat by Goins or Hargett, or indeed anything showing a likelihood that either plans to take (much less is "about to commence") any administrative or investigative action regarding possible violations by anyone (much less, any Plaintiff) of Section 115(b). At best, the Complaint states that Hargett gave a speech in April 2022 in which he stated that "[p]eople need to understand when you go vote in a primary, you are supposed to vote in the primary in which you are a member of the party . . . . The DA could actually prosecute that if people are willingly going in and voting in the other party." (Doc. No. 1 at ¶ 71). But this statement hardly constitutes a threat to take administrative or investigative action regarding Section 115(b). Rather, it is merely an undeniably true statement about a criminal statute based on the very nature of criminal statutes (which by definition are statutes enforceable via prosecution of violations

---

[25] In its standing analysis above, the Court concluded that statements made by DA Lawson in a letter he wrote do not show an intent to prosecute potential violations of Section 115(b). However, the Court did not address whether DA Lawson's statements could constitute an intent to investigate violations of Section 115(b), because that issue was not relevant to the standing analysis. Given the Court's assumption arguendo that the EPY exception applies when a state official threatens to merely to investigate (but not prosecute) a possible violation of a statute, the question of whether DA Lawson has made a threat that he is "about to commence" an *investigation* is relevant to the sovereign immunity analysis even though not relevant to the standing analysis. Oo the Court addresses that question here, and concludes that DA Lawson has not made such a threat.

Via the letter, DA Lawson simply advises the citizen to whom he is responding that, in the event he or she "become[s] aware of *anyone* breaking *any* provision of *any* law," he or she should report that information "to the authorities for an investigation." (Doc. No. 1 at ¶ 75) (emphasis added). That anodyne statement in no way constitutes a "threat" by DA Lawson that he is "about to commence" an investigation into potential violations of Section 115(b) specifically. Moreover, DA Lawson clearly states in response to the citizen's concerns about possible violations of Section 115(b) that no crime has yet been committed. (*Id.*). In light of this statement (and in the noted absence of any violation), the Court cannot conclude that DA Lawson's letter indicates a "threat" that he is "about to commence" an investigation. So even assuming arguendo (as the Court did above) that the EPY exception applies when a state official threatens to merely to investigate (but not prosecute) a possible violation of a statute, DA Lawson does not fall within the EPY exception.

thereof). And on its face, it refers to someone *other than Goins*—i.e., the DA in each judicial district—being the one to take enforcement action.

Thus, not only because Plaintiffs lack standing to sue Defendants, but also because Defendants are entitled to sovereign immunity, Defendants must be dismissed from this case. *See Russell*, 784 F.3d at 1045 ("If any [particular] officer is shielded by the Eleventh Amendment, that individual defendant must be dismissed from the case.").[26]

CONCLUSION

For the reasons indicated herein, Defendants' Rule 12(b)(1) motion (Doc. No. 49) will be GRANTED, and as a result all claims against Defendants will be DISMISSED without prejudice for lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).

An appropriate corresponding order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[26] Because all Defendants are protected by sovereign immunity and thus must be dismissed from the case, Plaintiffs' purported injury is not redressable through a favorable ruling. *See Russell*, 784 F.3d at 1045 ("If all Defendants are protected by the Eleventh Amendment here, then while [plaintiff's] judicially cognizable injury is fairly traceable to Defendants, we would nonetheless lack the power to remedy the injury through a favorable ruling, in which event we would be required to order the district court to dismiss the entire suit for want of jurisdiction."). So even if Plaintiffs could establish injury-in-fact (and causation), the Court's conclusion with respect to sovereign immunity would necessarily render Plaintiffs unable to establish jurisdiction. *Id*. The Court notes that although *Russell* suggests that the lack of jurisdiction resulting from the applicability of sovereign immunity is the result of a *lack of standing* in particular, it seems unclear as to whether that suggestion is widely accepted as valid. But whether or not couched as a lack of standing, a lack of subject-matter jurisdiction is the result of the applicability of sovereign immunity.